UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM A. NOGUERA,<br><br>　　　　Petitioner,<br><br>　　　　v.<br><br>RON DAVIS, Warden of California<br>State Prison at San Quentin,<br><br>　　　　Respondent. | CASE NO. CV94-6417-CAS<br><br>**DEATH PENALTY CASE**<br><br>ORDER |

## I.　BACKGROUND

Petitioner William A. Noguera is currently in the custody of the California Department of Corrections and Rehabilitation pursuant to a judgment of the Superior Court of California, Orange County, following his April 29, 1987 conviction of the first-degree murder (Cal. Pen. Code §187(a)) of Jovita Navarro, the mother of Petitioner's girlfriend, Dominique. (RT 8312.) The financial gain special circumstance allegation (Cal. Pen. Code §190.2, subd. (a)(1)) was found true. (RT 8313.) The jury also found Petitioner used a dangerous and deadly weapon in the murder of Ms. Navarro (Cal. Pen. Code §12022(b)). (RT 8313-15.)

On May 18, 1987, the penalty phase of Petitioner's capital trial began. The jurors began penalty phase deliberations at 3:05 p.m. on May 21, 1987 and

adjourned at 4:30 p.m. (RT 8711.) The following afternoon, on May 22, 1987, the jury returned a verdict of death. (RT 8717-18.) On January 29, 1988, the trial court heard and denied Petitioner's Motion for New Trial and for Modification of the Verdict, heard and denied Petitioner's Request to Strike the Special Circumstance, and sentenced Petitioner to death. (RT 8787-8874.)

On December 28, 1992, the California Supreme Court affirmed Petitioner's conviction and death sentence on direct appeal. *See People v. Noguera*, 4 Cal.4th 599 (1992). The California Supreme Court denied Petitioner's petition for rehearing on March 10, 1993. (Dkt. No. 148, Lodgment No. 8.) The United States Supreme Court denied Petitioner's petition for writ of certiorari on June 30, 1994. *Noguera v. California*, 512 U.S. 1253 (1994).

Petitioner filed his initial state habeas petition in the California Supreme Court on November 16, 1992. (Dkt. No. 148, Lodgment No. 4.) The California Supreme Court summarily denied the petition on September 29, 1993, with three justices noting their opinions that an order to show cause should issue. *In re Noguera*, No. S029779. (Dkt. No. 336, Lodgment No. 3.)

Almost one year later, Petitioner initiated federal habeas corpus proceedings by filing a Request for Appointment of Counsel and Stay of Execution in the United States District Court for the Central District of California. (Dkt. Nos. 1-2.) The Court appointed Rober Bryan and Nicholas C. Arguimbau on January 27, 1995. (Dkt. No. 11.) Petitioner filed a 91-claim federal habeas petition on July 26, 1996, and, just four days later, Mr. Arguimbau filed an Urgent Motion to Withdraw as Counsel. (Dkt. Nos. 99, 101-104.) The Court granted Mr. Arguimbau's Motion on August 5, 1996. (Dkt. No. 106.) On July 7, 1997, Petitioner moved to stay and abey the federal proceedings pending exhaustion of 31 unexhausted claims in state court. (Dkt. No. 154.) After initially dismissing the petition for failure to exhaust state remedies on October 28, 1997, the Court granted in part petitioner's motion for reconsideration on December 23, 1997, but

denied Petitioner's Motion to Hold Proceedings in Abeyance. (Dkt. No. 174.)

On January 12, 1998, Petitioner filed an Amended Petition for Writ of Habeas Corpus, excluding the 31 unexhausted claims. (Dkt. Nos. 175-76.) He filed his first exhaustion petition in the California Supreme Court on March 2, 1998, raising the unexhausted claims. (Dkt. No. 336, Lodgment 4.) While the exhaustion petition was pending in state court, the parties proceeded to litigate the merits of the first amended federal petition.[1] Respondent filed an Answer to the Amended Petition on September 9, 1998; and on February 9, 1999, Petitioner filed a Traverse to the State's Answer to the Amended Petition for Writ of Habeas Corpus. (Dkt. Nos. 180, 187-88.) On February 23, 1999, Petitioner filed a Motion for Evidentiary Hearing, which the Court denied on April 14, 2000, after a December 10, 1999 hearing. (Dkt. Nos. 190, 211, 216.) In its denial order, the Court ruled that Petitioner was not entitled to an evidentiary hearing on Claims 2, 4, and 60 of the first amended petition because those claims were without merit. (Dkt. No. 216.) The Court determined that, as to the remaining claims, the record was sufficiently developed to decide those claims without evidentiary hearing. (Dkt. No. 216.)

The parties filed supplemental briefs on the remaining claims in the first amended petition and, on August 31, 2001, the parties appeared for oral argument on the remaining claims. (Dkt. Nos. 225, 236, 227, 228, 245.) During oral argument, the Court noted that, on careful examination of the record and in view of changes in the law since the Court's October 28, 1997 Order, some of the claims in the first amended petition which the Court believed to be exhausted, might not be exhausted. The Court invited supplemental briefing, and the parties filed additional briefs on the question. (Dkt. Nos. 247, 248, 250.)

---

[1] The Court denied Petitioner's motion requesting that the parties not be required to litigate federally until completion of exhaustion proceedings in state court. (Dkt. Nos. 183-84.)

Meanwhile, the California Supreme Court denied petitioner's exhaustion petition on October 17, 2001. *In re Noguera*, No. S068360. (Dkt. No. 336 Lodgment 8.) Subsequently, on November 29, 2001, Petitioner filed a Motion for Leave to File Second Amended Petition. (Dkt. No. 249.) On April 9, 2003, the Court dismissed the first amended petition as a partially unexhausted, "mixed" petition and denied the motion to file the second amended petition because it included the same unexhausted claims as the first amended petition. (Dkt. No. 256; see also, Dkt. No. 262.) The Court also invited Petitioner to file a fully exhausted Third Amended Petition; and, on June 9, 2003, Petitioner simultaneously filed petitions in state and federal court. (Dkt. No. 258; Dkt. No. 336, Lodgment 9.) On July 28, 2003, this Court granted Petitioner's Motion to Hold Proceedings in Abeyance Pending Determination by State Court of Petitioner's Exhaustion Petition. (Dkt. Nos. 258, 259, 262, 263.) While Petitioner's third state petition was pending, he filed a fourth state petition on August 29, 2005. (Dkt. No. 336, Lodgment 13.) The third and fourth state habeas petitions were both denied on October 10, 2007. *In re Noguera,* No. S116529; *In re Noguera*, No. S136826. (Dkt. No. 336, Lodgments 12 & 15.) Petitioner notified the Court of the denials in a letter dated October 20, 2007, and this Court vacated the stay on November 5, 2007. (Dkt. Nos. 272, 273.)

On February 22, 2008, this Court again stayed the proceedings in this action due to Petitioner's then-pending request for substitution of federal habeas counsel and, on March 3, 2008, Robert R. Bryan filed a Request to Withdraw as Attorney for Petitioner. (Dkt. Nos. 284, 292.) The Court appointed the Federal Public Defender as advisory counsel on March 4, 2008, and on July 21, 2008, granted Bryan's request to withdraw. (Dkt. No. 286, 305.) The Office of the Federal Public Defender for the Central District of California was appointed as counsel for Petitioner on August 14, 2008. (Dkt. No. 307.)

Petitioner filed the operative Fourth Amended Petition for Writ of Habeas

Corpus on March 9, 2009. (Dkt. Nos. 317, 318.)  Respondent filed an Answer on November 6, 2009, and Petitioner filed a Traverse on January 19, 2010.  (Dkt. Nos. 330, 338.)  The parties began litigating discovery issues in 2010.  However, after the United States Supreme Court issued its decision in *Cullen v. Pinholster*, 563 U.S. 170 (2011), on April 4, 2011, this Court ordered Respondent to file a motion to dismiss, identifying on a claim by claim basis those claims Respondent contends are subject to summary dismissal without discovery or an evidentiary hearing. (Dkt. No. 351.)  Respondent filed a Motion to Dismiss on February 6, 2012. (Dkt. No. 355.) Petitioner filed an Opposition to Respondent's Motion to Dismiss on June 20, 2012, and Respondent filed a reply on October 16, 2012. (Dkt. No. 361.)  On November 2, 2012, Petitioner filed a Surreply, and Respondent filed a Reply Response to the Surreply on November 26, 2012.  (Dkt. Nos. 366, 368.)

On March 7, 2013, the case was reassigned from the calendar of Judge Stotler to the calendar of Judge Snyder for all further proceedings. (Dkt. No. 369.)

## II.    STATEMENT OF FACTS

This factual summary is taken in large part from the California Supreme Court's summary of the facts in its December 28, 1992 opinion.  Pursuant to 28 U.S.C. §§2254(d)(2), (e)(1), the state court's summary of facts is presumed correct.  To the extent that Petitioner does not present clear and convincing evidence to the contrary, the Court adopts the factual recitations set forth by the state appellate court.  *See Vasquez v. Kirkland*, 572 F.3d 1029, 1031 n. 1 (9th Cir. 2009) ("We rely on the state appellate court's decision for our summary of the facts of the crime.")

### A.    <u>Guilt Phase Evidence</u>

#### 1.    *The murder of Jovita Navarro: the prosecution's case*

Sometime between 11:30 on the night of April 23, 1983, and 4:30 the following morning, Jovita Navarro was murdered in the bedroom of her La Habra

bungalow. La Habra police found Jovita's body after being summoned by a "911" call from Mindy Jackson, Jovita's next-door neighbor. After securing the area, investigating officers went to the Jackson residence where they interviewed Dominique Navarro, Jovita's 16–year–old daughter. Dominique told them she had returned from a date with her then–18–year–old boyfriend around 2:00 that morning; after chatting briefly with her mother, who was reading in bed, and removing her makeup, Dominique had gone to bed and to sleep. She was awakened a few hours later, she said, by muffled noises coming from her mother's adjacent bedroom.

After a few minutes, Dominique heard her mother cry out, "get out, mi hija ("hija" is Spanish for "daughter"), get out, mi hija." Frightened, and unsure what was afoot in the darkened house, Dominique told Mindy Jackson that she sat at the end of her bed for "about 5 to 15 minutes," before running blindly down the hall and out the back door. As she ran, she heard a "thumping" sound coming from her mother's bedroom, followed by what sounded like the footsteps of someone close behind her.

Reaching Mindy Jackson's house, Dominique banged on the door until Jackson answered. In tears and near hysteria, according to Jackson, Dominique said that someone was hurting her mother; she begged Jackson to return to the house with her. Jackson refused. Instead, she managed to telephone 911. Authorities logged in the emergency call at 4:43 a.m.

To the casual observer, the murder scene suggested that Jovita had been killed in the course of a combined rape and burglary. Her body was found lying across the bed, her feet touching the floor. Her nightgown had been pulled up around her neck, and a pair of blue women's underpants was wadded between her thighs. The contents of the bedroom were in disorder—bedding and blankets had been pulled from the bed and thrown haphazardly on the floor; a jewelry box, normally resting on a dresser, was found upended on the hall floor, its contents of

costume jewelry scattered along the hallway.

Jovita had been badly beaten, mainly on the face and head. She had suffered extensive facial injuries, including dental and eye damage from at least 18 blows to the face and head; her skull had multiple depressed fractures and her scalp had been loosened and torn by the force of the beating; her nose almost touched her left cheek and "defensive wounds" were evident on her arms and hands. On her left thigh, examiners found oval shaped wounds.[2] Blood was spattered on the walls, furniture, and ceiling of the bedroom.

The pathologist who examined the body testified that the proximate cause of Jovita Navarro's death was not the beating but asphyxiation—induced by pressing a rounded object against her throat with such force that her larynx was crushed, choking off her airway. Extensive cyanosis, or blueing, of her lips and pinpoint hemorrhaging beneath her eyelids confirmed that Jovita had, in effect, been strangled. Had she not died from a lack of oxygen, the pathologist concluded, the severity of the beating would have resulted in her death.

In the bedroom, La Habra police investigators found a "tonfa," a martial arts weapon fashioned from red oak and resembling a police baton; it lay shattered in two pieces, testimony to the savagery of the beating. In a neighboring yard, police recovered a piece of wood shaped like a broom handle, with traces of blood on it. In another yard, they found a bloodstained tan leather glove; bloodstains were also found on a cinder block wall adjoining a nearby lot. The bloodstains on the tonfa, the wooden dowel, and the glove were the same type as Jovita's. An analysis of fibers removed from the brick wall and the glove were consistent with those found on the bedroom blanket.

La Habra and Orange County authorities began an extensive forensic

_____

[2] At trial, extensive testimony by forensic ondontologists was presented by both sides, pro and con, as to whether the wounds were human bite marks and, if so, when they were inflicted. The prosecution placed in evidence casts of the teeth of 12 individuals, including Petitioner, to support its claim that Petitioner had bitten Jovita in the act of killing her.

investigation of the crime scene. As a result, investigators concluded that much of the evidence pointing to a burglary and rape/murder of Jovita had been faked. An autopsy failed to reveal the presence of sperm in Jovita's vagina. An analysis of vaginal swabs was consistent with a finding that the victim might have had intercourse several hours earlier the preceding evening, but there was no external evidence of sexual trauma consistent with a forcible rape. Tests of the blue underwear for semen or other stains indicative of forcible sex were negative.

Although the bedroom appeared to have been rifled, nothing of value was missing, including a clear plastic change purse stuffed with small bills that the intruder could not have overlooked. The jewelry box had been knocked from its place and its contents scattered, but none of the jewelry had been taken. An analysis of the blood-spattering pattern on the bed linen suggested that it had been removed from the bed and arranged on the floor *after* the murder, rather than during a struggle. Moreover, the spatter analysis indicated that Jovita had probably been murdered *before* the contents of the bedroom had been upended. Finally, investigators could find no evidence that Jovita's killer had gained entry into the house by force.

The on-scene criminalist, examining the body at 6:30 that morning, initially estimated the time of death at between three and six hours prior to his examination, or between 12:30 and 3:30 a.m. Although routine examinations for lividity and rigor mortis—two crude measures used to approximate time of death—confirmed that estimate, it was later revised upward, to 4:45 a.m., based on Dominique's statement to the police that she had heard her mother cry out around 4:30 that morning.

After conducting an autopsy on the morning of April 24, the examining pathologist concluded on the basis of the quantity and state of the contents of her stomach that Jovita died sometime between 12:30 and 2:30 that morning. Another criminalist, who observed the body at the autopsy, testified that the 4:45 a.m. time

8

of death stated in the certificate of death was based on Dominique's account of the murder. Although that hour was not substantially out of line with the results of the lividity and rigor tests, had it not been for Dominique's statement the condition of the body suggested that death had occurred between three and seven hours earlier, or between 11:30 the preceding evening and 3:30 that morning.[3]

An inquiry into Jovita's financial circumstances disclosed that she carried $13,000 in life insurance and at the time of her death had approximately $14,000 in accumulated retirement benefits from her job as an Orange County welfare clerk. The house, with a market value of around $90,000, had an existing mortgage balance of $7,000; Jovita carried mortgage insurance in the event of her death. Dominique was her sole heir.

As their investigation deepened, police learned from interviews with Margaret Garcia, a coworker, and Mindy Jackson that relations between Jovita and Dominique's boyfriend, the Petitioner, were not always pleasant. Jovita had quarreled with both over Dominique's repeated violations of curfew hours, over her pregnancy and subsequent abortion, and over what Jovita regarded as a steep decline in Dominique's schoolwork and attendance beginning with the onset of her relationship with Petitioner. Garcia and Jackson both testified that Jovita was planning to sell the house and move to the beach, or to enlist Dominique in the Army, in an attempt to separate her from Petitioner. According to Garcia, Jovita had considered hiring a "hit man" to kill Petitioner. About two weeks before her death, Garcia said, Jovita told her that she had awakened in the middle of the night to find the front door open and all the outside lights off. Jovita found Dominique wandering the house; Dominique told her that she had opened the front door, but could not explain why.

About two or three weeks before Jovita's murder, Jackson had witnessed her

---

[3] As of 2 a.m. on April 24, 1983, the seasonal change from standard to daylight saving time occurred; clocks were set forward by one hour.

screaming into the telephone and had seen Dominique in the bathroom crying. Jovita had slammed down the handset and said that she "hated" Petitioner and didn't want to hear his name again. "If he [Petitioner] is going to use his karate on me, he has another thing coming," Jackson reported Jovita as saying.

Through interviews with Dominique and Petitioner, authorities learned that on the night of Jovita's death the two had gone to a party in West Covina about 7:00. They left around 11:30 that evening, they told police, and went for a hamburger with a friend; after dropping their friend off, they parked for an hour or two, returning to Jovita's house between 1:30 and 2:00 a.m. Dominique let herself in, locked the front door, opened a sliding glass door at the rear of the house in order to let the family dogs out, and turned off the outside lights. After chatting briefly with her mother, she went to bed.

Petitioner told police that after leaving Dominique's house, he went home. Because he had missed the 1:30 curfew set by his mother, he had to knock on the front door to get in. His grandmother, who was watching television with his mother, let him in. After talking with them and being lectured by his mother about being late, he went to bed.

La Habra police also interviewed Peter LaCombe, a diesel mechanic employed by the county who had been dating Jovita for about two weeks before her death. LaCombe had spent the evening of April 23 with Jovita at her house. The two ate a substantial dinner around 7:30 and then danced and watched television. Around 11:00 that evening, LaCombe testified, he left for home.

From interviews with the adjoining neighbor, Mindy Jackson, police learned that Jackson and her husband had entertained a friend, Tom Brooks, on the night of the murder. All three had heard loud noises coming from the Navarro house around 11:00 p.m. Brooks testified that he had gone outside to investigate but had noticed nothing remarkable; the house was dark and the sliding glass door at the rear was closed. Later that night, they heard what Brooks described as "really

radical noises" next door. The three had gone outside about 1:45 a.m. They heard Jovita's two dogs barking and growling; there were no lights either outside or inside the Navarro house.

Despite discrepancies in the accounts given by Dominique and Petitioner and others interviewed, and suspicions presented by the forensic analyses, police made no arrests in the case until late in the year. In December, the police inspector assigned to the investigation, Sergeant Keltner, received a tip from Steve Arce, an acquaintance of Petitioner, that Ricky[4] Abram might have information relevant to the homicide investigation. Keltner interviewed Abram on December 14, 1983, at the Ione Juvenile Detention Facility near Sacramento, where Abram was an inmate. He tape-recorded most of their conversation.

In substance, Abram testified at trial that he decided to disclose his knowledge of the murder scheme after Keltner told him of his possible criminal liability for Jovita's murder. Abram told the jury that in March 1983, a few weeks after he first met Petitioner, the two had driven in Petitioner's car to pick up Dominique at her house. On the way over, Petitioner told Abram that he intended to kill Dominique's mother. He asked for Abram's help in borrowing a shotgun for that purpose. After picking up Dominique, the three drove to Bob's Big Boy, a nearby restaurant. There, according to Abram, they discussed in detail Petitioner's plan to murder Jovita.

The murder, Abram testified, would be staged to look as if Jovita had been killed by a burglar in the middle of the night. Dominique's role would be to let the two men into the house; Abram would fake the burglary and take any items of value; Petitioner would kill Jovita with a shotgun blast. Petitioner and Dominique would then have intercourse, Abram said, after which Dominique, feigning a rape, would run hysterically next door to report the break-in and murder/rape. For his

---

[4] Record documents and pleadings refer to Mr. Abram alternatively as "Ricky" and "Rickie." For simplicity sake, the Court is using the spelling found in the Reporter's Transcript.

part in the crime, Petitioner promised Abram $5,000 from the $25,000 obtained from "the mother's insurance." In addition to his share of the insurance, Abram told the jury, Petitioner promised he could live in Jovita's house with Petitioner and Dominique, since "the house would be passed on to the daughter after the mom's death."

After leaving the restaurant and returning Dominique to her house, Petitioner dropped Abram off. In early April, Abram was arrested for auto theft, convicted and imprisoned. He testified that he did not see Petitioner or Dominique again until the trial, regarded the murder scheme as a "joke," and did not learn of Jovita's death until Keltner told him.

Police interviews with others provided additional evidence of Petitioner's involvement in the murder. Steve Arce told the jury of a fight he had with Petitioner around the Easter preceding Jovita's death. Petitioner had used his feet to quickly knock Arce to the ground. Arce had also seen tonfas in Petitioner's car and had seen Petitioner spinning a tonfa in his hand. He had seen Petitioner wearing tan leather motorcycle gloves on occasion, and had seen him with Ricky Abram. He also related an incident about a month before Jovita's death in which Petitioner kicked two individuals in a street encounter, knocking one of them to the ground in "thirty seconds maybe," using martial arts techniques. A couple of weeks before the murder, Arce had heard Petitioner complain about Jovita's interference in his relationship with Dominique; Petitioner had said that he wanted "to kill that bitch," referring to Jovita.

In the months following Jovita's death, investigators learned, Dominique spoke frequently with Petitioner by telephone from an uncle's house, where she was now living. Once, the uncle testified, he overheard Dominique complain after completing a call from Petitioner that she did not want to call the family attorney again; she was upset, her uncle said. The attorney, Dominique's cousin, confirmed that Dominique made a growing number of telephone calls to him in the months

following Jovita's death; her questions centered on the disposition of the family home and details concerning the amount of Jovita's insurance, the sums due creditors, and any surplus in the estate; Dominique was "very emphatic," he testified, that she did not want the house to be sold. That June, the attorney attended a meeting with Petitioner, his mother, Dominique, and another lawyer at which the possibility of Dominique's legal emancipation was discussed.

In December 1983, authorities arrested Dominique and Petitioner. Charged with one count of conspiracy to commit murder and one count of first degree murder, Dominique was tried as a juvenile, convicted and sentenced to the custody of the Youth Authority; her conviction was affirmed on appeal.

## 2. *The defense case.*

Petitioner testified in his defense. His relations with Jovita were "fair," he said; sometimes they got along well, sometimes not. He had lived at the Navarro residence for a few months in 1982 with Jovita's consent. The three regularly had dinner out about once a month. Petitioner denied any involvement in Jovita's death. He had talked to Ricky Abram once about selling him an automobile engine; they had gone to Bob's Big Boy with Dominique. While they had lunch, Dominique had complained that her mother had restricted her for coming home late. He never saw Abram again. Petitioner had studied martial arts as a young teenager, but had not earned a black belt and had no training in the use of a tonfa; nor had he ever owned one. He had been badly stabbed in the thigh in a fight in June of 1982, still walked with a limp and had difficulty stretching one of his legs. He had never had any knowledge of Jovita's life insurance.

On the night of Jovita's murder, Petitioner testified, he had gone with Dominique to a party in West Covina. After a hamburger with a friend, the two had parked for awhile. He dropped Dominique off at her house around 2:00 that morning, went home and, after talking with his mother and grandmother, went to bed. About 3:30 a.m., he heard a knock on his window. It was Margaret Noone, a

13

friend; he let her in and she stayed in bed with him for about an hour before leaving by the window. Around 6:00 a.m., Dominique had telephoned; she was very upset; Petitioner dressed and left immediately for her house.

Petitioner's sister supported his testimony regarding the injury to his leg and the fact that he had never received training in or owned a tonfa. His grandmother confirmed that Petitioner had arrived home around 2:00 on the morning of Jovita's murder.

Petitioner's mother testified that he returned home at exactly 2:00 on the morning of April 24, 1983—she had been watching a program on Spanish television and remembered the time. She spoke to Petitioner briefly as to why he was late. Later that night, Petitioner's mother heard the sound of voices in her son's room. Through the door, she asked Petitioner who was there; he told her to go to sleep and later refused to tell her the identity of his visitor. Asked about the meeting with Dominique's attorney in June of 1983, at which Dominique's legal emancipation was discussed, Mrs. Noguera testified that she had earlier accompanied Dominique to the Social Security office in an effort to help her receive some benefits—she had been without any income in the five months since her mother's death. A previous attorney had done nothing, and Dominique needed help.

Margaret Noone testified that around 3:00 a.m. on April 24, 1983, she had climbed into the window of Petitioner's bedroom and stayed for about one and one-half hours. She left when she heard someone knocking on the bedroom door.

Two of Petitioner's friends testified to prior conversations with Ricky Abram and Steve Arce. Wilbur Boring told the jury that in December of 1983, after he had implicated Petitioner in Jovita's murder, Abram had told him that "he [Petitioner] got what he deserved; he put me in jail so I put him in jail." Patrick Reese testified that Arce had told him that he cooperated with the police in exchange for immediate release on a felony charge; Arce had observed a pair of

14

nunchuku sticks in Petitioner's possession, not tonfas, and had told Reese that he (Arce) should not have told the police some of the things he told them.

### 3. *Rebuttal.*

The prosecution recalled Margaret Noone to the stand. She stated that, in testifying on behalf of Petitioner, she had "lied ... [about] basically almost everything" because she "was getting threats if I didn't say something like that [i.e., her alibi testimony] something would happen to me or my family because [Petitioner] has such powerful friends, even though he's in jail." She had seen nunchuku sticks in Petitioner's car, and he liked to "mess around with them." Noone told the jury that she had been granted immunity from prosecution by the People.

In addition, the trial court took judicial notice that Dominique had been called as a witness by the prosecution, had refused to testify, and been adjudged in contempt of court. A deputy marshal testified that shortly after Dominique was held in contempt, he heard Petitioner say to another inmate that Dominique "did a good job and tell her I love her."

### B. **Penalty Phase Evidence**

### 1. *The prosecution's case.*

John Antenucci testified that in August 1983, he placed a newspaper advertisement to sell a used Volkswagen. Accompanied by a friend, Petitioner responded to the advertisement and expressed an interest in buying the automobile. The three went for a test drive, during which Petitioner stopped the car and told Antenucci to get out because his friend "has a gun." Petitioner's friend displayed a handgun and threatened to shoot Antenucci, who managed to grab the car keys and escape.

### 2. *The defense case.*

Petitioner called 15 witnesses, including a former employer, his high school girlfriend, and several friends of his family. Several witnesses testified that

Petitioner's family was very close until his parents were divorced in 1980. His mother testified that Petitioner, who had hunted, fished, and gone on motorcycle trips with his father, appeared to take the divorce hard; he became quieter, more serious, less playful. She asked the jury to spare her son's life. Petitioner's sister and grandmother also asked the jury not to impose the death penalty.

Several witnesses testified to Petitioner's participation in the California Blue Jacket Cadette Corps, a youth organization modeled on the Navy. Junior high school authorities testified to his participation in such sports as basketball, track, softball, and football; elementary school employees testified that Petitioner's parents had been involved actively in his schooling.

## III. STANDARDS OF REVIEW

Because Petitioner's original §2254 habeas petition was filed after April 24, 1996, the Antiterrorism and Effective Death Penalty Act ("AEDPA"), codified in 28 U.S.C. §2254, applies to petitioner's claims. *Woodford v. Garceau*, 538 U.S. 202, 210 (2003) (holding that applicability of the AEDPA depends on whether the petitioner filed an application for habeas relief seeking an adjudication on the merits before or after the AEDPA's effective date); *see also Lindh v. Murphy*, 521 U.S. 320, 322 (1997).

Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state's adjudication of his claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §2254(d); *Harrington v. Richter*, 562 U.S. 86, 98 (2011); *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). If a petitioner satisfies either subsection (1) or (2) for a claim, then the federal court considers the claim de novo. *See Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (when

section 2254(d) is satisfied, "[a] federal court must then resolve the claim without the deference AEDPA otherwise requires."); *Frantz v. Hazey*, 533 F.3d 724, 737 (9th Cir. 2008).

The United States Supreme Court held in *Cullen v. Pinholster*, that when determining whether a petitioner has satisfied §2254(d), a court may only consider evidence in the state court record. 563 U.S. at 180-81, 185 n. 7. The Court held that "review under §2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Id.* at 180-81. Further, the Court found that section 2254(d)(2) "includes the language 'in light of the evidence presented in the State court proceeding,' . . . [providing] additional clarity . . . on this point." *Id.* at 185 n. 7.

The "contrary to" and "unreasonable application" clauses of section 2254(d) have separate and distinct meanings. *Williams v. Taylor,* 529 U.S. at 404. The Supreme Court explained that a state court decision is "contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from our precedent." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (internal quotations omitted). A state court decision is an "unreasonable application" of federal law if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Williams v. Taylor,* 529 U.S. at 414; *Lockyer,* 538 U.S. at 75. "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Lockyer,* 538 U.S. at 75 (internal citation omitted); *Richter,* 562 U.S. at 101. "While the 'objectively unreasonable' standard is not self-explanatory, at a minimum it denotes a great[ ] degree of deference to the state courts." *Clark v. Murphy,* 331

17

F.3d 1062, 1068 (9th Cir.), *cert. denied,* 540 U.S. 968 (2003). The United States Supreme Court made clear in *Richter* that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter,* 562 U.S. at 101 (citing *Yarborough v. Alvarado,* 541 U.S. 652, 664 (2004)).

Further, under §2254(d)(2), a decision adjudicated on the merits in a state court will not be overturned on factual grounds unless it is objectively unreasonable in light of the evidence presented in the state-court proceeding. 28 U.S.C. §2254(d)(2). Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary. 28 U.S.C. §2254(e)(1); *Cudjo v. Ayers*, 698 F.3d 752, 762 (9th Cir. 2012) ("[T]he statement of facts from the last reasoned state court decision is afforded a presumption of correctness that may be rebutted only by clear and convincing evidence."), *cert. denied,* 133 S.Ct. 2735 (2013). Thus, this Court must defer to the state court's factual findings unless a defect in the process is so apparent that "any appellate court ... would be unreasonable in holding that the state court's factfinding process was adequate." *Hibbler v. Benedetti*, 693 F.3d 1140, 1146-47 (9th Cir. 2012), *cert. denied,* 133 S.Ct. 1262 (2013); *Taylor v. Maddox,* 366 F.3d 992, 1000 (9th Cir.), *cert. denied,* 543 U.S. 1038 (2004).

In this case, many of Petitioner's claims were raised in his state petitions to the California Supreme Court, and summarily denied. In such a case where the state court decision is unaccompanied by an explanation, "the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98; *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir.), *cert. denied*, __ U.S. __, 134 S.Ct. 514 (2013). The Supreme Court has stated that "a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision;" the court must not "overlook[] arguments that would otherwise justify the state court's result . . ."

*Richter,* 562 U.S. at 102. "Crucially, this is not a de novo review of the constitutional question," as "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Walker v. Martel*, 709 F.3d at 939 (*quoting Richter*, 562 U.S. at 102); *see also Murray v. Schriro*, 745 F.3d 984, 996-97 (9th Cir. 2014). Section 2254(d) provides "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that the state-court decisions be given the benefit of the doubt." *Pinholster*, 563 U.S. at 181 (internal quotations omitted).

Respondent contends that the California Supreme Court's denial of Petitioner's state habeas petition was, on its face, "on the merits," and, as such, Petitioner must overcome §2254(d)'s relitigation bar. Respondent maintains that Petitioner cannot demonstrate that the state court's resolution of his claims was unreasonable under either §2254(d)(1) or (d)(2).

Petitioner argues, on the other hand, that the California Supreme Court's "process and analysis of his claims were unreasonable in light of California's special procedures for resolving habeas petitions." (Dkt No. 361, Response at 9.) He notes that the California Supreme Court's failure to issue an OSC in his case, under California law, necessarily means that the Court found that – assuming the truth of Petitioner's allegations and drawing all legitimate inferences in his favor – he had *not* made a prima facie case for relief on any of his claims. The summary denial, Petitioner suggests, was a final determination that is not entitled to deference because (1) it is not a merits determination such that 2254(d) applies;[5]

_____

[5] Petitioner argues that the California Supreme Court's failure to issue an OSC (1) implies the California Supreme Court "presumed the regularity of the proceedings over the truthfulness of [Petitioner's] allegations, thereby holding him to a higher standard than is required for the establishment of a prima facie claim under federal law"; and (2) demonstrates the "curious distinction that the California procedures make between OSC grants and summary denials" such that "a finding of sufficiency [is] tentative and non-binding, while a finding of insufficiency strengthens the underlying conviction and sentence and is unreviewable and binding." (Dkt. No. 361, Response at 14-16.) Petitioner contends that "the fact that Noguera presented sufficient factual allegations to make a prima facie case and the CSC summarily found that he did not suggests that application of the *Duvall* presumptions, rather than analysis of Noguera's claims under the applicable federal law, was determinitive." (Dkt No. 361, Response at 17.)

19

(2) the California Supreme Court's failure to issue an OSC constitutes an unreasonable interpretation and application of clearly established federal law under §2254(d)(1)[6]; and (3) if the state court based its denial of claims on factual findings or credibility determinations counter to Noguera's allegations and evidence, its decision  amounts to an unreasonable determination of facts under §2254(d)(2).[7]  As such, Petitioner suggests that §2254(d) and *Pinholster* have no relevancy to this Court's review of his claims.

Respondent rejects Petitioner's "process-based" theory as an attempt to "broaden federal review beyond whether state court factual findings were reasonable 'in light of the evidence presented in the State court proceeding.'" (Dkt. No 365, Response to Opposition at 15.)

## IV.   REVIEW OF CLAIMS

### A.   Conflict of Interest

#### 1.   *Legal Standard*

"Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S. 261, 271 (1981); *see also Cuyler v. Sullivan*, 446 U.S. 335 (1980).  The United States Supreme Court recognizes the unique nature of claims that arise out of a conflict of interest and does not impose on such claims the *Strickland v. Washington,* 466 U.S. 668, 687 (1984) two-pronged standard for ineffective assistance of counsel claims.  Rather, prejudice is presumed if the petitioner demonstrates that his attorney "actively represented

---

[6]  Citing *Nunes v. Mueller*, 350 F.3d 1045, 1054-55 (9th Cir. 2003) (finding state court's failure to issue an OSC and hold an evidentiary hearing to be an unreasonable application of clearly established federal law where petitioner's allegations clearly made out a prima facie case of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984).)

[7]  Citing *Nunes*, again, Petitioner suggests "federal courts need not defer to state-court fact-findings made in the absence of an evidentiary hearing." (Dkt No. 361, Response at 21.)  He argues that the Supreme Court's 2010 decision in *Wellons v. Hall*, 558 U.S. 220, 223 n. 3 (2010), and its more recent opinion in *Brumfield v. Cain*, __ U.S. __, 135 S.Ct. 2269 (2015), confirm that AEDPA does not require blind deference to inadequate state-court fact-findings.  (Dkt. No. 361, Response at 21 and Dkt No. 373, Notice of Recent Supreme Court Authority.)

conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance." *Sullivan*, 446 U.S. at 348, 350; *see also Wood*, 450 U.S. at 272-73; *Strickland*, 466 U.S. at 692; *Mickens v. Taylor*, 535 U.S. 162, 168 (2002). Conflicts can also arise from successive representation, particularly when a substantial relationship exists between the cases, such that the "factual contexts of the two representations are similar or related." *Trone v. Smith*, 621 F.2d 994, 998 (9th Cir.1980); *see also Fitzpatrick v. McCormick*, 869 F.2d 1247, 1252 (9th Cir.1989). The Supreme Court, however, has left open the question whether conflicts in successive representation that affect an attorney's performance require a showing of prejudice for reversal. *See Mickens*, 535 U.S. at 176.

> **2.** ***CLAIM 1: Lead Defense Counsel Suffered from a Conflict of Interest Due to His Representation of Petitioner's Mother and Because of Her Financial Control Over the Defense***

In Claim 1, Petitioner alleges that his rights under the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution were violated because his trial attorney, Lorenzo Pereyda, suffered from an undisclosed and unwaived conflict of interest that permeated the entire trial and adversely affected the representation Petitioner received. He argues that counsel's conduct violated his rights to the effective assistance of counsel, an impartial jury, a reliable special circumstance determination, a fair and reliable guilt and penalty determination, confrontation and cross-examination, Equal Protection and Due Process. (Dkt. 317 at 37-49.)

Petitioner raised this claim in his November 16, 1992, initial state habeas petition (Dkt. No. 148, Lodgment 4 at 57-64), and again in his June 9, 2003, exhaustion petition (Dkt. No. 336, Lodgment 9 at 11-42). On both occasions, the California Supreme Court summarily denied the claim on the merits. (Dkt. No. 336, Lodgments 3 & 12.) In 2003, the California Supreme Court alternatively denied the claim as untimely, successive, and as having previously been raised in

the 1992 petition. (Dkt. No. 336, Lodgment 12.)

In moving to dismiss Claim 1, Respondent contends that Petitioner has failed to meet his burden of showing that the California Supreme Court's resolution of the claim amounted to an unreasonable application of clearly established Federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding and, as such, Petitioner is barred from relitigating the claims in federal court. 28 U.S.C. §2254(d); *Pinholster*, 563 U.S. at 181-82. This Court disagrees.

a. *Facts Presented to the California Supreme Court*

(1) *Initial State Habeas Petition*

Petitioner first raised the issue of counsel's alleged conflict of interest in Claim III of his initial state habeas petition. In the 1992 petition, Petitioner presented the following facts:

– Petitioner's mother, Sarita Salinas, retained Pereyda in 1979 to represent her in the divorce action she brought against Petitioner's father, Guillermo Noguera.

– Pereyda represented Salinas in very acrimonious proceedings, through which he became privy to confidential information regarding the turmoil that pervaded the Noguera household and the emotional problems of both of Petitioner's parents.

– During their attorney-client relationship, Salinas told Pereyda that her husband was violent, had threatened her with bodily harm and death on many occasions, and had audio tapes detailing sexual acts involving animals. She also confided her concerns that Guillermo's actions were having a negative effect on her children.

– Salinas subsequently retained Pereyda to represent Petitioner in his capital trial.

– Pereyda was unable to present evidence of Petitioner's home life because to do so would have violated his on-going duty of loyalty to Salinas.

In support of Claim III, Petitioner submitted a Declaration of A. Lorenzo Pereyda (Exhibit I), in which Mr. Pereyda stated:

– His law practice included criminal law and general civil litigation, including

family law.

– He had never before tried a death penalty case.

– He has known the Noguera family for many years and has Petitioner since he was twelve or thirteen years old.

– He was retained to represent Petitioner's mother in connection with her bitter and acrimonious divorce from Petitioner's father. The litigation began in 1979 and ended in 1983.

– Ms. Salinas told Mr. Pereyda that Guillermo was violent and had a bad temper and that she had concerns that his actions were negatively impacting her children.

– At the time he was retained to represent Petitioner, Mr. Pereyda "was not totally familiar with capital litigation, particularly penalty phase strategy and tactics."

– Mr. Pereyda never explained to Petitioner that he had a legal conflict due to his prior representation of Salinas; and he never obtained a waiver of that conflict.

– The vast majority of Pereyda's trial preparation in Petitioner's case was spent on guilt-phase issues. Pereyda did no mental health investigation in connection with the guilt phase and did not explore Petitioner's social history to determine how family dynamics may have impacted his culpability.

– Pereyda's strategy for the penalty phase was to focus on the positive aspects of Petitioner's life, and present him in a favorable light. Pereyda did not investigate the case to determine whether Petitioner's troubled background could have contributed to the crime, or mitigated punishment.

– Pereyda was a potential witness during the penalty phase as he could have testified regarding mitigating information he learned about the family during the divorce proceedings.

(2)     *Third State Habeas Petition*

Petitioner again raised the conflict of interest issue in his 2003 state habeas petition in which he presented additional facts in support of the claim, including Declarations from his father (Exhibit D), his sister (Exhibit G), his mother (Exhibit

AA), and his wife (Exhibit GG). Petitioner alleged that not only was his mother a former client of Mr. Pereyda, to whom he owed an ongoing ethical and legal duty of confidentiality and loyalty, she was also paying Petitioner's legal fees and influencing his representation. In particular, Petitioner alleged:

– In retaining Pereyda, Ms. Salinas still considered him to be her attorney, obligated first to her. (Exhibit AA.) Moreover, she was outspoken regarding her control over Petitioner's defense and Mr. Pereyda's role as protector for her family. (Exhibit GG.)

– Mr. Pereyda had an on-going ethical and legal duty to Ms. Salinas and a fundamental obligation not to reveal information disclosed in confidence during the divorce proceedings.

– Ms. Salinas retained Mr. Pereyda to represent Petitioner on the condition that he not bring out any of the family's problems, but exclusively present the false defense that Petitioner was not the killer. (Exhibit G, Exhibit AA.)

– Ms. Salinas advised Mr. Pereyda that he was not to use any of the information he learned about the family during the divorce proceedings in Petitioner's defense case. (Exhibit AA.)

– Mr. Pereyda could not pursue viable mental health defenses and did not have Petitioner examined by a mental health expert because Ms. Salinas prohibited Mr. Pereyda from using information he "knew about [Petitioner] and the family . . . in [Petitioner's] defense." (Exhibit AA.)

– Mr. Pereyda could not question Ms. Salinas regarding her behavior which contributed to Petitioner's mental health problems.

– Mr. Pereyda could not present evidence of the violence and abuse perpetrated by Ms. Salinas and other members of the family. (Exhibit D, Exhibit G.)

– Although Petitioner told his mother that he thought he was crazy, and asked her for help, she told him there would be no mental health examinations, and that he was not crazy. She told him, "just listen to my attorney, who would get him out."

(Exhibit AA.)

– Salinas told Petitioner it did not matter that his defense team knew that he killed Jovita, "[her] attorney was going with the innocence defense." (Exhibit AA.)

– Petitioner's father did not trust Mr. Pereyda because he was Salinas' divorce attorney. (Exhibit D.)

– Neither Mr. Pereyda nor Mr. Campos attended a special circumstance/penalty conference on the case at which the case could have settled at a penalty less than death. According to Petitioner, "he was not consulted but rather instructed by his mother and his attorneys to refuse any type of settlement. . . . By accepting a plea bargain, his mother stated that everyone would say he committed the homicide and people would look at her as a bad mother." (Exhibit GG at 7.)

– Mr. Pereyda never disclosed his conflict of interest to Petitioner and there was no waiver. (Exhibit I.)

In light of the conflict, Petitioner argued, Mr. Pereyda failed to provide petitioner with constitutionally adequate representation.

        b. *California Supreme Court's Post Card Denial Was Premised on an "Unreasonable Determination of the Facts" Within the Meaning of §2254(d)(2)*

To demonstrate that the state court erred under §2254(d)(2), "the petitioner must establish that the state court's decision rested on a finding of fact that is 'objectively unreasonable.'" *Hibbler v. Benedetti*, 693 F.3d at 1146, quoting *Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004) and *citing Miller El v. Cockrell*, 537 U.S. 322, 340 (2003) and *Taylor v. Maddox*, 366 F.3d at 999. The question "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); *Wood v. Allen*, 558 U.S. 290, 301 (2010); *Brumfield v. Cain*, 135 S.Ct. at 2277.

In *Hibbler*, the Ninth Circuit noted that "[c]hallenges under §2254(d)(2) fall

into two main categories. First, a petitioner may challenge the substance of the state court's findings and attempt to show that those findings were not supported by substantial evidence in the state court record. Second, a petitioner may challenge the fact-finding process itself on the ground that it was deficient in some material way." *Hibbler*, 693 F.3d at 1146 [citations omitted]; *see also Taylor v. Maddox*, 366 F.3d at 999 (concluding that "unreasonable determination" in §2254(d)(2) may be based on a contention "that the [state court] finding is unsupported by sufficient evidence, that the process employed by the state court is defective, or that no finding was made by the state court at all." (citations omitted).) "Thus, if a petitioner challenges the substance of the state court's findings. . . '[the federal court] must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.'" *Hibbler,* 693 F.3d at 1146, *citing Taylor v. Maddox*, 366 F.3d at 1000. "Similarly, when the challenge is to the state court's procedure, 'mere doubt as to the adequacy of the state court's findings of fact is insufficient; '[the court] must be satisfied that *any* appellate court to whom the defect [in the state court's fact-finding process] is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate.'" *Hibbler*, 693 F.3d at 1146-47, *citing Lambert v. Blodgett*, 393 F.3d at 972. It is relevant to remember, *Pinholster* itself was a summary denial case. "The ultimate issue is whether the state's fact-finding procedures were reasonable; this is a fact-bound and case-specific inquiry." *Hibbler*, 693 F.3d at 1147. The state court does not act unreasonably in denying relief without holding an evidentiary hearing "so long as the state court could have reasonably concluded that the evidence already adduced was sufficient to resolve the factual question." *Id.*

This Court finds that Petitioner has satisfied his burden under AEDPA, showing that the state court's decision was premised on either "an unreasonable application of clearly established federal law" or an "unreasonable determination

of the facts" within the meaning of §2254(d). On the record before this Court --
the record presented to the California Supreme Court in state habeas corpus
proceedings -- Petitioner has demonstrated that his trial attorney "actively
represented conflicting interests" and that the conflict "adversely affected his
lawyer's performance." *Sullivan*, 446 U.S. at 350. The evidence presented to the
California Supreme Court in two state habeas corpus actions – including
declarations from both Mr. Pereyda and Ms. Salinas – indicated that Mr. Pereyda
was influenced in his basic strategic decisions by the interests of the third party
who hired him, petitioner's mother. Pereyda labored under an actual conflict of
interest throughout his representation of Petitioner, triggering the California
Supreme Court's duty to inquire further. Assuming Petitioner's allegations, and
the declarations submitted in support thereof, to be true (*see Pinholster,* 563 U.S.
at 188 n. 12), nothing more was required for a prima facie case. *See Nunes*, 350
F.3d at 1054 (taking petitioner's claims "at face value," petitioner "clearly made
out a prima facie case of ineffective assistance" where petitioner claimed his
"attorney gave him the wrong information and advice about the state's plea offer"
and that if he had "been informed accurately" he would have taken the plea offer).

"Under California law, the California Supreme Court's summary denial of a
habeas petition on the merits reflects the court's determination that 'the claims
made in th[e] petition do not state a prima facie case entitling the petitioner to
relief.' " *Pinholster*, 563 U.S. at 188 n. 12 (quoting *In re Clark*, 5 Cal.4th 750, 770
(1993)). As noted, the evidence Petitioner presented was sufficient to raise a
doubt as to Mr. Pereyda's representation and suggest that he labored under a
conflict of interest that adversely affected his performance. *Sullivan*, 446 U.S. at
348. Nevertheless, the California Supreme Court twice summarily rejected the
claim. (Dkt. No. 336, Lodged Docs. 3 & 8.) There was no reasonable basis for the
California Supreme Court's decisions. *See Pinholster*, 563 U.S. at 187-88 (where
there has been a summary denial, petitioner satisfies §2254 by showing "'there

was no reasonable basis' for the California Supreme Court's decision") (quoting *Richter*, 562 U.S. at 98). As such, the California Supreme Court's denials of this claim were based on "an unreasonable application of clearly established federal law" or an "unreasonable determination of the facts" within the meaning of §2254(d), and are not entitled to AEDPA deference.

This Court must now proceed to evaluate Petitioner's claim de novo. *Panetti v. Quarterman*, 551 U.S. 930 (2007) (when "the requirement set forth in § 2254(d)(1) is satisfied[, a] federal court must then resolve the [constitutional] claim without the deference AEDPA otherwise requires"); *see also Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (reviewing the prejudice requirement for an ineffective assistance of counsel claim de novo after identifying a § 2254(d)(1) error in the state court's evaluation of the performance requirement); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (similar); *Penry v. Johnson*, 532 U.S. 782, 795 (2001) (holding that even if the state court's decision was contrary to Supreme Court case law, "that error would justify overturning Penry's sentence only if Penry could establish that the error" was prejudicial under the pre-AEDPA standard for evaluating prejudice); *Williams*, 529 U.S. at 406 (explaining that when a federal habeas court identifies a "contrary to" error, it "will be unconstrained by § 2254(d)(1)").

Clearly established federal law holds that an actual conflict of interest arises where an attorney represents multiple clients with divergent interests. *See, e.g., Sullivan*, 446 U.S. at 348; *Mickens v. Taylor*, 535 U.S. at 166–69; *Holloway v. Arkansas*, 435 U.S. 475, 487–90 (1978); *Glasser v. United States*, 315 U.S. 60, 75–76 (1942), *superseded by rule on other grounds, Bourjaily v. United States*, 483 U.S. 171 (1987). Conflicts can also arise from successive representation. *Mickens*, 535 U.S. at 175-76; *Lewis*, 391 F.3d at 989 (applying Sixth Amendment analysis to question of successive representation); *Trone v. Smith*, 621 F.2d at 998; *see also Fitzpatrick v. McCormick*, 869 F.2d at 1252. The Sixth Amendment does

not protect against a "mere theoretical division of loyalties." *Mickens*, 535 U.S. at 171. Rather, it protects against conflicts of interest that adversely affect counsel's performance. *Id.* at 172 n. 5. Indeed, in *Mickens*, the Court held that "actual conflict" is defined by the effect a potential conflict had on counsel's performance.

In *Wood v. Georgia*, three indigent defendants convicted of distributing obscene materials had their probation revoked for failure to make monthly installment payments on their fines. In reviewing the case, the United States Supreme Court found that the record suggested the root of the problem might be the "divided loyalties of their counsel." 450 U.S. at 263. At all times during the proceedings against them, the defendants had been represented by a lawyer for their employer (the owner of the "adult" theater and bookstore that purveyed the obscenity), and the employer paid the attorney's fees and had promised to pay the fines. However, when the employer declined to make installment payments on the fines, and because their attorney "ha[d] acted as the agent of the employer and ha[d] been paid by the employer, [the Court found that] the risk of conflict of interest . . . [was] evident." *Id.* at 267. The record suggested that the employer's interest in reducing the fines he would have to pay for his indigent employees in the future diverged from the defendants' interest in obtaining leniency or paying lesser fines to avoid imprisonment. The Supreme Court found that the possibility that counsel was actively representing the conflicting interests of the employer and employee-defendants "was sufficiently apparent at the time of the revocation hearing to impose upon the court a duty to inquire further." *Id.* at 272. The Court remanded to the trial court "to determine whether the conflict of interest that th[e] record strongly suggest[ed,] actually existed" because, on the record before it, the Court could not "be sure whether counsel was influenced in his basic strategic decisions by the interests of the employer who hired him." *Id.* at 272-73.

The present record is sufficient to determine that Mr. Pereyda operated under an actual conflict of interest in representing Petitioner. Mr. Pereyda had an

29

on-going ethical and legal duty to Petitioner's mother, and a fundamental obligation not to reveal information disclosed in confidence during the divorce proceedings. Ms. Salinas retained Mr. Pereyda to represent Petitioner with the understanding that she would control the defense and that Mr. Pereyda would not bring out any of the family's problems, but would exclusively present the false defense that Petitioner was not the killer. (Exhibit G, Exhibit AA.) Clearly, Mr. Pereyda could not simultaneously act in the best interest of both clients. In his declaration, Mr. Pereyda admits that he represented Petitioner's mother in her divorce from Petitioner's father; that he never explained to Petitioner that he had a legal conflict due to his prior representation of Petitioner's mother; and that he never obtained a waiver of that conflict. The Court finds that Petitioner has established that Mr. Pereyda did, in fact, have an unwaived conflict of interest in representing Petitioner. The ultimate question, then, is whether the conflict adversely impacted Mr. Pereyda's performance as Petitioner's capital defense attorney. This Court finds that the answer to that question is yes.

First, Petitioner was adversely affected by Mr. Pereyda's failure to attend a pre-trial special circumstance/penalty conference at which the case could have settled at a penalty less than death. There is no explanation for such a failure, except that facilitating a plea for Petitioner was contrary to his mother's expressed personal interests. Petitioner "was not consulted but rather instructed by his mother and his attorneys to refuse any type of settlement. . . . By accepting a plea bargain, his mother stated that everyone would say he committed the homicide and people would look at her as a bad mother." (Exhibit GG at 7.)

Accordingly, Petitioner was negatively impacted by Mr. Pereyda's approach to his guilt-phase defense. Despite overwhelming evidence of Petitioner's participation in the murder, and Mr. Pereyda's personal knowledge of Petitioner's family and mental health problems, Mr. Pereyda failed to investigate and present evidence which could have undermined the prosecution's theory of the case as

death eligible. Counsel failed to investigate and discover evidence that Dominique constantly complained to Petitioner about how terrible her mother was to her, and begged him to protect her.[8] Counsel failed to investigate and present evidence that, in the fall of 1982 Dominique had become pregnant with Petitioner's child; Petitioner and Dominique were excited and had shared the news with Petitioner's family; Jovita had subsequently forced Dominique to have an abortion; and the chain of events sent Petitioner into despair.[9] Counsel failed to investigate and present evidence that Petitioner may have suffered from brain-damage and mental illness that may have influenced his decision-making,[10] and was also under the influence of steroids and other substances when he committed the homicide.[11] Rather, despite damaging witness statements from Ricky Abram, Steve Arce, Margaret Garcia, and Mindy Jackson, Mr. Pereyda instead presented a doomed innocence defense accompanied by a coerced alibi witness. While such an approach would normally inspire confusion and curiosity, under the circumstances of Petitioner's representation counsel's rationale is evident. As Ms. Salinas told Petitioner, it did not matter that his defense team knew that he killed Jovita, "[her] attorney was going with the innocence defense." (Exhibit AA.)

Furthermore, Petitioner was adversely affected by Mr. Pereyda's failure to adequately investigate and present a thorough mitigation case. At Ms. Salinas's

---

[8]  In her declaration, Dominque states "I complained to [Petitioner] almost every time I saw him, telling him how terrible my life was with my mother. I tried to use him to solve my problems. [¶] I was also filled with rage, hurt, and confusion that I wanted my mother out of my life. I constantly pressured [Petitioner] to come up with a solution. I manipulated him by telling him that if he really loved me, he would take care of it. (Exh. A, ¶¶16-17.)

[9]  Petitioner's sister attests that "[a]fter [Petitioner] learned that Dominique's mother had forced her to have an abortion, he was really upset. He talked about it constantly. He cried, and talked later about how Jovita had destroyed and murdered their baby." (Exh. G, ¶¶60-61.)

[10]  Mr. Pereyda did not have Petitioner examined by a mental health expert because Ms. Salinas prohibited Mr. Pereyda from using information he "knew about [Petitioner] and the family . . . in [Petitioner's] defense." (Exhibit AA.)

[11]  Throughout the federal habeas petition, Petitioner admits to having committed the homicide. *See e.g.,* Dkt. No. 317 at 43 (¶116); 72 (¶193); 89 (¶239); 90 (¶240); 92-93 (¶244-45).

direction, Mr. Pereyda focused his penalty phase presentation on the positive aspects of Petitioner's life. Mr. Pereyda thereby obscured extensive available mitigating evidence, detailing the reality of Petitioner's struggles and challenges, in favor of presenting Ms. Salinas in the most positive light.

Having considered the arguments and evidence presented in connection with Claim 1 of Petitioner's federal habeas petition, the Court concludes that Petitioner is entitled to habeas corpus relief on his conflict of interest claim. As the Supreme Court has noted, "inherent dangers that arise when a criminal defendant is represented by a lawyer hired and paid by a third party" including: the risk "that the lawyer will prevent his client from . . . taking . . . actions contrary to the [third party's] interest" and the risk that the lawyer will defer to the third-party's goals while sacrificing the defendant's best interests. *Wood*, 450 U.S. at 268-69. These dangers manifested in Petitioner's case. Mr. Pereyda operated under an actual conflict of interest that adversely affected Petitioner's representation. Claim 1 of Petitioner's federal habeas corpus petition is GRANTED.

3. ***CLAIM 3: The Defense Suffered from an Ethical Conflict of Interest Due to Paralegal Irma Soto's Unethical Conduct***

In Claim 3 of Petitioner's Fourth Amended Petition he argues that he was deprived of his Sixth Amendment right to the effective assistance of counsel because Mr. Pereyda failed to properly supervise paralegal Irma Soto. He contends that Ms. Soto carried on a romantic relationship with Petitioner and smuggled mind-altering drugs to him at the Orange County Jail before and during trial, to the detriment of his defense. Petitioner suggests that his use of the drugs "had a debilitating effect upon his mental state and competence" during critical proceedings and the romantic entanglement "negatively affected [Ms. Soto's] relationship with key defense witnesses." (Dkt. No. 361 at 51, Docket No. 317 at 53.) He argues that counsel were responsible for Ms. Soto's actions which undermined his defense. Simultaneously, Petitioner argues that Ms. Soto's conduct

created a conflict of interest that adversely affected Petitioner's representation within the meaning of *Sullivan.* (Dkt. No. 317 at 55-56.)

Petitioner raised this claim before the California Supreme Court in Claim 1 of his March 2, 1998, exhaustion petition. (Dkt. No. 336, Lodgment 4.) The California Supreme Court summarily denied the claim on the merits and alternatively denied the claim as untimely on October 17, 2001. (Dkt. No. 336, Lodgment 8.)

Respondent denies the factual allegations Petitioner makes in support of this claim and argues that Petitioner has failed to establish that the California Supreme Court's resolution of the claim contradicted or unreasonably applied controlling United States Supreme Court authority, or made any unreasonable determination of the facts, and, as such, he is barred from relitigating the claim in federal court. 28 U.S.C. §2254(d); *Cullen v. Pinholster*, 563 U.S. at 181-82. This Court agrees.

a. *Facts Presented to the California Supreme Court*

Petitioner alleged the following facts to the California Supreme Court in his 1998 exhaustion petition:

– Irma "Uribe" Soto worked for Mr Pereyda as "a legal employee and legal runner" before and during Petitioner's trial.

– Ms. Soto was privy to confidential and privileged information related to Petitioner and his case, including case files, defense strategy, defense witnesses, anticipated testimony, and potential problems.

– Ms. Soto communicated with witnesses by telephone, correspondence, and in person.

– During pretrial and trial proceedings, Ms. Soto expressed her love for Petitioner and her desire to marry him and have children. She also became involved with his family on a personal level and referred to them as family.

– Ms. Soto had pictures taken of herself, which she gave to Petitioner while he was in the Orange County Jail.

33

– Ms. Soto led Petitioner's family to believe that she "did everything on the case" and that without her, Petitioner would lose his case and would be executed.

– Ms. Soto obtained a court order allowing her to have contact visits with Petitioner, at which she smuggled mind-altering drugs to Petitioner inside highlighter pens.

– Petitioner ingested the drugs which compounded his pre-existing mental and organic problems, rendering him incompetent during crucial proceedings.

– When Petitioner rejected her overtures, because he was in love with Francesca Mozqueda, Ms. Soto vowed to damage his defense and later bragged about accomplishing her goal.

– Petitioner's family believed that Ms. Soto could see to it that Petitioner was convicted and executed, and urged Ms. Mozqueda to stop seeing him.

– Ms. Soto became romantically involved with one of the defense attorneys and an Orange County jail deputy during Petitioner's trial.

– Petitioner's attorneys knew about Ms. Soto's conduct, but were not concerned.

In support of the claim, Petitioner submitted declarations from his former brother-in-law, Fabian Perez (Exhibit LL), his sister (Exhibit G), his mother (Exhibit AA), his father (Exhibit D), his wife (Exhibit GG), prisoners from the Orange County Jail (Exhibits EE, FF), Ms. Soto's ex-husband (Exhibit KK), a wife of one of the Orange County Jail prisoners (Exhibit HH), and a friend of Ms. Soto's (Exhibit JJ).

//
//
//
//
//

      b.    *California Supreme Court's Adjudication of Petitioner's Claim Was Neither an "Unreasonable Application of Clearly Established Federal Law" nor an "Unreasonable Determination of the Facts" Within the Meaning of §2254(d)*

Accepting the factual allegations in the petition as true, this Court finds that Petitioner is not entitled to relief on either of his claims concerning the improper conduct of Irma Soto. The Court finds that the California Supreme Court's summary denial of the claim was neither an unreasonable application of clearly established federal law, nor an unreasonable determination of the facts, within the meaning of §2254(d), such that Petitioner is entitled to de novo review in federal habeas corpus proceedings.

While ineffective assistance of counsel claims generally require the petitioner to show deficient representation and prejudice, we "forgo individual inquiry into whether counsel's inadequate performance undermined the reliability of the verdict" in instances "where assistance of counsel has been denied entirely or during a critical stage of the proceeding." *Mickens,* 535 U.S. at 166. Circumstances of such magnitude may "arise when the [petitioner's] attorney actively represented conflicting interests." *Id.* at 166; *see also Sullivan,* 446 U.S. at 348. In order to establish a Sixth Amendment violation under the *Sullivan* exception, the petitioner must demonstrate that "an actual conflict of interest adversely affected his lawyer's performance." *Sullivan,* 446 U.S. at 348. As clarified in *Mickens,* an actual conflict is not "something separate and apart from adverse effect." *Mickens,* 535 U.S. at 172 n. 5. Rather, "[a]n 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance." *Id.* Thus, even if Petitioner can establish an actual conflict of interest, he cannot obtain relief unless he can show that his attorneys conflict adversely affected his performance. *Id.* at 162.

35

While the impropriety of Ms. Soto's alleged conduct during pretrial and trial proceedings, if true, is shocking, Petitioner has failed to demonstrate that Ms. Soto's behavior had any effect on defense counsel's performance, or the outcome of the trial.

First, with respect Petitioner's claim that Ms. Soto's alleged romantic interest in him during pretrial and trial proceedings amounted to a conflict of interest for his attorneys, this Court finds the Ninth Circuit's holding in *Earp v. Ornoski,* 431 F.3d 1158, dispositive.  In *Earp*, Petitioner carried on a romantic relationship with one of his trial attorneys before and during his capital trial.  In federal habeas corpus, Earp argued that he was deprived of the effective assistance of counsel because his intimate relationship with his counsel created a conflict of interest in her duties as counsel and her personal interests in the relationship. Holding the California Supreme Court's finding of no conflict was neither contrary to, nor an unreasonable application of, clearly established federal law, the Court of Appeals noted, "[t]he Supreme Court has never held that the *Sullivan* exception applies to conflicts stemming from intimate relations with clients." *Id.* at 1184-85 (citations omitted).  Here, Ms. Soto's romantic interest in Petitioner did not create a conflict of interest for his trial attorneys.  Petitioner presents no evidence suggesting his attorneys failed to act in his best interest nor that Ms. Soto's involvement with Petitioner had any adverse impact on his defense. Rather, Petitioner makes a series of conclusory allegations, unsupported by sufficient evidence.  *Jones v. Gomez*, 66 F.3d 199, 204-05 (9th Cir. 1995) (conclusory allegations unsupported by a statement of specific facts do not warrant habeas relief); *see Blackledge v. Allison*, 431 U.S. 63, 75 n. 7 (1977) (summary disposition of habeas petition appropriate where allegations are vague or conclusory; "the petition is expected to state facts that point to a real possibility of constitutional error") (citation, internal quotations and brackets omitted); *Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (per curiam ) (granting a habeas corpus

petition "on the basis of little more than speculation" is improper); *Cooks v. Spalding*, 660 F.2d 738, 740 (9th Cir. 1981) (per curiam ) (claim that "amounts to mere speculation" does not warrant habeas corpus relief), *cert. denied,* 455 U.S. 1026 (1982); *see also* Rules 2(c)(1), (2), Rules Governing Section 2254 Cases in the United States District Courts (federal habeas corpus petition must "specify all the grounds for relief available to the petitioner" and must "state the facts supporting each ground").

Second, with respect to Ms. Soto's alleged smuggling of drugs to Mr. Noguera while he was in the Orange County Jail, Petitioner has failed to provide sufficient evidence his trial attorneys were aware of Ms. Soto's conduct, or that her conduct prejudiced the defense in any way. While Petitioner proffers the declaration of Petitioner's wife, Francesca Mozqueda, in support of his contention that counsel knew of Ms. Soto's drug smuggling, her declaration does not support this supposition. In the declaration Ms. Mozqueda generally states that she "told Mr. Campos *what Irma was doing*. . . and how damaging it was to Bill's defense . . . [and] Mr. Campos simply said, 'okay.' " (Exhibit GG at 8.) Ms. Mozqueda's statement is vague and, if anything, refers to threats Ms. Soto allegedly made to get Ms. Mozqueda to stop seeing Petitioner. "Because Irma was creating a lot of problems for me with my parents (embarrassing my mother with her best friend, telling her family about Bill's case and telling Bill lies about me), *I finally told Mr. Campos what Irma was doing.*" (Exhibit GG at 8.)

There is no evidence to support the suggestion that counsel were made aware of illegal drug smuggling activities on the part of their employee and simply responded "okay." In fact, it is highly dubious that any attorney, upon being informed of their employee's illegal conduct, would turn a blind eye. With respect to "non-lawyer assistants," an attorney has an ethical responsibility to "make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer." ABA Rule 5.3(b). Moreover, "a lawyer

shall be responsible for conduct of such person that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer if: (1) the lawyer orders or, with the knowledge of the specific conduct ratifies the conduct involved; or (2) the lawyer . . . . knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action." ABA Rule 5.3(c). Ms. Mozqueda's conclusory declaration is insufficient evidence to support Petitioner's allegation that his trial counsel were aware of Ms. Soto's drug smuggling, and did nothing.

Moreover, Petitioner fails to allege how his decision to ingest illicit drugs violated his constitutional rights or "seriously affected his mental health" so as to implicate questions of competency. Whether or not Ms. Soto smuggled drugs, according to Ms. Mozqueda's declaration, Petitioner sought and obtained illicit drugs from numerous sources and "often called [her] from jail while he was drunk and/or on drugs." (Exhibit GG at 4, 6-7 ("Bill took drugs before and during the trial. There were two occasions in which two of Bill's friends were caught trying to smuggle drugs into the jail. One involved a girl who mailed marijuana and another a boy. Bill's mother told me she had split open the soles of Bill's shoes and inserted drugs inside. She then had one of Bill's friends take clothing and the shoes to the jail for court the following day.")

Petitioner has failed to establish that the California Supreme Court's resolution of Claim 3 contradicted or unreasonably applied clearly established federal law, or made an unreasonable determination of the facts. Claim 3 is DENIED.

## B. **Ineffective Assistance of Counsel**

### 1. *Standard for Relief for Ineffective Assistance of Counsel Claims*

The Sixth Amendment guarantees the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. at 686. "The benchmark for judging

38

any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* To establish ineffective assistance of counsel, Petitioner must demonstrate that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Id.* at 687.

To prove deficient performance, petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. *Id.* at 688; *see also Yarborough v. Gentry*, 540 U.S. 1 (2003) (per curium); *cf. Bobby v. Van Hook,* 558 U.S. 4, 13-14 (2009) (per curium) (Alito, J., concurring) (noting that guidelines such as those promulgated by the American Bar Association, purporting to establish what reasonable attorneys would do, may be helpful but are not the test for determining whether counsel's choices are objectively reasonable). The relevant inquiry is not what defense counsel could have done, but rather whether the choices made by defense counsel were reasonable. *See Babbitt v. Calderon,* 151 F.3d 1170, 1173 (9th Cir.1998), *cert. denied,* 525 U.S. 1159 (1999). "Judicial scrutiny of counsel's performance must be highly deferential. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight." *See Strickland,* 466 U.S. at 689; *Wildman v. Johnson,* 261 F.3d 832, 838 (9th Cir.2001); *Sanders v. Ratelle,* 21 F.3d 1446, 1456 (9th Cir.1994). The Court "must indulge a strong presumption that counsel's conduct falls within the wide range of professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland,* 466 U.S. at 689 (internal quotation omitted); *Pinholster*, 563 U.S. at 191.

To establish that counsel's deficient performance prejudiced the defense, Petitioner must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A

reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686. The defendant must show that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *Id.* at 688.

As both prongs of the *Strickland* test must be satisfied to establish a constitutional violation, a failure to satisfy either requires a petitioner's ineffective assistance of counsel claim be denied. *Strickland*, 466 U.S. at 697. A federal habeas court considering an ineffective assistance claim need not address the prejudice prong of the *Strickland* test "if the petitioner cannot even establish incompetence under the first prong." *Siripongs v. Calderon*, 133 F.3d 732, 737 (9th Cir.), *cert. denied*, 525 U.S. 839 (1998). Conversely, the court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697.

As the Supreme Court highlighted in *Richter,* meeting *Strickland's* high standard is all the more difficult under the AEDPA. "The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Richter,* 562 U.S. at 101. The rule of *Strickland*, i.e., that a defense counsel's effectiveness is reviewed with great deference, coupled with AEDPA's deferential standard, results in a "doubly" deferential judicial review process. *See Pinholster*, 563 U.S. at 202*; Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir.2010).

> Surmounting *Strickland's* high bar is never an easy task. . . . Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of

materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence. The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.

Establishing that a state court's application of *Strickland* was unreasonable under §2254(d) is all the more difficult. The standards created by *Strickland* and §2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under §2254(d). When §2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Richter*, 562 U.S. at 105 (internal quotations and citations omitted).

> ### 2. *CLAIM 4: Petitioner's Trial Counsel Failed to Investigate and Present Available Mental State Defenses, Including Diminished Actuality, Insanity, Intoxication, and Unconsciousness, and to Request Related Instructions*

In Claim 4, Petitioner alleges that his rights under the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments were violated by his trial attorney's failure to investigate and present mental state defenses at the guilt phase of his capital trial. (Dkt. No. 317 at 56-73.)

Petitioner raised this claim as Claim 2 of his March 2, 1998, exhaustion petition in the California Supreme Court. (Dkt. No. 336, Lodgment 4 at 36-86.) On October 17, 2001, the California Supreme Court summarily denied the claim on the merits and alternatively denied the claim as untimely. (Dkt. No. 336, Lodgment 8.)

Respondent argues that Petitioner has failed to establish that the California Supreme Court's resolution of the claim contradicted or unreasonably applied controlling United State Supreme Court authority, or made any unreasonable

determination of the facts, so as to get out from under the relitigation bar contained in 28 U.S.C. §2254(d). However, because this claim is integrally related to Claim 1, and Petitioner's contention that Mr. Pereyda's conflict of interest prevented him from investigating and presenting any evidence casting Petitioner or the family in a negative light, the Court grants relief with respect to Claim 4.

> 3. ***CLAIM 5: Defense Counsel Failed to Investigate, Seek a Hearing on and Present Evidence that Petitioner was Mentally Incompetent During Crucial Pretrial and Trial Proceedings***

Claim 5 of the Fourth Amended Petition argues that Petitioner's convictions and sentences violate the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, because his trial attorney failed to investigate and present "readily available evidence" that Petitioner was mentally incompetent during crucial pretrial and trial proceedings. (Dkt. No. 317 at 73-78.)

Petitioner raised this claim before the California Supreme Court in Claim 3 of his March 2, 1998, exhaustion petition. (Dkt. No. 336, Lodgment 4 at 86-96.) The California Supreme Court summarily denied the claim on the merits and alternatively denied the claim as untimely and barred under *In re Dixon*, 41 Cal.2d 756, 759 (1953) because they should have been raised on appeal. (Dkt. No. 336, Lodgment 8.)

Respondent contends that Petitioner has failed to establish that the California Supreme Court's resolution of the claim contradicted or unreasonably applied controlling United States Supreme Court authority, or made any unreasonable determination of the facts, and, as such, he is barred from relitigating the claim in federal court. 28 U.S.C. §2254(d); *Pinholster*, 563 U.S. at 181-82. Because Petitioner fails to provide evidence to buttress his claim of *incompetence*, this Court finds that the California Supreme Court was not unreasonable in rejecting the claim on the merits.

a.   *Facts Presented to the California Supreme Court*

Review of Petitioner's 1998 exhaustion petition reveals a number of conclusory statements alleged as facts in support of Claim 3. For example, Petitioner alleged "[t]here was substantial evidence available to trial counsel that Petitioner was mentally incompetent."   Moreover, Petitioner claimed he "was unable to understand the nature of the criminal proceedings" and "unable to assist counsel in conducting a defense in a rational manner, due to mental disorders, mental illnesses, and the ingestion of mind-altering drugs."  (Dkt. No. 336, Lodgment 4 at 87.)  In addition, Petitioner alleged:

– "During relevant court proceedings, Petitioner was irrational and out-of-contact with reality."

– "Petitioner suffered at all relevant times from a debilitating mental illness and thought disorder."

– Counsel did not have Petitioner psychologically or psychiatrically evaluated and reasonable evaluations would have revealed incompetency.

– Had counsel conducted a minimally competent investigation, they would have learned Petitioner was mentally incompetent.

– Petitioner's mental illness was substantially compounded and aggravated by his drug use during pretrial and trial proceedings.

– Petitioner "was in and out of reality."

In support of Claim 3, Petitioner submitted declarations from three former inmates in the Orange County Jail (Exhibits DD, EE, and FF), his mother (Exhibit AA), his wife (Exhibit GG), a psychiatrist (Exhibit B), and a psychologist (Exhibit Y).

//
//
//

b.　*California Supreme Court's Adjudication of Petitioner's Claim was Not Unreasonable Within the Meaning of §2254(d)*

Underlying Petitioner's claim of ineffective assistance is the assumption that he was, indeed, incompetent, such that trial counsel's failure to investigate and present evidence of that incompetence was "deficient" performance and "prejudicial." Thus, in order to find the California Supreme Court's summary denial "unreasonable" within the meaning of §2254(d), this Court must find that Petitioner presented evidence of Petitioner's incompetence. However, as discussed below, *infra* section IV.C., this Court finds that Petitioner's claim of incompetence is unsupported by the evidence. Claim 5 is DENIED.

**4.　*CLAIMS 6 and 7: Petitioner's Trial Counsel Unreasonably (1) Failed to Investigate Any Other Motive for the Homicide, Other than that Relied Upon by the Prosecution; (2) Failed to Present Available Evidence that the Homicide Was Caused by Very Different Reasons that Could Not Have Reasonably Resulted in a Finding of First Degree Murder with a Special Circumstance; and (3) Failed to Investigate and Rebut False Prosecution Assertions Regarding the Victim, Jovita Navarro, Her Daughter, Dominique Navarro, and the Homicide***

In Claims 6 and 7, Petitioner alleges that his rights under the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments were violated by his trial attorney's failure to investigate and present evidence in support of alternative motives for the homicide that would have belied the prosecution's first degree murder theory and defeated the financial gain special circumstance allegation that made Petitioner eligible for the death penalty. (Dkt. No. 317 at 78-96.)

Petitioner raised these issues for the first time in state court in Claim 1 of his initial state habeas petition. (Dkt. No. 148, Lodgment 4 at 10- 36.) The California

44

Supreme Court summarily rejected the claim on the merits. (Dkt. No. 336, Lodgment 3.) Petitioner raised these claims again as Claims 4 and 5 of his March 2, 1998, exhaustion petition in the California Supreme Court. (Dkt. No. 336, Lodgment 4 at 96-138.)  On October 17, 2001, the California Supreme Court summarily denied the claims on the merits and alternatively denied the claims as untimely. (Dkt. No. 336, Lodgment 8.)

Respondent contends that Petitioner has failed to establish that the California Supreme Court's resolution of Claims 6 and 7 contradicted or unreasonably applied controlling United State Supreme Court authority, or made any unreasonable determination of the facts, so as to get out from under the relitigation bar contained in 28 U.S.C. §2254(d).

Because these claims are integrally related to Claim 1, and Petitioner's contentions that Ms. Salinas controlled the defense and, consequently, Mr. Pereyda's conflict of interest prevented him from investigating and presenting a proper defense or any evidence casting Petitioner or the family in a negative light, the Court grants relief with respect to Claims 6 and 7.

5.  ***CLAIM 8: Petitioner's Trial Counsel Unreasonably Failed to Object to the Prosecutor's Improper and Prejudicial Arguments and Evidence***

In Claim 8, Petitioner argues that Mr. Pereyda provided constitutionally deficient representation in failing to object to multiple improper arguments made by the prosecutor during penalty phase closing argument.  Petitioner cites the trial record and broadly asserts that "counsel had no tactical reason for failing to object to these acts of prosecutorial misconduct," such that "counsel's performance fell below an objective standard of reasonableness" and Petitioner suffered prejudice at the guilt and penalty phases of the trial.  (Dkt. No. 317 at 100-101.)

As discussed *infra*, Petitioner raised the underlying prosecutorial misconduct claims before the California Supreme Court on direct appeal, and

argued that his attorneys were ineffective for failing to object. (Dkt. No. 148, Lodgment 1.) The state court found Petitioner had forfeited all but one of the prosecutorial misconduct claims due to the failure to object, and also found all of the claims to be without merit because, in each instance, the prosecutor acted properly. *People v. Noguera*, 4 Cal.4th 599, 638, 643-47 (1992). Petitioner raised the prosecutorial misconduct claims again in his June 9, 2003, exhaustion petition. (Dkt. No. 336, Lodgment 9.) The California Supreme Court summarily denied the claims on the merits and alternatively denied the claims as untimely, repetitive, and *Dixon* barred. (Dkt No. 336, Lodgment 12.) Petitioner raised the ineffective assistance claim for the first time as Claim 9 in his initial state habeas petition, and again as Claim 3 of the 2003 exhaustion petition. (Dkt. No. 148, Lodgment 4 at 88-91; Dkt. No. 336, Lodgment 9 at 93-96.) On both occasions, the Court summarily denied the claim on the merits and, with respect to the exhaustion petition, alternatively denied the claim as untimely and successive. (Dkt. No. 336, Lodgments 3 & 12.)

Respondent argues that Petitioner has failed to meet his burden of showing that the California Supreme Court's resolution of Claim 8 contradicted or unreasonably applied controlling United States Supreme Court authority, or made any unreasonable determination of the facts, and, as such, he is barred from relitigating the claim in federal court. 28 U.S.C. §2254(d); *Pinholster*, 563 U.S. at 181-82. This Court agrees.

Because there was no reversible misconduct on the part of the prosecutor in making his penalty phase closing argument, as discussed *infra*, it was not deficient performance for defense counsel to fail to object. *Strickland* and its progeny do not require trial counsel to make futile objections; thus, the decisions of Petitioner's counsel were reasonable under these circumstances. *See Sanders*, 21 F.3d at 1456; *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989) (finding that a challenge to a futile objection fails both prongs of *Strickland*). Moreover, as the

46

Ninth Circuit explained in *United States v. Necoechea*, 986 F.2d 1273 (9th Cir. 1993), "[b]ecause many lawyers refrain from objecting during opening statement and closing argument, absent egregious misstatements, the failure to object during closing argument and opening statement is within the 'wide range' of permissible professional legal conduct." *Id.* at 1281. Under *Nechoechea*, trial counsel's decision not to object to the prosecutor's comments, possibly to avoid highlighting them, was a reasonable strategic decision. *Cunningham v. Wong*, 704 F.3d 1143, 1159 (9th Cir.), *cert. denied,* __ U.S. __, 134 S.Ct. 169 (2013).

Under *Strickland*'s second prong, even if counsel should have objected, there is no reasonable likelihood that the outcome of the proceeding would have been different. The trial judge properly instructed the jury that closing arguments are not evidence. (CT 1379; RT 8678.) Petitioner has failed to demonstrate that the California Supreme Court's denial of this claim contradicted or unreasonably applied controlling United States Supreme Court authority, or amounted to an unreasonable determination of the facts under section 2254(d). Claim 8 is DENIED.

6.     ***CLAIM 9: Petitioner's Trial Counsel Unreasonably Failed to Seek Recusal of the Trial Judge***

In Claim 9, Petitioner argues that his trial counsel provided constitutionally deficient representation in failing to seek recusal of the trial judge. Petitioner suggests that the trial court made inappropriate remarks throughout the trial which demonstrated a bias against the defense. (Dkt. No. 317 at 101-107.)

Petitioner raised this claim for the first time in state court as Claim 6 of his March 1998 exhaustion petition. (Dkt. No. 336, Lodgment 4 at 139-42.) The California Supreme Court summarily denied the claim on the merits and alternatively denied the claim as untimely. (Dkt. No. 336, Lodgment 8.)

Respondent argues that Petitioner has failed to show that the California Supreme Court's resolution of the claim contradicted or unreasonably applied

controlling United States Supreme Court authority, or made an unreasonable determination of the facts. 28 U.S.C. §2254(d).

Under California law, "[a] judge shall be disqualified if . . . [f]or any reason . . . [a] person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial." Code Civ. Proc. § 170.1, subd. (a)(6)(A)(iii). "The standard for disqualification ... is fundamentally an objective one." *United Farm Workers of America v. Superior Court,*170 Cal.App.3d 97, 104 (1985). Thus, "[d]isqualification is mandated if a reasonable person would entertain doubts concerning the judge's impartiality." *Christie v. City of El Centro,* 135 Cal.App.4th 767, 776 (2006). "While this objective standard clearly indicates that the decision on disqualification not be based on the judge's personal view of his own impartiality, it also suggests that the litigants' necessarily partisan views not provide the applicable frame of reference." *United Farm Workers*, 170 Cal.App.3d at 104 (fn.omitted). "[M]ost matters relating to judicial disqualification [do] not rise to a constitutional level." *Caperton v. A.T. Massey Coal Co.,* 556 U.S. 868, 876 (2009). "[T]he due process clause should not be routinely invoked as a ground for judicial disqualification. Rather, it is the exceptional case presenting extreme facts where a due process violation will be found." *People v. Freeman*, 47 Cal.4th 993, 1005 (2010).

In making his claim regarding the trial court's alleged bias in favor of the prosecution, and against the defense, Petitioner cites: remarks the judge made to the jury regarding the prosecutor's wife's pregnancy-related problems; his comment during a bench conference, after limiting cross-examination of prosecution witness Abram, referencing the inevitable appeal; an inappropriate comment the judge made during cross-examination of prosecution witness Jackson; and a statement the court made outside the presence of the jury regarding Petitioner's alibi witness. Petitioner argues that the court's "comments injected an inappropriate note of levity into proceedings where Petitioner's life was at stake,

and they put Petitioner's counsel on notice of the court's bias against Petitioner and the need to make a motion for recusal." (Dkt. No. 317 at 107.) Petitioner argues that this bias violated his due process right to a fair trial.

To demonstrate ineffective assistance of counsel for failure to seek recusal, a petitioner must show that his attorney provided constitutionally deficient representation and, as a result, the petitioner suffered prejudice. There is a "strong presumption that counsel's conduct falls within the wide range of acceptable professional assistance." *Strickland*, 466 U.S. at 689.

Petitioner has failed to demonstrate that the California Supreme Court's denial of this claim contradicted or unreasonably applied controlling United States Supreme Court authority, or amounted to an unreasonable determination of the facts under section 2254(d). The state court could have reasonably concluded that none of the judge's remarks biased the jury in the prosecution's favor, such that the judge should have been recused, and such that trial counsel's failure to object to the remarks constituted ineffective representation. Failure to make a futile objection does not constitute ineffective assistance of counsel. *See, e.g., James v. Borg*, 24 F.3d 20, 27 (9th Cir.), *cert. denied*, 513 U.S. 935 (1994); *Morrison v. Estelle*, 981 F.2d 425, 429 (9th Cir. 1992), *cert. denied*, 508 U.S. 920 (1993). Moreover, the California Supreme Court could have reasonably concluded that Petitioner failed to meet his burden of demonstrating that he suffered prejudice from the judge's remarks. Claim 9 is DENIED.

> **7.** ***CLAIM 10: Trial Counsel Failed to Investigate and Present Available Mitigating Evidence at the Penalty Phase***

In Claim 10, Petitioner alleges that his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments were violated by his trial attorney's failure to investigate and present available mitigating evidence at the penalty phase. (Dkt. No. 317 at 107-21.)

Petitioner first raised this claim in state court as Claim 2 of his initial state

49

habeas petition. (Dkt. No. 148, Lodgment 4 at 36-57.) On September 29, 1993, the California Supreme Court summarily denied the claim on the merits. (Dkt. No. 336, Lodgment 3.) Petitioner raised the claim again as Claim 4 of his June 2003, exhaustion petition in the California Supreme Court. (Dkt. No. 336, Lodgment 9 at 50-74.) The California Supreme Court again summarily denied the claim on the merits and, alternatively, denied the claim as untimely, barred for having previously been raised and rejected in a prior petition, and successive. (Dkt. No. 336, Lodgment 12.)

Respondent contends that Petitioner has failed to establish that the California Supreme Court's resolution of the claim contradicted or unreasonably applied controlling United State Supreme Court authority, or made any unreasonable determination of the facts, so as to get out from under the relitigation bar contained in 28 U.S.C. §2254(d).

Because these claims are integrally related to Claim 1, and Petitioner's contention that Mr. Pereyda's conflict of interest prevented him from investigating and presenting any evidence casting Petitioner or the family in a negative light, the Court grants relief with respect to Claim 10.

> ### 8. *CLAIM 11: Trial Counsel Failed to Investigate and Present Evidence that Would Have Significantly Undermined the Credibility of the Prosecution's Key Witness, Ricky Abram*

In Claim 11, Petitioner argues that his trial counsel provided constitutionally deficient representation in failing to investigate and present evidence undermining the credibility of the prosecution's "key witness," Ricky Abram. Petitioner suggests counsel could have presented psychiatric evidence from Mr. Abram's medical file from California Youth Authority and expert testimony suggesting Mr. Abram was an unreliable witness. (Dkt. No. 317 at 123-28.) Petitioner argues that but for his counsel's failure to impeach Abram, the jury "would have been unable to convict Petitioner of first degree homicide or sentence

him to death based on Abram's weak testimony." (Dkt. No. 317 at 129.)

Petitioner first raised this claim in state court as Claim 4 of his initial state habeas petition. (Dkt. No. 148, Lodgment 4 at 64-76.) On September 29, 1993, the California Supreme Court summarily denied the claim on the merits. (Dkt. No. 336, Lodgment 3.) Petitioner raised the claim again as Claim 5 of his June 2003, exhaustion petition in the California Supreme Court. (Dkt. No. 336, Lodgment 9 at 74-90.) The California Supreme Court summarily denied the claim on the merits and, alternatively, denied the claim as untimely and successive. (Dkt. No. 336, Lodgment 12.)

Respondent contends that Petitioner has failed to establish that the California Supreme Court's resolution of the claim contradicted or unreasonably applied controlling United State Supreme Court authority, or made any unreasonable determination of the facts, so as to get out from under the relitigation bar contained in 28 U.S.C. §2254(d). Respondent notes that trial counsel sought to undermine Mr. Abram's credibility at trial, including questioning him regarding his mental state after he was arrested, held in custody, and medicated due to stress, depression, and emotional and sleeping problems.[12] (RT 5028-30, 5034-35, 5069-70.) Mr. Abram testified that he was housed in the hospital unit, taking anti-depressants and other medication which caused him to be drowsy for long periods of time.[13] (RT 5071, 5073.) He admitted he was going through some memory loss, but denied telling an investigator that he had "made up some rather wild stories." (RT 5036-38.)

In evaluating the reasonableness of a state court's rejection of a claim of

---

[12] Outside the presence of the jury, the prosecutor noted his concern that Mr. Abram's doctor-patient privilege be protected, and revealed that Mr. Abram "was undergoing psychiatric counseling because he attempted to commit suicide," and had been labeled as schizophrenic. (RT 5032.)

[13] The trial court denied Mr. Pereyda's request to question Mr. Abram about his suicide attempts, noting that he would need an expert to say that people who are depressed aren't truthful. (RT 5072.)

ineffective assistance of counsel, this Court must give trial counsel "the benefit of the doubt" and must "affirmatively entertain the range of possible reasons" he may have had for proceeding as he did. *Pinholster*, 563 U.S. at 196. Nevertheless, assuming without deciding that counsel provided deficient representation in failing to present available evidence that could have undermined the credibility of Mr. Abram, Petitioner has not demonstrated that the California Supreme Court was unreasonable in finding he suffered no prejudice.

At trial, Abram testified consistently with statements he made to police, regarding a meeting he had with Petitioner and Dominique in March 1983. On the way to pick up Dominique at her house, Petitioner asked Abram for his help in Petitioner's plan to kill Jovita. After they picked up Dominique, the three drove to Bob's Big Boy, where they all discussed the plan to murder Jovita. According to Abram, Petitioner wanted the murder scene to look like Jovita had been killed by a burglar in the middle of the night, and Dominique raped. Petitioner would kill Jovita with a shotgun and have intercourse with Dominque, while Abram staged the house, taking any items of value. Dominique's role was to let the two men in the house and, after the murder, to run hysterically to neighbors, reporting the break-in, rape, and murder. Abram testified that Petitioner promised him $5,000 (from the $25,000 sum Petitioner and Dominique expected to get from Jovita's insurance) and the opportunity to live in Jovita's house with Petitioner and Dominique because "the house would be passed on to the daughter after the mom's death." In early April, Abram was arrested for auto theft, convicted and imprisoned. He was in custody at the time Jovita was murdered, and did not learn of her death until Detective Keltner interviewed him on December 14, 1983, at the Ione Juvenile Detention Facility. (RT 4930-80.)

The evidence presented at trial corroborated Abram's statements and testimony about the robbery/murder plan he discussed with Petitioner and Dominique at Big Boy. After the killing, Dominique ran to neighbors, acting

hysterically and claiming an intruder had entered. (RT 5437, 5445.)  Moreover, there was evidence Dominique was very interested in the financial benefits to her resulting from her mother's death.  (RT 6162, 6164.)  There was no evidence introduced at trial that supported a motive for Abram to lie or wrongly implicate Petitioner.  Moreover, there was no evidence that Abram's statement to police was provided to him by detectives.  At time of his interview, Abram's California Youth Authority supervisor, Jeff Harada, was present.  (RT 5108, 5110-11.)  Harada testified that Detective Keltner did not provide details of the crime before he began recording Abram's statement.  (RT 5124.)

While perhaps Petitioner's trial counsel could have presented additional evidence impeaching Abram, this Court does not find that the California Supreme Court was unreasonable in determining that this cumulative evidence would not have changed the jury's verdict. Evidence that Mr. Abram suffered from Borderline Personality Disorder and was treated for mental health problems while in the California Youth Authority would not have resulted in a different verdict in this case.  The California Supreme Court's finding of no constitutional error was not an unreasonable application of clearly established federal law under section 2254(d)(1), nor an unreasonable determination of the facts under section 2254(d)(2). Claim 11 is DENIED.

### 9. *CLAIM 12: Trial Counsel Failed to Present Evidence that Prosecution Expert Witness Norman Sperber Perjured Himself*

In Claim 12, Petitioner argues that trial counsel provided constitutionally deficient representation in failing to present evidence that one of the prosecution's bite-mark experts, Dr. Norman Sperber, perjured himself when he testified that he was the chief forensic dentist for the FBI. (Dkt. No. 317 at 132, citing RT 6206.) Petitioner contends that, because there were dueling experts on the bite mark issue, and "the credibility of the experts testifying on the issue was a key factual

determination for the jury," impeachment of Dr. Sperber would have undermined the prosecution's case, providing the jury reasonable doubt regarding the origin of Jovita's leg injury, and altering the verdict in Petitioner's trial. (Dkt. No. 317 at 133.)

Petitioner first raised this claim in state court as Claim 7 of his initial state habeas petition. (Dkt. No. 148, Lodgment 4 at 84-87.) On September 29, 1993, the California Supreme Court summarily denied the claim on the merits. (Dkt. No. 336, Lodgment 3.) Petitioner raised the claim again as Claim 6 of his June 2003, exhaustion petition in the California Supreme Court. (Dkt. No. 336, Lodgment 9 at 90-93.) The California Supreme Court summarily denied the claim on the merits and, alternatively, denied the claim as untimely and successive. (Dkt. No. 336, Lodgment 12.)

Respondent contends that Petitioner has failed to establish that the California Supreme Court's resolution of the claim contradicted or unreasonably applied controlling United State Supreme Court authority, or made any unreasonable determination of the facts, so as to get out from under the relitigation bar contained in 28 U.S.C. §2254(d). Respondent suggests that it is not clear that Dr. Sperber provided false testimony and, in fact, "his testimony in context suggests otherwise" because his work with the FBI "was but part of a long curriculum vitae" that demonstrated he "was a consultant to a number of organizations." (Dkt. No. 330 at 42.) Respondent argues that "[e]vidence he was a consultant to the FBI, rather than a regular employee, would not have contradicted his trial testimony,....would not have impeached him... [and] would have had no effect on the trial." (Dkt. No. 330 at 43.)

An examination of the trial record reveals that Dr. Sperber testified in Petitioner's trial on March 19, 1987. (RT 6186.) After discussing Dr. Sperber's occupation as "a dentist in general practice," the prosecutor asked Dr. Sperber about his specialty in forensic odontology. (RT 6202.) Dr. Sperber explained his

54

area of expertise to the jury, and the prosecutor followed up by asking Dr. Sperber if he was "associated at all with any coroner's facilities." (RT 6205.) In response, Dr. Sperber indicated that he was the chief forensic dentist for San Diego and Imperial Counties, for the missing persons system for the California Department of Justice, and for the United States Department of Justice, in particular, the FBI. (RT 6205-06.) With reference to the FBI, Dr. Sperber described his involvement in creating a national system for identifying people who are either alive or dead. (RT 6206.)

While Petitioner contends the evidence demonstrates that prosecution's expert provided false testimony, this Court cannot agree. In context, it is clear that Dr. Sperber did not claim to be an "employee" of the FBI. Rather, and in fact, he told the jury that he had a general dentistry practice and was associated various law enforcement agencies, including the FBI, for which he created computer systems designed to help identify individuals through dental data. The testimony related to his work with the FBI was part of a list of roles he played in various state and federal law enforcement agencies. While Dr. Sperber did state that he was "chief forensic dentist" for the FBI, there is no reason to believe that this testimony misled the jury to think that Dr. Sperber was an FBI employee, rather than a consultant, nor is there reason to believe that this was the jury's understanding. As such, the California Supreme Court was not unreasonable in finding that Petitioner's trial attorney did not provide deficient representation in failing to present evidence that Dr. Sperber "perjured himself." Moreover, Petitioner failed to demonstrate that he suffered any prejudice from counsel's alleged failure. As Respondent points out, evidence Dr. Sperber was a consultant to the FBI would not have contradicted or impeached him and would not have resulted in a different verdict in this case. The California Supreme Court's finding of no constitutional error was not an unreasonable application of clearly established federal law under section 2254(d)(1), nor an unreasonable

determination of the facts under section 2254(d)(2). Claim 12 is DENIED.

          **10.**    ***CLAIM 13: Petitioner's Trial Counsel Unreasonably Failed to Make Adequate Objections to Prejudicial and Inadmissible Testimony During the Guilt Phase of Trial***

In Claim 13, Petitioner argues that his trial attorney failed to make "adequate objections" to "highly prejudicial arguments and evidence" during the guilt phase of the trial. (Dkt No. 317 at 135.) He cites 17 examples in subclaims (a)-(q). (Dkt. No. 317 at 136-38.)

Petitioner first raised this claim as Claim 7 of his June 2003, exhaustion petition in the California Supreme Court. (Dkt. No. 336, Lodgment 9 at 93-96.) The California Supreme Court summarily denied the claim on the merits and, alternatively, denied the claim as untimely and successive. (Dkt. No. 336, Lodgment 12.)

Respondent contends that Petitioner has failed to establish that the California Supreme Court's resolution of the claim contradicted or unreasonably applied controlling United State Supreme Court authority, or made any unreasonable determination of the facts, so as to get out from under the relitigation bar contained in 28 U.S.C. §2254(d).

"An attorney's failure to object to the admission of inadmissible evidence is not necessarily ineffective" but is presumed to be sound trial strategy which a Petitioner must overcome. *Morris v. California*, 966 F.2d 448, 456 (9th Cir. 1991), *cert. denied,* 506 U.S. 831 (1992). Trial counsel may have chosen not to object, but this Court "need not determine the actual explanation for trial counsel's failure to object, so long as his failure to do so falls within the range of reasonable representation." *Id.; see e.g., United States v. Molina*, 934 F.2d 1440, 1448 (9th Cir. 1991) ("From a strategic perspective...many trial lawyers refrain from objecting during closing argument to all but the most egregious misstatements by opposing counsel on the theory that the jury may construe their objections to be a

sign of desperation or hyper-technicality."). Moreover, a petitioner must demonstrate that any objection—assuming sustained—would have altered the outcome at trial. *See Jackson v. Brown*, 513 F.3d 1057, 1082 (9th Cir. 2008) ("[E]ven if [counsel's] failure to object was deficient, we cannot find that, but for his errors, there is a reasonable probability that the jury would not have still convicted [the petitioner].").

a. *Failure to Object to Motion in Limine*

Petitioner claims that his trial attorney should have objected to the prosecutor's motion to preclude the defense from mentioning in opening statements, Ricky Abram's California Youth Authority psychiatric records and his misdemeanor record. (Dkt. 317 at 136.) Petitioner's claim is conclusory. *See James v. Borg*, 24 F.3d at 26 ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief."); *Jones v. Gomez*, 66 F.3d at 205 (habeas relief not warranted where claims for relief are unsupported by facts); *see also Gentry v. Sinclair*, 705 F.3d 884, 899-900 (9th Cir.) (rejecting ineffective assistance of counsel claim based on counsel's failure to offer mitigating evidence of petitioner's mental condition because petitioner failed to provide declaration or affidavit from counsel addressing reason counsel failed to present such evidence), *cert. denied*, __ U.S. __, 134 S.Ct. 102 (2013). He fails to explain why counsel should have brought this information up during opening statements, and does not demonstrate that he suffered any prejudice from counsel's decision not to oppose the motion in limine. Petitioner has not demonstrated that the California Supreme Court's ruling, finding that he failed to make a showing of ineffective assistance of counsel for failure to object to the motion in limine, was (1) contrary to, or an unreasonable application of clearly established federal law; or (2) premised upon an unreasonable determination of the facts in light of the evidence presented. Accordingly, habeas relief is not warranted. See 28 U.S.C. § 2254(d)(1) & (2).

1

        b.    *Failure to Object to Lack of Foundation*

2    Petitioner argues that trial counsel should have objected to La Habra Police

3    Officer Dennis Guy Serles's testimony regarding Dominique Navarro's bedroom

4    because it lacked foundation.  (Dkt. No. 317 at 136, citing RT 4410.)  Officer

5    Serles testified that he was the first officer to respond to the crime scene on April

6    24, 1983. (RT 4394-95.)  He waited for backup, and once Sergeant Keltner

7    arrived, they entered the residence together. (RT 4395-96.) In relevant part,

8    Officer Serles testified that he saw signs of struggle in Jovita Navarro's bedroom,

9    but not in any other rooms in the house, including Dominique's bedroom.

10   (RT4410-11.) Petitioner's claim that counsel provided ineffective assistance in

11   failing to make a foundation objection to Officer Serles's testimony is conclusory.

12   The California Supreme Court's conclusion that Petitioner did not demonstrate

13   that trial counsel's performance fell below an objective standard of reasonableness,

14   and that the outcome of Petitioner's trial would not have been effected by a

15   foundation objection, was not contrary to or an unreasonable application of

16   *Strickland*. Accordingly, Petitioner is not entitled to habeas corpus relief on this

17   claim.

18        c.    *Failure to Object to Leading Questions*

19   Petitioner claims that trial counsel provided ineffective representation in

20   failing to object to the prosecutor's use of leading questions during his

21   examination of pathologist Richard I. Fukomoto.  (Dkt. No. 317 at 136.)

22   Petitioner's claim is conclusory.  Not only does Petitioner fail to provide specific

23   examples of the questions he finds objectionable, he fails to indicate how he was

24   prejudiced by counsel's failure to object.[14]  Petitioner has not demonstrated that

25   the California Supreme Court's ruling, finding that he failed to make a showing of

26   ineffective assistance of counsel for failure to object to the prosecutor's

27

28   [14]  The rule against asking leading questions does not apply stringently when an expert witness is being interrogated or when exhibits are being identified. *People v. Campbell*, 233 Cal.App.2d 38, 44(1965) (citing *Bruce v. Western Pipe & Steel Co.*, 177 Cal. 25, 27 (1917)).

58

examination of Dr. Fukomoto, was contrary to or an unreasonable application of *Strickland*. Petitioner is not entitled to habeas corpus relief on this claim.

d.  *Failure to Object to Autopsy Photos*

Petitioner claims that trial counsel should have objected to the prosecution's introduction of "prejudicial and inflammatory autopsy photos." (Dkt. No. 317 at 136.)  Once again, Petitioner's claim is conclusory. He does not explain what was prejudicial or inflammatory about any of the photos, or why counsel should have objected. When § 2254(d) applies, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington*, 562 U.S. at 105. Because the extent of Jovita's injuries was highly relevant to the prosecution's case, it was not likely that an objection to the autopsy photos would have been sustained.  The failure to object to admissible evidence is not deficient performance.  In addition, the evidence against Petitioner was overwhelming such that even had the photos not been introduced, Petitioner was not likely to have received a different result. Accordingly, Petitioner has not demonstrated that the California Supreme Court's ruling, finding that he failed to make a showing of ineffective assistance of counsel for failure to object to the introduction of the autopsy photos, was contrary to or an unreasonable application of *Strickland*. Accordingly, Petitioner is not entitled to habeas corpus relief on this claim.

e.  *Failure to Object to Hearsay During Examination of the Coroner*

Time of death was a significant issue at trial. The on-scene criminalist,  who initially exaimined Jovita's body provided an initial time of death estimate at between three and six hours prior to his examination, or between 12:30a.m. and 3:30a.m.  However, based upon Dominique's statement to police regarding the timeline of the evening, and her neighbor Mindy Jackson's 4:43 a.m. 911 call to authorities, the criminalist revised his time of death estimate to 4:45 a.m.

Under the defense team's theory of the case, Jovita was attacked at around 4:30 a.m, when an intruder entered her home. Dominique heard the commotion in her mother's room, heard her mother scream out to her to "get out," and fled to Mindy Jackson's house. The prosecution's theory of the case relied upon an alternate timeline, in which Petitioner killed Jovita at approximately 2:00 a.m., after he and Dominique returned from a date. After the killing, the pair staged the crime scene to look as though Jovita was murdered in the course of a rape and burglary, Petitioner returned to his home, and Dominique initiated the charade with her neighbor and police.

On direct examination, the prosecution's expert pathologist, Dr. Fukumoto, testified that, based upon the contents of Jovita's stomach, he believed she died within four-hours of her last meal; thus, if she last ate between eight and ten o'clock at night, he estimated her time of death, at the latest, at two o'clock in the morning. (RT 4710-11.)

On cross-examination, Petitioner's trial counsel focused much of his questioning on the pathologist's opinion on time of death. Counsel asked Dr. Fukumoto if he, in attempting to estimate Jovita's time of death, "ha[d] some conversations with someone?" The pathologist replied, "yes," and explained that he had conversations with the coroner-investigator who went out to the scene, Mr. King. (RT 4716.) Together, based upon the information they had, Dr. Fukumoto and Mr. King estimated Jovita's time of death at approximately 4:45 a.m. (RT 4717.) Subsequently, Dr. Fukumoto testified consistently with that estimate at the preliminary hearing in Petitioner's case, and repeated that testimony at a subsequent proceeding in this matter. (RT 4718.) Dr. Fukumoto admitted that he did not have any way of knowing when Jovita ate for the last time, and affirmed that the 4:45a.m. time of death was fixed after the autopsy. (RT 4721-22.)

Petitioner suggests that trial counsel provided constitutionally deficient representation in failing to make a hearsay objection when Dr. Fukumoto provided

60

testimony on redirect regarding statements made by Dominique Navarro, and deputy coroner King, about the victim's time of death. (Dkt. No. 317 at 136.) In relevant part, the colloquy to which Petitioner objects went as follows:

Q:   And isn't it true, Dr. Fukumoto, that Deputy Coroner King received information from the La Habra Police Department that Dominique Navarro heard her mother scream at 4:30 in the morning, words to the effect, "Mia, Mia get out of the house"?[15]

A:   Yes.

Q:   Now, Dr. Fukumoto, in estimating the time of death, isn't it true that if you have an eyewitness that actually sees the homicide or hears the homicide, that is better evidence than, let's say, rigor mortis, lividity, or food that is in the stomach?

A:   That's correct.

Q:   And isn't it true that Deputy Coroner King, at least in the report that you have read, estimated the time of death based on the statement of the daughter?

                    *                    *                    *

A:   Yes, sir.

(RT 4730-31.)

     A review of the record demonstrates that this testimony was solicited on redirect examination, immediately after Petitioner's trial attorney closed his cross-examination by asking Dr. Fukumoto about the time of death listed on the death certificate and autopsy report. (RT 4729.) The hearsay was not offered to prove the truth of the matter asserted, i.e., the victim's time of death. Rather, the prosecution solicited this information to explain Dr. Fukumoto's preliminary hearing testimony in Dominique's trial, that the time of death was 4:45a.m.

---

[15]   This statement was also introduced as the statement of a co-conspirator, over defense objection, during the testimony of Officer Keltner. (RT 5174-75.)

61

As Respondent notes, hearsay statements are admissible, when offered by an expert, in reference to his investigation, and when of the type of information reasonably relied upon by such experts in forming opinions. *People v. Nazary*, 191 Cal.App.4th 727, 749 (2010) (qualified experts may rely upon and testify to the sources on which they base their opinions, including hearsay of a type reasonably relied upon by professionals in their field), *overruled on other grounds in People v. Vidana*, 1 Cal.5th 632, 648 (2016). Dr. Fukumoto relied upon this hearsay in making his initial estimate on time of death. Moreover, and in fact, as Respondent points out, the hearsay supported the defense theory of the case. Petitioner has not demonstrated that the California Supreme Court's ruling, finding that he failed to make a showing of ineffective assistance of counsel for failure to object, was (1) contrary to, or an unreasonable application of clearly established federal law; or (2) premised upon an unreasonable determination of the facts in light of the evidence presented.

To the extent that Petitioner contends he was denied his Sixth Amendment right to confront witnesses, this contention is without merit. Counsel was free to cross examine the prosecution's expert, and Petitioner has made no claim that his counsel did so ineffectively. *See United States v. Beltran Rios*, 878 F.2d 1208, 1213 (9th Cir.1989) (stating that where a defendant is given ample opportunity to examine an expert whose opinion is based in part on hearsay, no confrontation clause violation occurs); *People v. Sisneros*, 174 Cal.App.4th 142, 153-54 (2009) (" [A]dmission of expert testimony based on hearsay will typically not offend confrontation clause protections because 'an expert is subject to cross-examination about his or her opinions and additionally, the materials on which the expert bases his or her opinion are not elicited for the truth of their contents; they are examined to assess the weight of the expert's opinion.'"); *cf* Fed.R.Evid. 703 (providing that the facts or data upon which an expert bases her opinion need not be admissible in evidence if of a type reasonably relied upon by experts in the particular field), *see*

*also United States v. McCollum*, 732 F.2d 1419, 1422 (9th Cir.) (applying Rule 703 to affirm the admission of expert testimony based on hearsay), *cert. denied*, 469 U.S. 920 (1984); *Alejandre v. Brazelton*, No. C 11-4803 CRB (PR), 2013 WL 1729775, at **10-11 (N.D. Cal. April 22, 2013) (expert witness' testimony concerning the meaning of defendant's tattoos based in part on hearsay statements from an undisclosed parolee did not violate Confrontation Clause); *Lee v. Gipson*, No. 11-cv-2855 MCE KJN P, 2012 WL 5349506 (E.D. Cal. Oct. 26, 2012 (concluding that *Crawford* does not undermine the established rule that experts can testify to their opinions on relevant matters and may relate the information and sources upon which they rely in forming those opinions)); *Lopez v. Horel*, Civ. No. 07-4169, 2011 WL 940054, at *11 (C.D. Cal. Jan. 19, 2011) ("Thus, *Crawford* does not undermine the established rule that experts can testify to their opinions on relevant matters and may relate the information and sources upon which they rely in forming those opinions"). The California Supreme Court was not unreasonable in finding that Petitioner failed to demonstrate a Confrontation Clause violation. Accordingly, habeas relief is not warranted. See 28 U.S.C. § 2254(d)(1) & (2).

           f.     *Failure to Object to Testimony Regarding Conversation Between Jovita and Dominique Navarro*

Citing three-pages of the record, Petitioner suggests that his trial attorney provided constitutionally deficient representation in failing to object "on federal constitutional grounds, or under California Evidence Code §352" to Margaret Garcia's testimony regarding a conversation between Jovita and Dominique Navarro. (Dkt. No. 317 at 137.) A review of the record reveals that counsel's hearsay objection to the testimony was initially sustained, but subsequently overruled. (RT 4842, 4844.) Petitioner fails to indicate what constitutional objection should have been made, or why Evidence Code 352 was implicated. As such, Petitioner's claim is conclusory. He fails to demonstrate either deficient

performance or prejudice. The California Supreme Court's conclusion that Petitioner did not demonstrate that trial counsel's performance fell below an objective standard of reasonableness and that the outcome of Petitioner's trial was not affected by counsel's failure to object was not contrary to or an unreasonable application of *Strickland*. Accordingly, Petitioner is not entitled to habeas corpus relief on this claim.

g.   *Failure to Object to Testimony Regarding Petitioner's Hospitalization*

Again citing Margaret Garcia's testimony, Petitioner contends trial counsel should have objected to "hearsay statements allegedly made by Jovita Navarro to the effect that Petitioner had been hospitalized because he had been stabbed." (Dkt. No. 317 at 137.) As Respondent points out, Noguera used the fact that he had been stabbed as part of his defense and, as such, counsel's failure to object to Ms. Garcia's testimony was consistent with his defense strategy. Petitioner fails to provide any explanation as to how counsel's failure to object to this testimony prejudiced him. The California Supreme Court was not unreasonable in finding that Petitioner failed to make a showing of ineffective assistance of counsel for failure to object.

h.   *Failure to Object to Testimony Regarding Insurance*

Darlene Alves, Group Insurance Coordinator for the Orange County Employee's Association, was called by the prosecution to testify as the custodian of records for Jovita Navarro's insurance with the county.  (RT 4913-14.)  Ms. Alves testified that Jovita had a $6,000 life insurance policy, a $6,000 accidental death policy, and $1000 in accidental death benefits.  (RT 4914.)  According to the insurance policies, Dominique Navarro was beneficiary.  (RT 4915-16.)  Petitioner argues that trial counsel should have made an unspecified constitutional objection and a California Evidence Code §352 objection to this testimony.  Petitioner fails to indicate what constitutional objection should have been made, or why Evidence

Code 352 was implicated. As such, Petitioner's claim is conclusory. He fails to demonstrate either deficient performance or prejudice. The California Supreme Court was not unreasonable in finding that Petitioner failed to make a showing of ineffective assistance of counsel for failure to object.

i. *Failure to Seek Limiting Instruction Regarding Identification of Ricky Abram*

Prosecution witness Officer Keltner testified on direct examination that he interviewed Ricky Abram on December 14 1983. (RT 5179) He explained that he "learned through [his] investigation that there had been a black person seen with Noguera with a tonfa. And [he] found out that this person was identified as Ricky Abram." (RT 5179-80.) Petitioner asserts that trial counsel "unreasonably and inexplicably failed to seek a limiting instruction" with respect to this testimony. (Dkt. No. 317 at 137.) Petitioner fails to identify the basis for any objection, or what type of limiting instruction should have been given. As such, Petitioner's claim is conclusory. He fails to demonstrate either deficient performance or prejudice. The California Supreme Court was not unreasonable in finding that Petitioner failed to make a showing of ineffective assistance of counsel for failure to object.

j. *Failure to Object to Officer Keltner's Testimony Regarding Ricky Abram's Statement that the Truth was that he was Involved in Planning the Homicide*

On direct examination, Officer Keltner, testified that he had not recorded his entire conversation with Mr. Abram. (RT 5181.) Officer Keltner stated that the purpose of his interview with Mr. Abram was to determine whether he had seen Petitioner with a tonfa or a glove. (RT 5181-82.) The conversation took a different turn, and Officer Keltner "got the tape recorder out" after "Ricky stated. . . that he might as well tell [Officer Keltner] the truth. And the truth was that he was involved in the planning of this homicide." (RT 5182.) Petitioner argues that trial

counsel provided constitutionally deficient representation in failing to move to strike this "inadmissible testimony." (Dkt. No. 317 at 137.) Petitioner fails to demonstrate how he suffered any prejudice from Officer Keltner's statement and, specifically, what benefit he would have obtained from objecting. The tape recording, on which Mr. Abram recounted the details of his meeting with Petitioner and Dominique at the Big Boy restaurant, had already been played on the record. (RT 5122.) The California Supreme Court was not unreasonable in finding that Petitioner failed to make a showing of ineffective assistance of counsel for failure to object.

> k. *Failure to Object to Hearsay Statements Regarding Teeth Impressions*

On direct examination, Officer Keltner testified that in the course of his investigation, he learned of bite mark evidence and, as a result, made arrangements to have teeth impressions taken from a number of individuals including Petitioner and Dominique. (RT 5187-88.) With respect to other people from whom impressions were collected, the prosecutor asked Officer Keltner for the rationale behind the collection. (RT 5188.) Citing just a single page of the record, Petitioner argues that trial counsel was ineffective in failing to object to "numerous inadmissible hearsay statements . . . as to why the teeth impressions were taken of certain individuals." (Dkt. No. 317 at 137, citing RT 5188.) Petitioner's claim is conclusory. He fails to demonstrate how he suffered any prejudice from Officer Keltner's statements and what benefit he would have obtained from objecting. The California Supreme Court was not unreasonable in finding that Petitioner failed to make a showing of ineffective assistance of counsel for failure to object.

> l. *Failure to Object to Testimony About Navarro Residence*

Petitioner contends that his trial attorney provided ineffective representation in failing to object to the testimony of prosecution witness Connie Sue Lowe who

testified "about the Navarro residence." (Dkt. No. 317 at 137-38, citing RT 5262-82.) Petitioner suggests that counsel should have objected "on federal constitutional grounds or under California Evidence Code §352." (Dkt. No. 317 at 137.) Petitioner's claim is conclusory. Petitioner fails to identify the basis for any objection, or to demonstrate either deficient performance or prejudice. The California Supreme Court was not unreasonable in finding that Petitioner failed to make a showing of ineffective assistance of counsel for failure to object.

     m.  *Failure to Object to Testimony About Jovita's Statements*

During his direct examination of witness Mindy Jackson, the Navarro's neighbor, the prosecutor questioned Ms. Jackson about Jovita's opinion of Dominique's relationship with Petitioner. Ms. Jackson testified that Jovita did not like them dating "because the two got in trouble together." (RT 5392-93.) She went on to say that Dominique had been skipping school, that Jovita planned to move to make the relationship more difficult to maintain, and that Dominique had a curfew. (RT 5393-96.) Petitioner argues that trial counsel provided constitutionally deficient representation in failing to request a limiting instruction with regard to Jovita's statements "that Petitioner was a bad influence on . . . Dominique. . ." (Dkt. No. 3177 at 138.) However, the Court did instruct the jury during Ms. Jackson's testimony that, "with regards to the statements by the alleged victim in the case, Jovita Navarro, to this [Ms. Jackson], [the jury was] to consider those statements only for the state of mind of the victim and for no other reason." (RT 5395-96.) The California Supreme Court's finding of no constitutional error was not an unreasonable application of clearly established federal law under section 2254(d)(1), nor an unreasonable determination of the facts under section 2254(d)(2).

     n.  *Failure to Object to Steve Arce's Testimony Regarding Statements of Third Parties*

The prosecution called Steve Arce to testify at Petitioner's trial. He testified

67

that he had seen the martial arts weapon depicted in People's Exhibits 51A in Petitioner's car. (RT 5752-53.)  Mr. Arce also testified that a couple of weeks before Jovita's death, he heard Petitioner say that "Dominique's mom didn't want [Dominique] to go out with him and he wanted to kill [Jovita]." (RT 5754.)  Over a defense objection under Evidence Code 352, the Court permitted the prosecution to question Mr. Arce regarding two prior incidents when Petitioner used martial arts. (RT 5758-61.)  The trial court found the prejudicial impact of the testimony to be outweighed by its probative value. (RT 5756-57.)  On cross-examination, Petitioner's trial attorney questioned Mr. Arce about why, sometime after July 6, 1983, he called the La Habra Police for assistance. (RT 5815-16.) In reply, Mr. Arce testified that "some guys came to [his] house threatening [him], telling [him that he] better not testify." (RT 5816.)  Subsequently, on redirect, the prosecution asked some follow-up questions about the incident. The court overruled a defense relevancy objection and allowed Mr. Arce to provide additional details about why he called the police.  He testified that "guys came up to [his] door and they said if [he] didn't want to end up like Dominique's mom, . . . [he] wouldn't testify." (RT 5820.)  They mentioned Petitioner's name, and Mr. Arce subsequently told police about the incident. (RT 5820.)

Petitioner argues that trial counsel provided ineffective assistance in failing to raise unspecified "federal constitutional or hearsay objections, or objections under Evidence Code §352" to Mr. Arce's testimony about the threats. (Dkt. No. 317 at 138.)  However, as Respondent notes, evidence of threats made to a witness is admissible where it aids the jury in assessing the witness's credibility. Under state law, evidence a witness was threatened and is afraid to testify is relevant to the credibility of that witness and is therefore admissible. Evid.Code, § 780; *People v. Warren,* 45 Cal.3d 471, 481 (1988). It is not necessary to show threats against the witness were made by the defendant personally. *People v. Green,* 27 Cal.3d 1, 19–20 (1980).  As such, counsel's performance was not deficient.

Moreover, in light of strength of the evidence against Petitioner at trial, Petitioner fails to demonstrate that he suffered prejudice as a result of counsel's failure to object. The California Supreme Court's finding of no constitutional error was not an unreasonable application of clearly established federal law under section 2254(d)(1), nor an unreasonable determination of the facts under section 2254(d)(2).

o.    *Failure to Object to Michael Moore's Testimony Regarding His Conversation with Steve Arce*

After Steve Arce testified during the prosecution's case in chief, the defense called La Habra Police Homicide Investigator Michael Moore to testify regarding his July 7, 1983 interview of Mr. Arce. (RT 6523.) On cross-examination, the prosecutor questioned Investigator Moore regarding statements Mr. Arce made about a fight he had with Petitioner in which Petitioner used martial arts. (RT 6534-35.) Petitioner argues that trial counsel provided ineffective assistance of counsel in failing to make a hearsay objection to this line of cross-examination. (Dkt. 317 at 138.) As discussed just above, because Mr. Arce himself testified regarding the fight, trial counsel could quite reasonably have chosen not to object to Investigator Moore's testimony regarding the same facts. Moreover, Petitioner cannot demonstrate that he suffered prejudice as a result of counsel's failure to object. The California Supreme Court's finding of no constitutional error was not an unreasonable application of clearly established federal law under section 2254(d)(1), nor an unreasonable determination of the facts under section 2254(d)(2).

p.    *Failure to Object to Use of Phone Company Records to "Refresh" Witness's Recollection*

The defense called Petitioner's sister, Sarita Noguera Perez, to testify during the guilt phase of trial. (RT 6549.) On cross-examination the prosecutor asked Ms. Perez if she remembered the phone number for the Noguera family's residence on

the date of the murder. (RT 6575.)  Ms. Perez stated she thought it was 918-6240, but she "couldn't tell . . . for sure." (RT 6575.) The prosecutor subsequently questioned Ms. Perez regarding People's Exhibit 106, the phone records of Antonio Contreras, which indicated "several calls" to the 918-6240 number. (RT 6576.) He asked Ms. Perez if the records refreshed her recollection as to whose phone number that was, and she said "that was ours." (RT 6576.)  Petitioner contends that trial counsel provided ineffective assistance in failing to object to the improper use of the phone company records to refresh Ms. Perez's recollection "when her recollection did not need to be refreshed." (Dkt. No. 317 at 138.) Petitioner's claim is entirely without merit. Ms. Perez stated that she was not sure about the phone number. After the prosecutor showed her the record, she recalled the number definitively.  Petitioner has failed to demonstrate either deficient performance or prejudice.  The California Supreme Court's finding of no constitutional error was not an unreasonable application of clearly established federal law under section 2254(d)(1), nor an unreasonable determination of the facts under section 2254(d)(2).

q.  *Failure to Object to Hearsay Testimony of Sarita Salinas Noguera*

During direct examination of Petitioner's mother, Sarita Salinas Noguera, defense counsel asked Ms. Noguera about contacts she had with Dominique after her mother's death. (RT 6648-49.) After Ms. Noguera affirmed that Dominique had called to talk about "her situation," defense counsel asked "what exactly did she tell you?" (RT 6649.)  The prosecution made a hearsay objection, to which defense counsel responded that the statement was offered as a "statement of a co-conspirator." (RT 6649.)  However, because the statement was not offered *against* a party to the conspiracy, the objection was sustained. (RT 6649-50.)  Petitioner argues that trial counsel provided ineffective assistance in failing to explain that Dominique's statements were not being offered for their truth. (Dkt. No. 317 at

70

138.) Trial counsel's arguments, at sidebar, that Dominique's statements fell under an exception to the hearsay rule and were being offered "by way of rebuttal" to the prosecution's contention that "Dominique was continuing to pursue her attorney, drawing the inference she wanted to get the money, get the house," belie Petitioner's contention that Dominque's statements were not being offered for their truth. (RT 6649-50.) Petitioner fails to explain what counsel expected to elicit, and what purpose, other than truth, Dominique's statements would have served. Petitioner has not met his burden under *Strickland* to demonstrate either deficient performance or prejudice. The California Supreme Court's finding of no constitutional error was not an unreasonable application of clearly established federal law under section 2254(d)(1), nor an unreasonable determination of the facts under section 2254(d)(2).

Particularly given the other evidence presented at trial, there is nothing to suggest a likelihood that any of the alleged errors discussed in Claim 13 resulted in prejudice. *See United States v. O'Neal*, 937 F.2d 1369, 1376 (9th Cir.1990) (denying ineffective assistance of counsel claim because "[e]ven if defense counsel's failure to call more witnesses fell below the standard of competent representation," evidence of guilt was "strong" and thus defendant could not show prejudice under *Strickland* ), *superseded by statute on other grounds as recognized by United States v. Sahakian*, 965 F.2d 740, 742 (9th Cir.1992); *Wood v. Ryan*, 693 F.3d 1104, 1119 (9th Cir.2012) (denying ineffective assistance- of counsel claim challenging counsel's failure to object to certain evidence because counsel's decisions were consistent with overall trial strategy and "strong evidence" supported jury's verdict in any event), *cert. denied*, __ U.S. __, 134 S.Ct. 239 (2013).

The California Supreme Court's finding of no constitutional error was not an unreasonable application of clearly established federal law under section 2254(d)(1), nor an unreasonable determination of the facts under section

2254(d)(2). Claim 13 is DENIED.

11.   ***CLAIM 14: Petitioner's Trial Counsel Unreasonably Failed to Participate in the District Attorney's Pretrial Penalty Evaluation Process Despite Invitations from the District Attorney to Do So***

In Claim 14, Petitioner argues that his trial counsel provided ineffective representation in ignoring pre-trial invitations to participate in hearings to determine whether Petitioner would face the death penalty.  (Dkt. No. 317 at 139-43.) Petitioner raised this claim for the first time in state court as Claim 7 in his March 1998 exhaustion petition.  (Dkt. No. 336, Lodgment 4 at 142-44.) The California Supreme Court summarily denied the claim on the merits and, alternatively, found the claim to be untimely.  (Dkt. No. 336, Lodgment 8.)

Respondent argues that Petitioner has failed to meet his burden of showing that the California Supreme Court's resolution of the claims amounted to an unreasonable application of clearly established Federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding and, as such, Petitioner is barred from relitigating the claims in federal court.  28 U.S.C. §2254(d); *Pinholster*, 563 U.S. at 181-82.

Because this claim is integrally related to Claims 1, 4, 6, 7 and 10, the Court grants relief with respect to Claim 14.

12.   ***CLAIM 15: Petitioner's Trial Counsel Unreasonably Gave a Closing Argument that Contained Matters Prejudicial to Petitioner***

In Claim 15, Petitioner argues that counsel provided deficient representation during penalty phase closing argument.  (Dkt. No. 317 at 143-46.) Petitioner raised this claim in state court as Claim 8 in his March 1998 exhaustion petition.  (Dkt No. 336, Lodgment 4 at 144-46.) The California Supreme Court summarily denied the claim on the merits and, alternatively, found the claims to be untimely. (Dkt.

No. 336, Lodgment 8.)

Respondent argues that Petitioner has failed to meet his burden of showing that the California Supreme Court's resolution of the claims amounted to an unreasonable application of clearly established Federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding and, as such, Petitioner is barred from relitigating the claims in federal court.  28 U.S.C. §2254(d); *Pinholster*, 563 U.S. at 181-82.  This Court agrees.

During his penalty phase closing argument Mr. Pereyda argued:

> Now, if you have listened to our petition and you grant our petition, Billy will spend the rest of his life in prison.

> There was an article in the Orange County Register. . . on May 18, 1987 . . . . headlined as follows: Singlton: How '77 Laws Set Him Free.

> And they went on to say in the article contained in The Register that he, Lawrence Singleton – I don't know if you recall who he was, but he was convicted of rape and he's the one that dismembered a young girl . . . [¶] [a]nd they went on to say he only spent eight and a half years of a 14-years sentence."

> That is not going to be Billy's fate. If you give him life, that means that Billy will spend the rest of his life in prison. . .

(RT 8671.) Counsel went on to describe all of the things that Petitioner would *not* be able to do in prison, and all of the things in life he would miss out on – things he enjoyed, and things to which he had looked forward. (RT 8671-74.)

Petitioner contends that counsel's reference to the infamous Singleton case in Orange County inflamed and horrified the jury, encouraging them to vote of the death penalty, and prejudicing Petitioner. (Dkt. No. 317 at 144-45.) However, read in context, it is clear, as Respondent argues, that "[t]he point of counsel's argument was to impress upon the jury that a life sentence would in fact be terribly

punishing to [P]etitioner, and that, unlike Singleton, [P]etitioner would never get out.. . . " (Dkt. 330 at 53.) Given the context of the case, and the public notoriety of the Singleton case during the litigation of Petitioner's capital trial, counsel's strategy was not unreasonable.

Petitioner also argues that counsel argued "that Petitioner would be better off dead than with a sentence of life without the possibility of parole." (Dkt. No. 317 at 144-45.) Counsel did not make such an argument. Rather, counsel made an effort to describe for the jury the harsh reality of a sentence of life in prison without possibility of parole. (RT 8671-74.) At no time did counsel suggest that Petitioner would be better off dead than in prison. He did, however, explain to the jury that Petitioner was not Lawrence Singleton; he would "spend the rest of his life in prison." (RT 8671.) He would never again celebrate holidays or see his family at home. (RT 8672.) He would never again play the guitar or accordion. (RT 8672.) He would not have the opportunity to watch his children grow up, or spend time with them. (RT 8673.) Trial counsel explained that a life without parole prison sentence for Petitioner meant "spending the rest of his life in a cell" with only "fear in what the next day brings" as a companion. (RT 8673.) Clearly, counsel's strategy was to stress for the jury that life without possibility of parole was a severe sentence.

The California Supreme Court's finding of no constitutional error was not an unreasonable application of clearly established federal law under section 2254(d)(1), nor an unreasonable determination of the facts under section 2254(d)(2). Claim 15 is DENIED.

13. ***CLAIM 16: The Cumulative Effect of the Ineffective Assistance of Counsel at the Guilt and Penalty Phases of Petitioner's Trial Require that Petitioner's Conviction and Death Judgment Be Vacated***

In Claim 16, Petitioner argues that he suffered prejudice as a result of the

cumulative instances of counsel's alleged ineffective assistance. (Dkt. No. 317 at 146-49.) Petitioner raised this claim for the first time in state court as Claim 9 in his March 1998 exhaustion petition. (Dkt. 336, Lodgment 4 at 147.) The California Supreme Court summarily denied the claim on the merits and, alternatively, found the claims to be untimely. (Dkt. No. 336, Lodgment 8.)

Respondent argues that Petitioner has failed to meet his burden of showing that the California Supreme Court's resolution of the claims amounted to an unreasonable application of clearly established Federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding and, as such, Petitioner is barred from relitigating the claims in federal court. 28 U.S.C. §2254(d); *Pinholster*, 563 U.S. at 181-82.

In light of this Court's finding, granting relief on Claims 1, 4, 6, 7, 10 and 14, the Court grants relief on Claim 16.

## C. <u>Incompetence</u>

### 1. *Standard for Relief for Mental Competency Claims*

A defendant has a due process right not to be tried while incompetent. *See Drope v. Missouri,* 420 U.S. 162, 172 (1975); *Pate v. Robinson,* 383 U.S. 375, 378 (1966). Competence to stand trial requires (1) "sufficient present ability to consult with [a] lawyer with a reasonable degree of rational understanding" and (2) "a rational as well as factual understanding of the proceedings." *Dusky v. United States,* 362 U.S. 402 (1960). When the evidence raises a bona fide doubt about the defendant's mental competence, due process requires a full competency hearing. *Pate,* 383 U.S. at 385; *Stanley v. Cullen,* 633 F.3d 852, 860 (9th Cir.2011); *Hernandez v. Ylst,* 930 F.2d 714, 716 (9th Cir.1991). The question to be asked by the reviewing court is " 'whether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial.' " *Stanley,* 633 F.3d at 860 (quoting *de Kaplany v. Enomoto,* 540 F.2d 975, 983 (9th Cir.1976) (en

banc)).

"[E]vidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required"; any one of those factors "standing alone may, in some circumstances, be sufficient." *Drope,* 420 U.S. at 180. "There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated." *Id.; accord McMurtrey v. Ryan,* 539 F.3d 1112, 1118 (9th Cir.2008).

The Supreme Court has recognized a due process right to competence during the trial itself. *See Cooper v. Oklahoma,* 517 U.S. 348, 354 (1996); *Medina v. California,* 505 U.S. 437, 453 (1992); *Drope v. Missouri,* 420 U.S. at 171; *Pate v. Robinson,* 383 U.S. at 378; *cf. Spain v. Rushen,* 883 F.2d 712, 722, 728 (9th Cir.1989) (finding a constitutional violation where severe and prolonged shackling impaired the defendant's mental faculties and ability to communicate with counsel), *cert. denied*, 495 U.S. 910 (1990). A criminal defendant must have " 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding ... [and] a rational as well as factual understanding of the proceedings against him.' " *Cooper,* 517 U.S. at 354 (quoting *Dusky v. United States,* 362 U.S. at 402). The rationale for the requirement has shifted somewhat over time.  Capacity for rational communication once mattered because it meant the ability to defend oneself, *see Faretta v. California,* 422 U.S. 806, 823–26 (1975); John H. Langbein, *The Criminal Trial Before the Lawyers,* 45 U. Chi. L.Rev. 263 (1978), while it now means the ability to assist counsel in one's defense, *see Cooper,* 517 U.S. at 354.  But whatever the rationale for the requirement, capacity to communicate remains a cornerstone of due process at trial.

## 2. *CLAIMS 17 and 18*

In Claims 17 and 18, Petitioner argues that he was incompetent to stand trial such that the trial court erred in failing to inquire into his competence (Dkt. No. 317 at 149-58) and he was not mentally present during crucial trial proceedings (Dkt. No. 317 at 158-60). He argues that his convictions and sentences violate the Fifth, Sixth, Eighth and Fourteenth Amendments because he lacked "'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding'" and "'a rational as well as factual understanding of the proceedings against him.'" *Godinez v. Moran*, 509 U.S. 389, 396 (1993) (quoting *Dusky v. United States*, 362 U.S. 402). Petitioner raised these claims in his March 1998 exhaustion petition. The California Supreme Court summarily denied the claims on the merits and, alternatively, found the claims to be *Dixon* barred. (Dkt. No. 336, Lodgment 8.)

Respondent argues that Petitioner has failed to meet his burden of showing that the California Supreme Court's resolution of the claims amounted to an unreasonable application of clearly established Federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding and, as such, Petitioner is barred from relitigating the claims in federal court. 28 U.S.C. §2254(d); *Pinholster*, 563 U.S. at 181-82. This Court agrees.

### a. *Facts Presented to the California Supreme Court*

With respect to his claims of incompetence, Petitioner generally alleged in Claims 10 and 11 of his 1998 exhaustion petition that he was mentally incompetent, unable to understand the nature of the criminal proceedings against him, unable to assist counsel in the conduct of his defense in a rational manner, and "not mentally present during crucial periods of the trial." Although his exhaustion petition provided some details regarding his alleged pre-existing mental impairments (diagnosed after the filing of the federal petition), and his alleged use of mind-altering drugs during trial, he failed to provide any supporting

77

documentation to establish that his condition prevented him from understanding the proceedings against him or that he was unable to assist counsel in his defense. Petitioner did not present any evidence showing that issues involving his competence should have been known to the trial court such that a *sua sponte* inquiry should have been made, nor did he provide reason to believe that he was in fact incompetent at trial. (Dkt. No. 336, Lodgment 4 at 147-57.)

In support of the claims, Petitioner submitted declarations from three former inmates in the Orange County Jail (Exhibits DD (Willie Wisely), EE (Rodney Beeler), and FF (John Galen Davenport)), his mother (Exhibit AA), his wife (Exhibit GG), a psychiatrist (Exhibit B (Fred Rosenthal)), and a psychologist (Exhibit Y (Anne Evans)).

> b. *California Supreme Court's Adjudication of Petitioner's Claim Was Neither an "Unreasonable Application of Clearly Established Federal Law" Nor an "Unreasonable Determination of the Facts" Within the Meaning of §2254(d)*

The Court finds that the California Supreme Court's summary denials of Claims 10 and 11 of the 1998 exhaustion petition were neither an unreasonable application of clearly established federal law, nor an unreasonable determination of the facts, within the meaning of §2254(d), such that Petitioner is entitled to de novo review in federal habeas corpus proceedings. Petitioner points to no evidence that should have raised a bona fide doubt about his mental competence. His habeas filing with the state courts pled conclusory allegations, e.g., "[h]e was unable to understand the nature of the criminal proceedings due to mental disorders . . ."; "[he] was unable to assist counsel . . ."; "during relevant court proceedings, Petitioner was irrational and out-of-contact with reality"; "he suffered at relevant times from a debilitating mental illness . . ."; and his mental illness "was substantially compounded and aggravated at relevant times by the

ingestion of drugs." (Dkt. No. 336, Lodgment 4 at 148.) Petitioner supported his state habeas claim with declarations from family members and jail inmates who offered observations about Petitioner's behavior and drug use in the Orange County Jail, and declarations from a forensic psychiatrist and a forensic psychologist who offered their opinions,18 years post-trial, that they had doubts about Mr. Noguera's competency to stand trial, largely due to his drug use. Petitioner did not attach a transcript or other evidence of record that would have prompted further inquiry into his mental competence.

In fact, as Respondent points out, Petitioner's claims are belied by the trial record, which includes approximately 167 pages of Noguera's testimony in which he comes across as rational and aware of many details. (RT 7618-7785.) Moreover, though cited by Petitioner in support of his claim of incompetence, Francesca Mozqueda's declaration actually portrays Petitioner as a man with a thorough understanding of his situation and the proceedings against him, and a man with sufficient ability to consult with his lawyer with a reasonable degree of rational understanding. *Godinez v. Moran*, 509 U.S. at 396. Ms. Mozqueda noted that Petitioner "would cry and express how desperate and helpless he felt"; he discussed psychological defenses with his attorneys and wanted to be psychologically evaluated. (Exh. GG at 5.) In addition, the record indicates Petitioner was sufficiently aware of his situation that he attempted to intimidate witnesses to testify on his behalf. At trial, after testifying on Petitioner's behalf, Margaret Noone was recalled by the prosecution on rebuttal and testified that she lied on direct because she was afraid of, and was threatened by, Petitioner. *People v. Noguera*, 4 Cal.4th at 619. Thus, the Court concludes that Petitioner's state habeas petition offered no facts from which a court could plausibly find a valid claim based on mental incompetence. Claims 17 and 18 are DENIED.

*//*

## D.  **Prosecutorial Misconduct Claims**

### 1.  *Legal Standard*

A habeas petition alleging prosecutorial misconduct will be granted only when the misconduct"so infect[ed] the trial with unfairness as to make the resulting conviction a denial of due process." *Greer v. Miller,* 483 U.S. 756, 765 (1987) (*quoting Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974)): *see also Darden v. Wainwright,* 477 U.S. 168, 181 (1986). "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips,* 455 U.S. 209, 219 (1982). Under *Darden,* the first issue is whether the prosecutor's remarks or conduct were improper; if so, the next question is whether such remarks or conduct infected the trial with unfairness. *Tan v. Runnels,* 413 F.3d 1101, 1112 (9th Cir.2005) (*citing Darden,* 477 U.S. at 181), *cert. denied,* 546 U.S. 1110 (2006).  Eliciting inadmissible evidence may constitute misconduct when the prosecutor's actions were knowing and intentional. *See United States v. Percy,* 250 F.3d 720, 729 (9th Cir.), *cert. denied,* 534 U.S. 1009 (2001).

### 2.  *Pre-Trial & Guilt Phase*

a.  *CLAIM 20 (and portion of Claim 47): The Prosecutor's Improper Voir Dire Questions and Argument Misled the Jurors About the Scope of Their Sentencing Discretion*

In Claim 20, Petitioner argues that the prosecutor erroneously questioned the jury regarding whether they could sentence petitioner to death once they recognized his humanity.  (Dkt. No. 317 at 164-68.)  In Claim 47, Petitioner similarly argues that the prosecutor committed misconduct by asking jurors if they could impose the death penalty for a person who looked and acted normally in court. (Dkt. No. 317 at 267-274.) Petitioner raised some of these arguments for the first time in state court as Claim 14 on direct appeal. (Dkt. No. 148, Lodgment 1 at 157-64.) The California Supreme Court rejected the claims on the merits. *People*

*v. Noguera*, 4 Cal.4th at 645-47. Petitioner raised additional arguments in Claim 8 in his 2003 exhaustion petition. (Dkt. No. 336, Lodgment 9 at 96-99.)  The California Supreme Court summarily denied the claims on the merits and, alternatively, found the claims to be untimely, barred for having been previously raised on appeal, barred for not having previously been raised on direct appeal, and successive.  (Dkt. No. 336, Lodgment 12.)

Respondent argues that Petitioner has failed to meet his burden of showing that the California Supreme Court's resolution of the claims amounted to an unreasonable application of clearly established Federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding and, as such, Petitioner is barred from relitigating the claims in federal court.  28 U.S.C. §2254(d); *Pinholster*, 563 U.S. at 181-82.

Petitioner's objection to the prosecutor's voir dire questions is essentially an objection to death qualification. The prosecutor sought to empanel jurors who would be willing and able to impose the death penalty upon the defendant in the case before them – a defendant with whom they might identify, or for whom they might have sympathy.  As such, the district attorney's questions focused on whether the jurors could vote for death. With regard to Juror Celine Reilly, the prosecutor asked, "if you find him guilty of first degree murder, . . . and we get to the penalty phase. And you weigh the aggravation versus the mitigation, and you feel that death is the appropriate penalty, do you have it in you to be a participant in a decision with 11 other people that in all actuality would result in the death of another human being?" (RT 2972-73.)  This was proper voir dire, as were similar questions asked of Juror Janice Berens (RT 2258), Juror Ruth Stasiak (RT 3781), and alternate Carol Newton (RT 3680-81). Nothing about the prosecutor's voir dire misled the jurors about the scope of their sentencing discretion. *See e.g., Lockhart v. McCree*, 476 U.S. 162, 178 (1986) (death qualification does not violate a defendant's right to a fair and impartial jury); *Wainwright v. Witt*, 469

81

U.S. 412, 424 (1985); *Adams v. Texas*, 448 U.S. 38, 45 (1980).

The California Supreme Court's finding of no constitutional error was not an unreasonable application of clearly established federal law under section 2254(d)(1), nor an unreasonable determination of the facts under section 2254(d)(2). Claim 20 and the portion of Claim 47 addressing voir dire are DENIED.

> b. <u>*CLAIM 21: The Prosecutor's Improper Voir Dire Questions and Argument Violated the Requirement of an Individualized Sentencing Determination*</u>

In Claim 21, Petitioner argues that his constitutional rights were violated because the prosecutor posed voir dire questions and made penalty phase closing argument that prevented the jury from making an individualized sentencing determination. (Dkt. No. 317 168-72.) Petitioner raised portions of this claim for the first time in state court as Claim 18 on direct appeal. (Dkt. No. 148, Lodgment 1 at 191-96.) He argued that the prosecutor was improperly permitted to ask voir dire questions, and make a closing argument, that diminished the mitigating effect of Petitioner's age and the fact that he had committed a single murder. (Dkt. No. 148, Lodgment 1 at 195-96.) The California Supreme Court rejected the claim on the merits, finding that the district attorney's voir dire questions properly elicited information regarding the jurors' abilities to consider imposing a death sentence under the facts of the case. *People v. Noguera*, 4 Cal.4th at 647 (the prosecutor "was merely making the entirely proper argument that the circumstances under which the murder of Jovita Navarro occurred were sufficiently aggravating to warrant the death penalty, despite defendant's youth and the fact that there was only one victim."). Petitioner raised the clam again in his June 2003 exhaustion petition, adding constitutional claims that the prosecutor's actions denied him effective assistance of counsel, a fair trial, an impartial jury, a reliable special circumstance determination, a fair and reliable penalty phase determination, equal

protection of the law, and due process of law. (Dkt. 336, Lodgment 9 at 99-100.) The California Supreme Court summarily denied the claim on the merits and, alternatively, denied the claim as untimely, barred for having been previously raised on appeal, barred for not having been previously raised on appeal, and successive. (Dkt. No. 336, Lodgment 12.)

Respondent argues that Petitioner has failed to meet his burden of showing that the California Supreme Court's resolution of the claim amounted to an unreasonable application of clearly established Federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding and, as such, Petitioner is barred from relitigating the claim in federal court. 28 U.S.C. §2254(d); *Pinholster*, 563 U.S. at 181-82. This Court agrees.

With regard to voir dire, Petitioner contends that the prosecutor asked questions that required jurors to prejudge the aggravating and mitigating evidence, creating "an unconstitutional presumption in favor of death." (Dkt. No. 317 at 170.) Petitioner suggests that the voir dire questions, and particularly the prosecutor's penalty phase closing argument "led the jury to believe that Petitioner's individual characteristics need not be considered because the crime was, in the prosecutor's view, so horrible that nothing could mitigate it." (Dkt. No. 317 at 170-71.) With respect to voir dire, Petitioner's claim is conclusory. He fails to point to particular questions he claims required the jury to prejudge the evidence. As such, this Court cannot find that the prosecutor's questions were improper rather than within the district attorney's right to inquire into jury bias. As discussed *infra*, nothing about the prosecutor's voir dire misled the jurors about the scope of their sentencing discretion. *See e.g., Lockhart v. McCree*, 476 U.S. at, 178 (death qualification does not violate a defendant's right to a fair and impartial jury); *Wainwright v. Witt*, 469 U.S. at 424; *Adams v. Texas*, 448 U.S. at 45. With respect to the prosecutor's penalty phase closing argument, the excerpts Petitioner cites in support of his claim reveal nothing improper. (Dkt. No. 317 at 170 n.11.)

83

Petitioner was convicted of first-degree special circumstances murder, and the prosecutor argued that the evidence in aggravation warranted a death sentence. This was proper argument.

In Mr. Pereyda's closing argument, he was free to dispute the prosecutor's claims, to discuss the evidence presented in mitigation, to argue a different interpretation of the weighing process, to clarify any concerns about the jury's perception of its sentencing discretion, and to draw the jury's attention to the penalty phase instructions. As discussed below, defense counsel properly directed the jury's attention to the penalty phase instructions, quoted CALJIC 8.84.2, explicitly informed the jury that they could return a life verdict even if they found that the aggravating evidence outweighed the mitigating evidence, and detailed the mitigating factors he thought the jury should consider. Moreover, the trial court instructed the jury that "[s]tatements made by the attorneys during trial are not evidence" (CT 1379; RT 8678) and gave the modified version of CALJIC 8.84.1, submitted by the defense (CT 1245-46), advising the jury that "[i]n determining which penalty is to be imposed on the defendant, you shall consider all of the evidence which has been received during any part of the trial of this case. . ." including factor (k). (RT 8696-99; CT 1407-08.) The Court also gave the defense's special instructions, focusing on mitigation (RT at 8696-99; CT at 1409, 1247), and sympathy. (RT 8704; CT 1253, 1416.) The jurors were also instructed that they must "determine the facts of the case from the evidence received in the trial and not from any other source." (CT 1593.) The Court must "generally presume that jurors follow their instructions." *Penry v. Johnson*, 532 U.S. 782, 799 (2001); see also *Cheney v. Washington*, 614 F.3d at 997. "The Court presumes that jurors, conscious of the gravity of their task, attend closely to the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them." *Francis v. Franklin*, 471 U.S. 307, 324 n. 9 (1985). Further, "it is well established that 'arguments of

84

counsel generally carry less weight with a jury than do instructions from the court.' " *Cheney*, 614 F.3d at 997 (citing *Boyde v. California*, 494 U.S. 370, 384 (1990); *see also Waddington v. Sarausad*, 555 U.S. 179, 194-95 (2009) (finding that the state court reasonably concluded that the prosecutor's use of an improper hypothetical during closing argument "did not taint the proper instruction of state law," because of the foregoing statement in *Boyde* ). "[J]uries generally 'vie[w] [closing arguments] as the statements of advocates' rather than 'as definitive and binding statements of the law.' " *Sarausad*, 555 U.S. at 195 n. 6 (quoting *Boyde*).

Petitioner has not adduced any evidence showing that the jury failed to follow the trial court's instructions. The California Supreme Court's finding of no constitutional error was not an unreasonable application of clearly established federal law under section 2254(d)(1), nor an unreasonable determination of the facts under section 2254(d)(2). Claim 21 is DENIED.

       c.     *<u>CLAIM 24: The Prosecution Discriminatorily Used Peremptory Challenges to Remove Jurors Who Were Hispanic and Other People of Color from Petitioner's Jury, and Petitioner's Trial Counsel Unreasonably Failed to Object to this Misconduct</u>*

In Claim 24, Petitioner claims that his Fifth, Sixth, Eighth and Fourteenth Amendment rights were violated "because the prosecution discriminatorily used peremptory challenges to remove jurors who were Hispanic and other people of color from Petitioner's jury." (Dkt. No. 317 at 180-82.) Petitioner raised this claim for the first time in state court as Claim 14 of his March 1998 exhaustion petition. (Dkt. No. 336, Lodgment 4 at 163-64.) The California Supreme Court summarily denied the claim on the merits and, alternatively, found the claim to be untimely. (Dkt. No. 336, Lodgment 8.)

Respondent argues that Petitioner has failed to meet his burden of showing that the California Supreme Court's resolution of the claim amounted to an

85

unreasonable application of clearly established Federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding and, as such, Petitioner is barred from relitigating the claim in federal court.  28 U.S.C. §2254(d); *Pinholster*, 563 U.S. at 181-82.  This Court agrees.

Petitioner's claim is entirely conclusory. He fails to cite any factual support for his allegations. The California Supreme Court's finding of no constitutional error was not an unreasonable application of clearly established federal law under section 2254(d). Claim 24 is DENIED.

### 3.  *Penalty Phase Summation*

Petitioner avers that the prosecutor committed various acts of misconduct during penalty phase closing argument.  Federal habeas corpus review of prosecutorial misconduct claims is limited to the narrow issue of whether the alleged misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. at 181 (*quoting Donnelly v. DeChristoforo*, 416 U.S. at 643).  The "standard allows a federal court to grant relief on habeas review when the state court trial was fundamentally unfair but avoids interfering in state-court proceedings when errors fall short of constitutional magnitude." *Drayden v. White*, 232 F.3d 704, 713 (9th Cir. 2000), *cert. denied*, 532 U.S. 984 (2001). "To constitute a due process violation, the prosecutorial misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial." *Greer v. Miller*, 483 U.S. at 765. "[P]rosecutorial misconduct[] warrant[s] relief only if [it] 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Wood v. Ryan*, 693 F.3d at 1113 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

With respect to summations, a reviewing court should consider challenged remarks in light of the realistic nature of closing arguments at trial. Counsel are given latitude "in the presentation of closing arguments, " and courts must allow prosecutors "to strike hard blows based on the evidence presented and all

reasonable inferences therefrom." *Ceja v. Stewart*, 97 F.3d 1246, 1253-54 (9th Cir. 1996) (quoting *United States v. Baker*, 10 F.3d 1374, 1415 (9th Cir. 1993)), *cert. denied,* 522 U.S. 971 (1997); *United States v. Molina*, 934 F.2d at 1445 (noting that a prosecutor must have "reasonable latitude" to fashion closing arguments). "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). Thus, "[i]mproper argument does not, per se, violate a defendant's constitutional rights." *Jeffries v. Blodgett*, 5 F.3d 1180, 1191 (9th Cir.1993), *cert. denied*, 510 U.S. 1191 (1994). "[I]t is not enough that the prosecutor's remarks were undesirable or even universally condemned." *Darden*, 477 U.S. at 181 (internal punctuation and citation omitted). Rather, the Court must determine whether remarks rendered a trial fundamentally unfair, looking at the challenged remarks in the context of the entire proceeding to determine whether the argument influenced the jury's decision. *Boyde v. California*, 494 U.S. at 385; *Greer v. Miller*, 483 U.S. at 765–66*; Darden*, 477 U.S. at 179-82; *Hall v. Whitley*, 935 F.2d 164, 165 (9th Cir.1991). A prosecutor's comments in summation constitute grounds for reversal only when the remarks caused actual prejudice. *Shaw v. Terhune*, 380 F.3d 473, 478 (9th Cir. 2004) (applying harmless error test to claim of prosecutorial misconduct in summation); *Fields v. Woodford*, 309 F.3d 1095, 1109 (9th Cir.), as amended by 315 F.3d 1062 (9th Cir.2002).

As an initial matter, on direct appeal the California Supreme Court rejected Petitioner's arguments raised in claims 43 through 50, and 52, due to a failure to object at trial. *People v. Noguera*, 4 Cal.4th at 638, 644. Consequently, because the Court found these contentions forfeited under California's contemporaneous objection rule, they are procedurally defaulted from federal habeas review. *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991) (a federal court will not review a claim if the state court's rejection of the claim rests on a state law ground

that is independent of the federal question and adequate to support the judgment). The Ninth Circuit has repeatedly recognized and applied the California contemporaneous objection rule in affirming denials of federal habeas petitions on grounds of procedural default where there was a failure to object at trial. *See, e.g., Inthavong v. Lamarque*, 420 F.3d 1055, 1058 (9th Cir. 2005), *cert. denied,* 547 U.S. 1059 (2006); *Paulino v. Castro*, 371 F.3d 1083, 1092-93 (9th Cir. 2004); *Melendez v. Plieler*, 288 F.3d 1120, 1125 (9th Cir. 2002).

In addition, the California Supreme Court found that trial counsel's failure to object was not ineffective assistance of counsel, as there was no reasonable likelihood that any of the challenged comments might have been misconstrued by the jurors. *People v. Noguera*, 4 Cal. 4th at 638-39. The Court explicitly found that "[t]he prosecutor neither vouched personally for the death penalty as an appropriate sentence nor argued on the basis of facts not in evidence." *Id.* at 639. As such, the Court determined that the prosecutor did not commit prejudicial misconduct. Even if Petitioner's claims were not procedurally defaulted, he would not be entitled to relief because, as discussed in further detail below, the California Supreme Court was not unreasonable in finding that they are without merit.

> a. *CLAIM 43 – The Prosecutor Committed Misconduct When He Expressed His Personal Opinion About the Gravity of the Crime*

In Claim 43, Petitioner suggests that the prosecutor committed prejudicial misconduct during penalty phase closing argument when he made statements expressing "a personal opinion that the crime was worse than any other." (Dkt. No. 317 at 247.) Specifically, Petitioner takes issue with the prosecutor's statement that, "There are lots and lots of murders which are prosecuted in this courthouse in which this type of penalty is not sought. There's a reason for that." (RT 8631.) He also notes that the prosecutor later continued by saying that he could "think of no other crime involving one victim that is so horrible that the

1    evidence suggests that you shouldn't impose the death penalty." (RT 8658.)

2        Petitioner argues that these statements referenced the prosecutor's personal

3    belief regarding Petitioner's guilt, or the appropriateness of the death penalty,

4    based upon facts not in evidence. Petitioner suggests the statement violated

5    section 3-58(b) of the ABA Standards of Criminal Justice, which provides that

6    "[i]t is unprofessional conduct for the prosecutor to express his or her personal

7    belief or opinion as to the truth and falsity of any testimony or evidence or the

8    guilt of the defendant." (ABA Standards of Criminal Justice 3-58(b), 2d ed.

9    1980). Petitioner also argues that the prosecutor's discussion of a hypothetical set

10   of facts "compounded his intentional and egregious misconduct by measuring

11   Petitioner's culpability against a heat of passion killing" because voluntary

12   manslaughter is not a capital offense and "the culpability of the accused is much

13   less than any special circumstance murder." (Dkt. No. 317 at 249.)

14       Petitioner initially raised this claim on direct appeal as Claim 11. (Dkt. No.

15   148, Lodgment 1 at 136-143.) The California Supreme Court found that Petitioner

16   had waived the claim by failing to object to the prosecutor's argument, and such

17   failure did not amount to ineffective assistance of counsel because "[t]he

18   prosecutor neither vouched personally for the death penalty as an appropriate

19   sentence [citation] nor argued on the basis of facts not in evidence." *People v.*

20   *Noguera*, 4 Cal.4th at 639. Petitioner raised the claim again in his June 9, 2003,

21   exhaustion petition. (Dkt. No. 336, Lodgment 9 at 148-151.) The California

22   Supreme Court summarily denied the claim on the merits and, alternatively, denied

23   the claim as untimely, barred for having previously been raised and rejected on

24   appeal, and successive. (Dkt. No. 336, Lodgment 12.)

25       Respondent argues that Petitioner has failed to meet his burden of showing

26   that the California Supreme Court's denial of Claim 11 on the merits amounted to

27   an unreasonable application of clearly established federal law, or an unreasonable

28   determination of the facts in light of the evidence presented in the state court

                                        89

proceeding. 28 U.S.C. §2254(d); *Pinholster*, 563 U.S. at 181-82.

A court must "examine the likely effect of the statements in the context in which they were made," *Sandoval v. Calderon*, 241 F.3d 765, 778 (9th Cir. 2000), *cert. denied*, 534 U.S. 847 (2001), to determine "whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden*, 477 U.S. at 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S. at 643). "Improper comment warrants reversal only if it appears that the comment may possibly have affected the verdict." *Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987) (citation omitted). The jury found Petitioner guilty of special circumstances murder. It listened to Ricky Abram's testimony regarding the meeting at Bob's Big Boy, where Petitioner confided in Abram the details of his plan to kill Jovita Navarro, and sought his help. It heard John Arce's testimony that Petitioner said he wanted to kill Jovita. It rejected Petitioner's denial of involvement in Jovita's killing, and his alibi defense. It heard Margaret Noone's testimony that Petitioner had threatened her into testifying on his behalf. It learned that Petitioner had previously carjacked John Antenucci at gunpoint, and it listened to Petitioner's case in mitigation. Assuming without deciding that the prosecutor's remarks were inappropriate, the California Supreme Court was not unreasonable in finding that Petitioner did not suffer prejudice as a result thereof. Claim 43 is DENIED.

      b.    *CLAIM 44 – The Prosecutor Committed Misconduct When He Compared Petitioner to an Imaginary, Less Culpable Defendant*

In Claim 44, Petitioner argues that the prosecutor committed prejudicial misconduct during penalty phase closing argument when he "compared petitioner to an imaginary character of mythic proportions" and thereby violated Petitioner's Eighth Amendment right to individualized sentencing under *Woodson v. North Carolina*, 428 U.S. 280 (1976) (Dkt. No. 317 at 251-57.) Specifically, Petitioner

takes issue with the prosecutor's comments regarding Petitioner's mitigating evidence, and the weight it should be accorded. The district attorney argued that Petitioner's evidence in mitigation did not outweigh the prosecution's evidence in aggravation, and referenced examples of mitigating circumstances he opined might be given "high value," but were absent from Petitioner's case.

> Do you have a person who won the medal of honor? Do you have a person who was valedictorian in their class? Do you have a person who is asking you to spare his life that saved a little three-year-old boy from drowning?
>
> Because if you had that, ladies and gentlemen, you may be able to put the value on one of those three things in the same quantity that you can put to any one of those 12 aggravating factors. But you don't.
>
> Do you have a defendant who was sexually abused as a child? Because if you did, you would probably want to put a high value on that for pity and sympathy.
>
> Do you have a defendant that comes from a broken home? Do you have a defendant whose mother didn't love him, whose father didn't love him, whose sister didn't love him?
>
> Do you have a defendant who wasn't provided with clothing or food or shelter, that had to hit the streets when he was 11 or 12, that had to hit the streets and make it on his own? Do you have any of that? No, you don't have any of that.

(RT 8650-51.) The prosecutor further argued, "[t]his is not an 18 year old boy who got kicked out of his home, who goes into a market with a mask on because he's hungry and he has a loaded weapon and he goes in there and here's a clerk, and for some reason the clerk takes the mask off and this 18-year-old, because of being hungry, panics, kills that person because perhaps that person is going to be a

91

witness. You don't have that in this case. (RT 8658-59.)

Petitioner contends that these arguments, "comparing Petitioner to . . . hypothetical characters," undermined the value of his mitigating evidence and "led the jury to preclude consideration of Petitioner's mitigating evidence," judging him not as an individual, but "in terms of who he was not." (Dkt. No. 317 at 254-55.) Petitioner suggests that the prosecutor's argument violated his constitutional right to "individualized consideration," under *Woodson* and *Penry v. Lynaugh,* 492 U.S. 302 (1969),

Petitioner initially raised this claim in state court on direct appeal. (Dkt. No. 148, Lodgment 1 at 144-48.) The California Supreme Court denied the claim, in combination with the other prosecutorial misconduct in penalty phase closing argument claims, finding Petitioner had waived the claims by failing to object and, in any case, "there 'was not a reasonable likelihood any of the challenged comments might have been misconstrued by the jurors." Petitioner raised the claim again as Claim 29 of his June 9, 2003 exhaustion petition. (Dkt. No. 336, Lodgment 9 at 151-53.) The California Supreme Court summarily denied the claim on the merits and, alternatively, found it untimely, *Waltreus* barred to the extent it was raised on appeal, *Dixon* barred as to the parts not previously brought on appeal, and successive to the extent it could have been raised in Petitioner's prior habeas petition. (Dkt. No. 336, Lodgment 12.)

Respondent argues that Petitioner has failed to meet his burden of showing that the California Supreme Court's denials of the claim amounted to an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. §2254(d); *Pinholster*, 563 U.S. at 181-82.

Once again, this Court must determine "whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden*, 477 U.S. at 181. As the Supreme Court has noted,

"arguments of counsel generally carry less weight with a jury than do instructions from the court. The former are usually billed in advance to the jury as matters of argument, not evidence, and are likely viewed as the statements of advocates; the latter. . . are viewed as definitive and binding statements of the law." *Boyde v. California*, 494 U.S. at 384, *citing Carter v. Kentucky*, 450 U.S. 288, 302–304, and n. 20 (1981); *Quercia v. United States*, 289 U.S. 466, 470 (1933); *Starr v. United States*, 153 U.S. 614, 626 (1894). Moreover, "arguments of counsel, like the instructions of the court, must be judged in the context in which they are made." *Boyde*, 494 U.S. at 385, citing *Greer v. Miller,* 483 U.S. at 766; *Darden,* 477 U.S. at 179; *United States v. Young*, 470 U.S. 1, 11–12 (1985); *Donnelly v. DeChristoforo*, 416 U.S. at 647 ("[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations").

In *Woodson*, on which Petitioner relies, the Supreme Court held, in relevant part, that North Carolina's mandatory death sentence for first-degree murder violated the Eighth Amendment by prohibiting "consideration of relevant aspects of the character and record of each convicted defendant before the imposition upon him of a sentence of death." *Woodson*, 428 U.S. at 303. The Court condemned

> a process that accords no significance to relevant facets of the
> character and record of the individual offender or the circumstances
> of the particular offense excludes from consideration in fixing the
> ultimate punishment of death the possibility of compassionate or
> mitigating factors stemming from the diverse frailties of humankind.
> It treats all persons convicted of a designated offense not as uniquely
> individual human beings, but as members of a faceless,
> undifferentiated mass to be subjected to blind infliction of the penalty

of death.

*Id*. at 304.  In so doing, the Court held that "in capital cases the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensible part of the process of inflicting the penalty of death." *Id.*

Petitioner suggests that, as a result of the prosecutor's argument, "[t]he jurors were not clearly informed of what mitigation actually is" and they were "prevented" from considering Petitioner's mitigating evidence.  (Docket No. 317 at 255.)  However, a simple reading of the trial record belies Petitioner's contentions.  First, following the prosecutor's closing statement, Petitioner's counsel had an opportunity to address the jury.  He properly directed the jury's attention to the fact that, "[t]he Court will give you instructions . . . in the light of how we go through this weighing process in reference to the aggravating and the mitigating circumstances." (RT at 8661.)  In a counterpoint to the prosecutor's argument, Mr. Pereyda told the jury,

> . . . I don't mean to belittle anybody's argument or anybody's thought processes, but this is an obligation of not merely like going to a shopping center, like going to a market and assigning values and saying this costs so much and this item is worth more and this item is worth less.  I think what you have to consider is you have to consider the totality of the circumstances.

(RT at 8662.)  Defense counsel then quoted CALJIC 8.84.2 –

> If in your reason [sic] judgment you conclude that the aggravating circumstances outweigh the mitigating circumstances, and you personally believe death is the appropriate sentence under all the circumstances, then you shall impose death.  In the event that you cannot so find, you shall impose life without the possibility of parole.

94

(RT at 8662; CT 1415.)  Mr. Pereyda went on to explicitly tell the jurors that they could return a life verdict even if they found that the aggravating evidence outweighed the mitigating evidence, to detail the mitigating factors he thought the jury should consider, and to again direct the jury's attention to the instructions they would be given.  (RT at 8663-70.)

Following closing statements, the Court instructed the jury that "[s]tatements made by the attorneys during trial are not evidence"  (CT 1379; RT 8678) and gave the modified version of CALJIC 8.84.1, submitted by the defense (CT 1245-46), advising the jury that "[i]n determining which penalty is to be imposed on the defendant, you shall consider all of the evidence which has been received during any part of the trial of this case. . ." including factor (k),

> any other circumstance which extenuates the gravity of the crime
> even though its not a legal excuse for the crime [and any sympathetic
> or other aspect of the defendant's character or record that the
> defendant offers] as a basis for sentence less than death, whether or
> not related to the offense for which he is on trial....

(RT 8696-99; CT 1407-08.)  The Court also gave Special Instruction Number Two, requested by the defense (CT 1247), focusing on mitigation:

> As to those factors that you find to be mitigating, they are only
> examples of the factors that you may consider in determining
> punishment in this case.

> You should pay careful attention to them and give them the
> wight to which you find them to be entitled.

> You are not required to limit your consideration of mitigating
> circumstances to these factors.

> You may also consider other circumstances as reasons for not
> imposing the death sentence.

> Any mitigating circumstances, standing alone, may be

sufficient to support a decision that life without the possibility of

parole is the appropriate punishment.. . .

(RT at 8696-99; CT at 1409.) Judge Robert R. Fitzgerald also gave another special instruction requested by the defense, advising the jurors, "you may consider pity and sympathy for the defendant in deciding the penalty to be imposed on the defendant." (RT 8704; CT 1253, 1416.)

The jury was free to consider and give effect to Petitioner's mitigating evidence in imposing sentence. *Penry v. Lynaugh*, 492 U.S. 302 (1989). As in *Boyde*, "there is not a reasonable likelihood that the jurors in Petitioner's case understood the challenged instructions to preclude consideration of relevant mitigating evidence offered by Petitioner." *Id.* at 386. Even if the prosecutor's discussion of hypothetical mitigating evidence was inappropriate, the California Supreme Court was not unreasonable in finding that Petitioner did not suffer prejudice as a result thereof. Claim 44 is DENIED.

  c. *CLAIMS 45 & 46 – The Prosecutor Committed Misconduct When He Relied on Less Serious, Noncapital Homicides to Argue that Petitioner's Crime Could Not Be Mitigated* and *Misled the Jury About the Nature and Scope of Its Sentencing Discretion*

In Claims 45 and 46, Petitioner relies on identical allegations, contending that the prosecutor committed prejudicial misconduct by using "straw man" arguments "to alter the jury's perception of the magnitude of Petitioner's offense." (Dkt. No. 317 at 257-64, 265-66.) Petitioner takes issue with the prosecution's discussion of hypothetical, non-capital homicides, that Petitioner claims were "completely irrelevant to the jury's decision." (Dkt. No. 317 at 260.) By referencing these other crimes, Petitioner argues, the prosecutor urged the jury to vote for death based upon an invalid comparison, and essentially "created a presumption in favor of death." (Dkt. No. 317 at 260.) In other words, "[t]he

weight given to the crime was improperly inflated by comparing it to less serious crimes." (Dkt. No. 317 at 261.)

Petitioner initially raised Claim 45 in state court on direct appeal. (Dkt. No. 148 at 149-56.) As it did with all of the prosecutorial misconduct in closing argument claims, the California Supreme Court denied the claim, finding Petitioner had waived the claims by failing to object and, in any case, "there 'was not a reasonable likelihood any of the challenged comments might have been misconstrued by the jurors." *People v. Noguera,* 4 Cal.4th at 638-39. Petitioner raised the claim again as Claim 30 of his June 9, 2003 exhaustion petition, and raised Claim 46 as claim 31 of that same petition. (Dkt. No. 336, Lodgment 9 at 153-55, 155-56.) The California Supreme Court summarily denied the claims on the merits and, alternatively, found them untimely, *Waltreus* barred to the extent they were raised on appeal, *Dixon* barred as to the parts not previously brought on appeal, and successive to the extent they could have been raised in Petitioner's prior habeas petition. (Dkt. No. 336, Lodgment 12.)

Respondent argues that Petitioner has failed to meet his burden of showing that the California Supreme Court's denials of the claims amounted to an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. §2254(d); *Pinholster*, 563 U.S. at 181-82.

Petitioner's argument is based upon clearly established federal law holding that *states' capital sentencing procedures* must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens*, 462 U.S. 862, 877 (1983); *Godfrey v. Georgia*, 446 U.S. 420, 428-29 (1980) (striking down statutory aggravating circumstance that failed to narrow the class of persons eligible for the death penalty.) This precedent does not support Petitioner's contention that a prosecutor's closing argument

could similarly offend the Constitution by failing to circumscribe the class of persons eligible for the death penalty. This is the role of the statute and, as discussed *infra* with respect to Claims 62-66, California's death penalty statute has long been held to be in constitutional.

The prosecutor did not, as Petitioner suggests, argue that Petitioner's crime "could not be mitigated" nor did he mislead the jury about the nature and scope of its sentencing discretion. Rather, it is well within the prosecutor's purview to make the kinds of argument Petitioner takes issue with here. For example, when the district attorney discussed the "circumstances of the crime" aggravating factor, he argued that "strangulation" was a "very personal thing," as compared to other types of killings. The prosecutor referenced hypothetical crimes to emphasize the *personal* nature of Petitioner's offense, and to demonstrate the time and effort it would have taken to extinguish Jovita Navarro's life. (RT 8647-48.) He used the comparison to argue in favor of the weight he thought the aggravator should be given. These arguments did not "mislead the jury about the weighing process," "create a presumption in favor of death," or "encourage the jury to make an arbitrary and capricious sentencing decision." Petitioner was convicted of first-degree special circumstances murder, and the prosecutor argued that the evidence in aggravation warranted a death sentence.

The defense was free to dispute the prosecutor's claims, to present evidence in mitigation, to argue a different interpretation of the weighing process, to clarify any concerns about the jury's perception of its sentencing discretion, and to draw the jury's attention to the penalty phase instructions. As discussed above, Petitioner's counsel properly directed the jury's attention to the penalty phase instructions, quoted CALJIC 8.84.2, explicitly informed the jury that they could return a life verdict even if they found that the aggravating evidence outweighed the mitigating evidence, and detailed the mitigating factors he thought the jury should consider.

Moreover, the trial court instructed the jury that "[s]tatements made by the attorneys during trial are not evidence" (CT 1379; RT 8678) and gave the modified version of CALJIC 8.84.1, submitted by the defense (CT 1245-46), advising the jury that "[i]n determining which penalty is to be imposed on the defendant, you shall consider all of the evidence which has been received during any part of the trial of this case. . ." including factor (k). (RT 8696-99; CT 1407-08.) The Court also gave the defense's special instructions, focusing on mitigation (RT at 8696-99; CT at 1409, 1247), and sympathy. (RT 8704; CT 1253, 1416.) The jurors were also instructed that they must "determine the facts of the case from the evidence received in the trial and not from any other source." (CT 1593.) The Court must "generally presume that jurors follow their instructions." *Penry v. Johnson*, 532 U.S. at 799; see also *Cheney v. Washington*, 614 F.3d at 997. "The Court presumes that jurors, conscious of the gravity of their task, attend closely to the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them." *Francis v. Franklin*, 471 U.S. at 324 n. 9. Further, "it is well established that 'arguments of counsel generally carry less weight with a jury than do instructions from the court.' " *Cheney*, 614 F.3d at 997 (citing *Boyde v. California*, 494 U.S. at 384; *see also Waddington v. Sarausad*, 555 U.S. at 194-95 (finding that the state court reasonably concluded that the prosecutor's use of an improper hypothetical during closing argument "did not taint the proper instruction of state law," because of the foregoing statement in *Boyde* ). "[J]uries generally 'vie[w] [closing arguments] as the statements of advocates' rather than 'as definitive and binding statements of the law.' " *Sarausad*, 555 U.S. at 195 n. 6 (quoting *Boyde*).

In *Darden*, the Supreme Court concluded that the petitioner was not deprived of a fair trial based on numerous "undoubtedly" improper comments made by the prosecutor during closing argument, because, inter alia, "[t]he trial court instructed the jurors several times that their decision was to be made on the

basis of the evidence alone, and that the arguments of counsel were not evidence." 477 U.S. at 181–82. Petitioner has not adduced any evidence showing that the jury failed to follow the trial court's instructions. There is no basis for concluding that the jurors perceived the prosecutor's comments about hypothetical crimes to override their duty to base their decision on the facts and the law or that the jury was misled regarding its sentencing discretion. The jury was free to consider and give effect to Petitioner's mitigating evidence in imposing sentence. *Penry v. Lynaugh*, 492 U.S. 302. The California Supreme Court's decisions denying relief was neither an unreasonable application of clearly established federal law, nor an unreasonable determination of the facts under §2254(d). Claims 45 and 46 are DENIED.

    d.    <u>*CLAIM 47 – The Prosecutor Committed Misconduct When He Removed Sympathy from the Jury's Consideration During Voir Dire[16] and Closing Argument*</u>

In Claim 47, Petitioner argues that the prosecutor committed misconduct during penalty phase closing argument when he "argued that, although the jury [would be] instructed that it could consider sympathy [in the factor (k) instruction], Petitioner was not entitled to it." (Dkt. No. 317 at 271, citing RT 8642-45.) Petitioner suggests that the prosecutor led jurors "to believe that their basic moral values and their perceptions of Petitioner were distinct from the penalty process." (Dkt. No. 317 at 272.) In his penalty phase closing argument, after discussing Petitioner's family members' testimony, the prosecutor argued:

    . . . [T]he question you have to ask yourself is does the defendant deserve that sympathy for his family members?

        Because ladies and gentlemen, no matter what your verdict is,

---

[16] The portion of Claim 47 arguing the prosecutor committed misconduct during voir dire when he "repeatedly asked prospective jurors if they could vote for death once they recognized Petitioner's humanity" (Dkt. No. 317 at 268) is substantially similar to the argument raised in Claim 20     The Prosecutor's Improper Voir Dire Questions and Argument Misled the Jurors About the Scope of Their Sentencing Discretion     and is addressed *supra* in connection therewith.

because whether you say he's going [to] die or you say he's going to live the rest of his life in San Quentin, they are here because of what he did. And there is nothing that you can do that's going to change that.

And do you think it's fair? Do you think it's right? Does it come to your sense of dignity that because they are suffering, he should get that benefit? Of course not.

And I ask you to consider that because it gets back to what I said before, to try to distinguish the emotion that you're going to have – and you should have that – from genuine pity on the behalf of the defendant.

And there's another thing about sympathy on behalf of the defendant; does he really deserve it? What did he do in the guilt phase?

He got up and he testified that he didn't have anything to do with the crime.. . . [O]ne of things I suggested to you to consider when you consider pity and sympathy is remorse.

Don't you think that a person, before you give him pity and before you give him sympathy, should be remorseful for what he did? No, not this man who is sitting over there.

. . . He gets upon the stand and one, he commits perjury. And number two, he by the threat of force, the threat of force, he coerces and threatens Marjorie Noone to come in here and to commit perjury.

And I ask you, and once again, these are difficult questions, but when you go back there, you ask yourself, is that the kind of man that we're going to give sympathy and pity to?

. . . I ask you to reject paragraph K because I don't think it applies because of what I just said. . . .

(RT 8644-45.)

Petitioner argues that the prosecutor's statements narrowed the scope of factor (k), focusing exclusively on "the allusion to sympathy" and then suggested to the jury that factor (k) did not apply because Petitioner did not deserve sympathy. (Dkt. No. 317 at 270-71.) As such, Petitioner contends that the prosecutor *"prevented"* the jury from feeling sympathy, from considering all relevant mitigating evidence, and from properly weighing aggravation and mitigation pursuant to California law so as to make Petitioner's sentence a denial of due process.

Petitioner initially raised this claim on direct appeal. (Dkt. No. 148, Lodgment 1 at 157-64.) The California Supreme Court found that Petitioner had waived the claim by failing to object to the prosecutor's argument, and such failure did not amount to ineffective assistance of counsel because "[t]he prosecutor neither vouched personally for the death penalty as an appropriate sentence [citation] nor argued on the basis of facts not in evidence." *People v. Noguera*, 4 Cal.4th at 639. Petitioner raised the claim again in his June 9, 2003, exhaustion petition. (Dkt. No. 336, Lodgment 9 at 159-61.) The California Supreme Court summarily denied the claim on the merits and, alternatively, denied the claim as untimely, barred for having previously been raised and rejected on appeal, and successive. (Dkt. No. 336, Lodgment 12.)

Respondent argues that Petitioner has failed to meet his burden of showing that the California Supreme Court's denial on the merits amounted to an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. §2254(d); *Pinholster*, 563 U.S. at 181-82.

As discussed above, the Supreme Court has noted that "arguments of counsel generally carry less weight with a jury than do instructions from the court. The former are usually billed in advance to the jury as matters of argument, not

102

evidence, and are likely viewed as the statements of advocates; the latter. . . are viewed as definitive and binding statements of the law." *Boyde v. California*, 494 U.S. at 384, *citing Carter*, 450 U.S. at 302–304, and n. 20; *Quercia*, 289 U.S. at 470; *Starr*, 153 U.S. at 626.   Moreover, "arguments of counsel, like the instructions of the court, must be judged in the context in which they are made." *Boyde*, 494 U.S. at 385, citing *Greer v. Miller,* 483 U.S. at 766; *Darden v. Wainwright*, 477 U.S. at 179; *Young*, 470 U.S at 11–12; *Donnelly v. DeChristoforo*, 416 U.S. at 647 ("[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations").

Petitioner maintains that the prosecutor prevented the jury from feeling sympathy, and narrowed the application of factor (k), when he argued that factor (k) did not apply.   This Court finds no objectionable prosecutorial argument in the prosecutor's factor (k) argument.   Reading the prosecutor's comments in context, it is clear that he asked the jury to "reject paragraph k," but never suggested or instructed the jury that it could not consider the penalty phase evidence Petitioner presented.   The prosecutor stated, "I ask you to reject paragraph k *because I don't think it applies. . .*" (RT 8645.)   The prosecutor's approach was not to contend that background and character evidence was irrelevant, but rather, to argue that, *in his opinion*, Petitioner *did not deserve sympathy* and that the aggravating circumstances outweighed the mitigating circumstances.   The jury was free to consider and give effect to Petitioner's mitigating evidence in imposing sentence. *Penry v. Lynaugh*, 492 U.S. 302.   "Indeed, the prosecutor explicitly assumed that petitioner's mitigation evidence was a proper factor in the weighing process, but argued that it was minimal in relation to the aggravating circumstances." *Boyde*, 494 U.S. at 385.   The district attorney encouraged the jurors to consider the evidence presented by the defense, that "in 1976 [Petitioner] joined the Blue

Jackets of California", "that his mother and father were divorced in 1979", and "that he went to school." (RT at 8646.) He simply *argued* that aggravating evidence outweighed the mitigating evidence. (RT at 8648-49.)

Moreover, Petitioner's trial attorney countered the prosecutor's sympathy argument during his penalty phase closing statement, arguing:

> . . . I would submit to you that I think every mother should have some sympathy. Everybody that brings somebody into this world to live I think has earned sympathy. And the fact that she has seen her son go through this ordeal, the fact that she has seen him convicted, and the fact that she will no longer see him at home, I think that bears some sympathy.

(RT 8667.) Mr. Pereyda also argued,

> You will receive a jury instruction to the effect that you can consider pity and sympathy for the defendant and that is the defendant alone. Not just his family. You can consider that as a mitigating factor as well as considering any sympathy you may have for his family and for his friends.

(RT 8670-71.)

Subsequently, the trial court gave the factor (k) instruction, advising the jury, in relevant part, to consider

> (k) any other circumstance which extenuates the gravity of the crime even though its not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for [a] sentence less than death, whether or not related to the offense for which he is on trial. You must disregard any jury instruction given to you in the guilt or innocence phase of this trial which conflicts with this principle.
>
> As to those factors that you find to be mitigating, they are only

examples of some of the factors that you may consider in determining

punishment in this case.

You should pay careful attention to them and give them the

weight to which you find them to be entitled.

You are not required to limit your consideration of mitigating

circumstance [sic] to these factors.

You have also consider [sic] other circumstances as reasons for

not imposing the death sentence.

Any mitigating circumstances, standing alone, may be

sufficient to support a decision that life without the possibility of

parole is the appropriate punishment.

(RT at 8698-99.) Moreover, the trial court gave a special instruction requested by the defense, advising the jurors, "you may consider pity and sympathy for the defendant in deciding the penalty to be imposed on the defendant." (RT 8704; CT 1253, 1416.) As in *Boyde*, "there is not a reasonable likelihood that the jurors in Petitioner's case understood the challenged instructions to preclude consideration of relevant mitigating evidence offered by Petitioner." *Id.* at 386. The California Supreme Court's rejection of Petitioner's claim was not an unreasonable application of clearly established federal law nor an unreasonable determination of the facts under §2254(d). Claim 47 is DENIED.

     e.   *CLAIM 48 – The Prosecutor Committed Misconduct When He Argued that the Jury Could Not Consider Sympathy in the Penalty Phase Unless Petitioner Expressed Remorse, Commented on Petitioner's Failure to Admit Participation, and Urged that Mitigating Evidence Not Be Considered*

In Claim 48, Petitioner additionally suggests that the prosecutor erroneously argued that Petitioner was not entitled to the jury's sympathy because he had not

expressed remorse for the crime and failed to admit participation in the crime. (Dkt. No. 317 at 275-81.) On the heels of his argument that the jury should distinguish their sympathy for Petitioner's family from sympathy on Petitioner's behalf, the Prosecutor argued:

> And there's another thing about sympathy on behalf of the defendant; does he really deserve it? What did he do in the guilt phase?
>
> He got up and he testified that he didn't have anything to do with the crime. One of the things I asked you to suggest, or one of the things I suggested to you to consider when you consider pity and sympathy is remorse.
>
> Don't you think that a person, before you give him pity and before you give him sympathy, should be remorseful for what he did? No, not this man who is sitting over there.
>
> What this man came – and he makes I think your decision much easier for you – he gets up on the stand and one, he commits perjury. And number two, he by the use of force, the threat of force, he coerces and threatens Marjorie Noone to come in here and to commit perjury.
>
> And I ask you , and once again, these are difficult questions, but when you go back there, you ask yourself, is that the kind of man that we're going to give sympathy and pity to?

(RT 8644-45.)

Petitioner claims that the prosecutor committed misconduct during this closing statement because he "placed Petitioner between a rock and hard place." (Dkt. No. 317 at 277.) Petitioner suggests that in order to have expressed remorse at the penalty phase, he would have had to abandon his penalty phase defense of lingering doubt and the prosecutor's argument "makes it impossible for a

defendant who claims he or she is innocent to ever benefit from sympathy as a mitigating factor." (Dkt. No. 317 at 277.)  Further, Petitioner contends that the prosecutor's remorse argument violated Petitioner's constitutional rights because it was a statement that Petitioner "should be penalized for failing to confess" and "a defendant cannot express remorse without admitting guilt." (Dkt. No. 317 at 277-78.)

Petitioner initially raised this claim as Claim 33 in his June 9, 2003 exhaustion petition.  (Dkt. No. 336, Lodgment 9 at 161-163.) The California Supreme Court summarily denied the claim on the merits and, alternatively, denied the claim as untimely, barred for having been previously been raised and rejected on direct appeal, barred for having not been raised on direct appeal, and successive.  (Dkt. No. 336, Lodgment 12.)

Respondent argues that Petitioner has failed to meet his burden of showing that the California Supreme Court's denial on the merits amounted to an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. §2254(d);  *Pinholster*, 563 U.S. at 181-82.

The Supreme Court has never "clearly established" that a sentencing court may not make an adverse inference from a defendant's lack of remorse at sentencing.  In *Mitchell v. United States*, 526 U.S. 314 (1999), the Supreme Court held that he Fifth Amendment right to remain silent survives a guilty plea and applies at sentencing.  *Id.* at 317  (A sentencing court may not draw an adverse inference from a defendant's silence.).  However, the Court "express[ed] no view" on "[w]hether silence bears upon the determination of a lack of remorse, or upon acceptance of responsibility. . ." *Id.* at 330.

Petitioner testified during the guilt phase, offering an alibi defense, and maintaining he had no involvement in the commission of the crimes for which he was on trial.  (RT 7663-66.)  Although the jury rejected this defense, convicting

him of first degree special circumstances murder, he put on a "lingering doubt" defense at the penalty phase. Petitioner now contends that, by arguing that he was not entitled to sympathy because he failed to express remorse for the crimes, the prosecution placed him "between a rock and hard place." Essentially, Petitioner suggests that he could not express remorse without abandoning his "lingering doubt" penalty phase defense, that the prosecutor's comment on his lack of remorse constituted a statement on his exercise of his right against self-incrimination, and that any defendant who claims innocence could never benefit from sympathy as a mitigating factor.

The prosecutor in Petitioner's case was perfectly within his lane when he argued that Petitioner did not deserve sympathy given his lack of remorse. The jury had already rejected Petitioner's claim of innocence during the guilt phase; nevertheless, he chose to pursue the lingering doubt defense at the penalty phase. The prosecutor's comment was not a statement on Petitioner's exercise of his Fifth Amendment right against self-incrimination. Petitioner testified. He maintained his innocence.[17] The prosecutor's comment was a statement regarding Petitioner's failure to express remorse for a crime for which the jury had already found him guilty. It was an attack on his penalty phase defense and a suggestion that Petitioner did not deserve sympathy. *See United States v. Segal*, 549 F.2d 1293, 1299 n.3 (9th Cir.) ("a sentencing court [may] impose a harsh sentence as a penalty for the defendant's refusal to admit guilt, since an admission would evidence the first step in rehabilitation"), *cert. denied*, 431 U.S. 919 (1977); *see also United States v. Long*, 706 F.2d 1044, 1055 (9th Cir. 1983); *Gollaher v. United States*, 419 F.2d 520, 529-31 (9th Cir.), *cert. denied*, 396 U.S. 960 (1969).

With respect to Petitioner's contention that the prosecutor's argument

_____

[17] The idea that the expression of remorse warrants sympathy or mitigating effect, is not supposed to induce involuntary incriminating statements; rather, the expression of genuine remorse implicates societal interests and indicates the defendant might deserve some leniency. *Cf United States v. Belgard*, 694 F.Supp. 1488, 1497-98 (D.Ore. 1988).

concerning Petitioner's lack of remorse constituted a violation of his right against self-incrimination, the Ninth Circuit has long observed that the "presence or absence of remorse is a factor relevant to the jury's penalty decision" in a California state capital case. *Harris v. Pulley*, 885 F.2d 1354, 1384 (9th Cir. 1988) (internal quotation marks omitted), *cert. denied*, 493 U.S. 1051 (1990); *Sims v. Brown*, 430 F.3d 1220 (9th Cir. 2005) (citing *Griffin v. California*, 380 U.S. 609 (1965) and finding prosecutor's statements regarding petitioner's lack of remorse during penalty phase did not constitute impermissible commentary about petitioner's exercise of his Fifth Amendment right not to testify), *cert. denied*, 549 U.S. 833 (2006); *see also Isaacs v. Head*, 300 F.3d 1232, 1271 (11th Cir. 2002) (noting that "several other courts have found that, under many circumstances, arguments or comments related to a lack of remorse do not implicate the defendant's decision not to testify because they may related to other evidence properly before the jury or to the defendant's demeanor at trial"), *cert. denied*, 538 U.S. 988 (2003).   The California Supreme Court's rejection of Petitioner's claim was not an unreasonable application of clearly established federal law nor an unreasonable determination of the facts under §22554(d).  Claim 48 is DENIED.

> f.    *CLAIMS 49 & 50 – The Prosecutor Committed Misconduct When He Used Nonstatutory Aggravating Factors During Penalty Phase Argument Without Prior Notice*

In Claims 49 and 50, Petitioner argues that the prosecutor committed prejudicial misconduct when he argued nonstatutory aggravating factors at penalty phase closing argument.  (Dkt. No. 317 at 281-91.) The particular arguments Petitioner cites were actually made when the prosecutor was addressing mitigating evidence.  (RT 8642-45.) After reading the language of factor (k), the prosecutor argued:

> Yesterday you heard some very emotional testimony, and I

more than anyone else in this courtroom was moved when the sister
got on the stand, when the grandmother got on the stand, when the
father got on the stand.

The mother, I think the evidence suggests you should have no
sympathy for her. That is her child, she's come in here, and she
committed perjury during the penalty phase.

(RT 8642-43.) In discussing the sympathy the jurors might have for Petitioner's
sister, father and grandmother, the prosecutor argued that he did not feel that Mr.
Noguera deserved to benefit from the juror's sympathy for his family members.
(RT 8644.) As discussed, *supra*, the district attorney argued that Petitioner did not
deserve sympathy because he failed to show remorse, he failed to take
responsibility, and he committed perjury in "testif[ying] he didn't have anything to
do with the crime." (RT 8644-45.) Moreover, the prosecutor drew the jury's
attention to the fact that Petitioner "coerc[d] and threaten[ed] Marjorie Noone to . .
. commit perjury," and summed up his argument by suggesting that the jurors ask
themselves, "is that the kind of man that we're going to give sympathy and pity
to?" (RT 8645.)

Petitioner initially raised these facts and argument as Claim 17 in his direct
appeal. (Dkt. No. 148, Lodgment 1 at 181-90.) The California Supreme Court
found that Petitioner had waived the claim by failing to object to the prosecutor's
argument, and such failure did not amount to ineffective assistance of counsel
because "[t]he prosecutor neither vouched personally for the death penalty as an
appropriate sentence [citation] nor argued on the basis of facts not in evidence."
*People v. Noguera*, 4 Cal.4th at 639. Petitioner raised the claim(s) again in his
June 9, 2003, exhaustion petition as Claims 34 and 35. (Dkt. No. 336, Lodgment 9
at 163-65.) The California Supreme Court summarily denied the claims on the
merits and, alternatively, denied the claims as untimely, barred for having been
previously been raised and rejected on direct appeal, barred for having not been

raised on direct appeal, and successive. (Dkt. No. 336, Lodgment 12.)

Respondent argues that Petitioner has failed to meet his burden of showing that the California Supreme Court's denials on the merits amounted to an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. §2254(d); *Pinholster*, 563 U.S. at 181-82. This Court agrees. More pointedly, Petitioner misconstrues the record.

Without citing any clearly established federal law, Petitioner argues that the California Supreme Court's decisions denying his claims were contrary thereto. Even a cursory examination of the record on appeal reveals the flaws in Petitioner's contention. Nowhere in the prosecutor's argument did he suggest that the subject guilt phase testimony should be considered as aggravating evidence. Nor did he argue that the absence of mitigation should be considered in aggravation. *Cf McDowell v. Calderon*, 107 F.3d 1351, 1365 n. 7 (9th Cir. 1997) ("We assume only for the purpose of this analysis that it could be an error of federal constitutional dimension for the prosecutor to argue that the absence of a mitigating factor can be considered by the jury as an aggravating factor in a capital case.") The prosecutor simply argued that the evidence proffered in mitigation did not deserve much weight. There is absolutely no support in the record for Petitioner's contention that the prosecution argued, or that the jury considered, "nonstatutory aggravating factors." The California Supreme Court's rejection of Petitioner's claim was not an unreasonable application of clearly established federal law nor an unreasonable determination of the facts under §2254(d). Claims 49 and 50 are DENIED.

//

//

//

g.   *CLAIM 51 – The Prosecutor Committed Misconduct*
     *When He Improperly and Fraudulently Contended*
     *During the Guilt Phase that the Alleged Co Conspirator,*
     *Dominique Navarro, Had Refused to Testify at*
     *Petitioner's Behest*

In Claim 51, Petitioner argues that the prosecutor committed prejudicial misconduct during guilt phase closing argument when he suggested that Dominique Navarro had refused to testify "at Petitioner's behest." (Dkt. No. 317 at 291-96.)

Petitioner initially brought this claim as Claim 16 in his initial exhaustion petition. (Dkt. No. 336, Lodgment 4 at 165-71.) The California Supreme Court summarily denied the claim on the merits and, alternatively, found the claim to be untimely and barred for having not been raised on direct appeal. (Dkt. No. 336, Lodgment 8.)

Respondent argues that Petitioner has failed to meet his burden of showing that the California Supreme Court's denials on the merits amounted to an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. §2254(d); *Pinholster*, 563 U.S. at 181-82.

As discussed above, Dominique Navarro was Jovita Navarro's daughter, and Petitioner's girlfriend. On the evening before the murder, Petitioner and Dominique went to a party together, went out for a hamburger and "went parking before Petitioner took [Dominique] home about 1:30 am." (Dkt. No. 317 at 23, citing CT Supp. I at 54-56.) By all accounts, Dominique was home at 4:30 a.m., when Jovita was attacked, and she ran to a neighbor's house for help. (RT at 5175, 5183, 5438, 5583; CT Supp. I at 63.) Contrary to Petitioner's suggestion that "Dominique's testimony appeared to be neither material nor pertinent,"[18] there

---

[18] Dkt. No. 317 at 292-93.

was substantial reason for the prosecution to call her as a witness at trial as the state's theory at trial was that Dominique and Petitioner conspired in the murder of her mother.

On February 4, 1987, during a pre-trial hearing regarding motions scheduling, the district attorney advised the trial court that he intended to file a motion regarding the use of Dominique Navarro's statements to police and prosecutors, and her application for life insurance benefits following the murder of her mother. (RT 4276.) The prosecutor sought to introduce this evidence in support of his theory that "there were three objectives [of the conspiracy]: to kill the victim, to cover it up, and to collect the money from the insurance." (RT 4340.) At the time of the hearing, Ms. Navarro's juvenile first-degree murder conviction was final, and she had already spoken to an investigator from the district attorney's office. (RT 4277.) The district attorney stated that he planned to call her to testify at an *in limine* motion hearing, but she advised the investigator that she was going to refuse to testify. (RT 4277.) The prosecutor advised the judge that it was his "desire to call her in our case in chief" and "specifically to impeach her [with her prior statements] if she does not. . . let me back it up." (RT 4277.)

On February 9, 1987, Dominique took the stand a pretrial hearing in Petitioner's case, while represented by counsel. (RT 4295-96.) Her attorney advised the court that "[s]he did not want to be involved. She did not want to be sworn, did not want to have anything to do with the case. . ." (RT 4296.) She also said that she understood "the consequences of taking the posture," but "did not wish to participate as a witness." (RT 4296.) After Dominique refused to respond to the administration of the oath, the trial court held her in contempt and ordered her held in the Orange County Jail until either the conclusion of the trial or she

113

notified authorities of her intention to testify.[19] (RT 4299-300.) In her absence, the trial court denied the People's motion to introduce at trial her December 20, 1983, statement to police, determining that the statement was involuntary. (RT at 4338.) The court did, however, grant the People's motion to introduce Dominique's statement to Mindy Jackson, her statements to police on April 24, 1983, and her applications for insurance benefits in June and September of 1983. The court found that "the statements offered or proffered ultimately were made in preparation of the objective of conspiracy; therefore, the statements [were] admissible as an exception to the hearsay rule." (RT 4341.)

During the defense case, Petitioner took the stand and testified that he had no involvement in Jovita Navarro's murder. (RT 7618-90.) Immediately upon conclusion of his testimony, out of the presence of the jury, the prosecution noted its intention to ask Petitioner on cross-examination if he had made certain statements before and after Dominique's February 9, 1983, refusal to testify.[20] (RT 7690-91.) If he denied making the statements, the prosecutor intended to subpoena two deputy marshals to testify regarding the statements, which were relevant to the prosecution's contention that Petitioner dissuaded Dominique from testifying. (RT 7691-96.) The trial court overruled the defense objection to the introduction of the evidence. (RT 7696.)

On cross-examination, the district attorney asked Petitioner about Dominique's appearance in court on the morning of February 9, 1987. (RT 7698-

[19] On February 11, 1987, Dominique was charged by complaint with a violation of California Penal Code section 32, "accessory after the fact," "as a result of her failure to take the oath when commanded to by the court." (RT 8795-800, 8828-29.) Under section 32, "[e]very person who, after a felony has been committed, harbors, conceals or aids a principal in such felony, with the intent that said principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that said principal has committed such felony or has been charged with such felony or convicted thereof, is an accessory to such felony." Cal. Pen. C. §32.

[20] At trial, the court took judicial notice of the facts that, (1) on February 9, 1983, Dominique took the stand, and refused to take the oath and testify; and (2) as of the time she was called to the stand, she had no privilege to prevent her from testifying. (RT 7843-44, 7846-47.)

114

99.) Petitioner testified that before the hearing he was housed downstairs. (RT 7700.) He recalled that he asked the marshal if it was okay if he saw Dominique, and was told that "if [he] wanted a visit, [he would] have to have a custody visit." (RT 7700-01.) Petitioner denied referring to Dominique as his "wife." (RT 7701.) Petitioner testified that Dominique was escorted into court, took the witness stand, and did nothing; she stood mute. (RT 7699.) She was held in contempt, and taken out of the courtroom. (RT 7702.) Petitioner denied asking anyone to "tell Dominique she did a real good job in testifying." (RT 7703.)

In rebuttal, the prosecution called Deputy Cindy Lucille Cossairt who testified that she was assigned to be Mr. Noguera's runner on February 9, 1983, to take him up to the courtroom. (RT 7839.) Sometime between 8:30 and 9:00 a.m., before Dominique testified, Petitioner asked Deputy Cossairt who was in charge of the basement holding facility because he wanted to be able to talk to "his wife" who "had just come down to testify in his case." (RT 7838-39.) Deputy Cossairt testified that Dominique Navarro was the only female in the holding area who was scheduled to testify; she was present when Dominique was given the oath. (RT 7840, 7844.)

Subsequently, Deputy William A. Elliott testified that he was working in the holding area at approximately noon on February 9, 1983, when he heard Petitioner talking to another inmate, "Mr. Clark." (RT 7848-49.) "[Mr. Noguera] relayed to Mr. Clark . . . to tell Dominique that, 'she did a good job and tell her that I love her.'" (RT 7849.) That day, Deputy Elliott contacted Jeff Arnold from the Orange County District Attorney's Office. (RT 7850-51.)

Given the fact that Dominique did not have a privilege at the time she refused to testify, in combination with the deputy marshals' testimony, it was not unreasonable for the prosecutor to infer that Petitioner had influenced her decision. There is no evidence to support Petitioner's contentions that "*the prosecutor knew*" (1) "that Dominique Navarro's refusal to testify was due to her

115

concern that it would negatively affect her safety in the Women's Jail at the time";
or (2) "that, had Dominique Navarro been transferred to another facility, she
would have been willing to testify." (Dkt. No. 317 at 295.) The prosecutor's
argument did not constitute misconduct.

Moreover, unless the prosecutor's alleged misconduct had a substantial and
injurious effect or influence in determining the jury's verdict, a grant of relief is
unwarranted. *Brecht*, 507 U.S. at 637-38; *Darden*, 477 U.S. at 181; *see also Smith
v. Phillips*, 455 U.S. at 219 ("Past decisions of this Court demonstrate that the
touchstone of due process analysis cases of alleged prosecutorial misconduct is the
fairness of the trial, not the culpability of the prosecutor.") The touchstone of the
*Darden/Donnelly* standard is the fairness of the trial. *See Darden*, 477 U.S. 181-
82 & n. 13 (noting that prosecutorial comments, although deserving of
condemnation , did not violate due process because they did not affect the fairness
of the trial). The *Darden* factors—i.e., the weight of the evidence, the prominence
of the comment in the context of the entire trial, whether the prosecution misstated
the evidence, whether the judge instructed the jury to disregard the comment,
whether the comment was invited by defense counsel in its summation and
whether defense counsel had an adequate opportunity to rebut the
comment—require courts to place improper argument in the context of the entire
trial to evaluate whether its damaging effect was mitigated or aggravated. What
*Darden* requires reviewing courts to consider appears to be equivalent to
evaluating whether there was a "reasonable probability" of a different result. As
such, a key factor in the prejudice analysis is the strength of the evidence against
the accused.

Assuming without finding that the prosecutor's inference here was
somehow erroneous, Petitioner cannot demonstrate that he suffered any prejudice
therefrom. During his guilt phase closing argument, the prosecutor admitted to the
jury that his case relied upon circumstantial evidence. (RT 8237.) He discussed

each of the pieces of the puzzle that was his case – (1) the bogus rape; (2) the bogus burglary; (3) the lack of forced entry; (4) Petitioner's knowledge of martial arts; (5) the testimony of the two deputy marshals, suggesting that Petitioner had influenced Dominique's February 9, 1983, refusal to testify; (6) forensic evidence; (7) Margaret Noone's perjury; (8) Dominique's unusual behavior on the night of the murder; (9) the meeting at Bob's Big Boy with Ricky Abram; (10) the motive; and (11) Dominique's statements to La Habra Police. (RT 8237-40.) The prosecutor repeatedly advised the jurors that they could accept or reject any of the pieces – "if we don't prove it to you. . . you can just throw it away and you consider the rest of the evidence and see if we proven [sic] to you beyond a reasonable doubt....." (RT 8238, 8239.)

In light of the evidence presented at the guilt phase, Petitioner cannot demonstrate that the California Supreme Court's decision, denying his claim that prosecutor's argument affected the fairness of his trial, was unreasonable under §2254(d). *See Darden*, 477 U.S. at 181 n. 13. Claim 51 is DENIED.

> h. *CLAIM 52 – The Prosecutor Committed Misconduct*
> *When He Improperly Led the Jury to Place a Price Tag*
> *on Each Aggravating or Mitigating Factor*

In Claim 52, Petitioner argued that the prosecutor suggested the jury place a "price tag"[21] on each of the aggravating and mitigating factors and thereby misled the jury "about the nature of its responsibility for determining the appropriateness of the death penalty in Petitioner's case." (Dkt. No. 317 at 298-99.)

Petitioner initially brought this claim as Claim 36 in his June 9, 2003 exhaustion petition. (Dkt. No. 336, Lodgment 9 at 166-69.) The California

---

[21] While the prosecutor did use the term "price tag" on one occasion, he explained to the jurors that it was their duty to "assign a value" or "assign a weight" to each of the mitigating and aggravating factors. (RT 8646) The district attorney emphasized the weighing analogy and argued that the jury's sentencing decision would result from not simply counting the numbers on each side, but weighing the factors on each side against each other. (RT 8646-47.)

Supreme Court summarily denied the claim on the merits and, alternatively, found the claim to be untimely, barred for having been raised on direct appeal, barred to the extent it was not raised on direct appeal, and barred as successive. (Dkt. No. 336, Lodgment 12.)

Respondent argues that Petitioner has failed to meet his burden of showing that the California Supreme Court's denials on the merits amounted to an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. §2254(d); *Pinholster*, 563 U.S. at 181-82. This Court agrees.

For the reasons set forth *supra* with respect to Claims 44, 45 and 46, Claim 52 is DENIED.

       i.       *CLAIM 54 – The Cumulative Effect of the Prosecutor's Misconduct Requires that Petitioner's Convictions and Death Sentence Be Reversed*

In Claim 54, Petitioner argues that the errors alleged in Claims 43-52, individually or in combination, had a substantial and injurious influence on Petitioner's convictions and sentences, rendering them fundamentally unfair and a miscarriage of justice. (Dkt. No. 317 at 304.)

Petitioner raised this claim for the first time as Claim 37 in his June 9, 2003 exhaustion petition. (Dkt. No. 336, Lodgment 9 at 169.) The California Supreme Court summarily denied the claim on the merits and, alternatively, found the claim to be untimely, barred for having been raised on direct appeal, barred to the extent it was not raised on direct appeal, and barred as successive. (Dkt. No. 336, Lodgment 12.)

Respondent argues that Petitioner has failed to meet his burden of showing that the California Supreme Court's denials on the merits amounted to an unreasonable application of clearly established federal law, or an unreasonable

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. §2254(d); *Pinholster*, 563 U.S. at 181-82.

In considering the cumulative effect of the prosecutorial misconduct Petitioner alleges, the Court must "analyze the prosecutorial misconduct challenges [addressing arguments to the jury] to assess whether they alone so infected the trial with unfairness as to make the resulting conviction a denial of due process. If the prosecution's comments alone do not meet this standard, [the Court] analyze[s] them together" with any additional allegations of prosecutorial misconduct , "to determine whether there is a reasonable probability that without those violations the result of the proceeding would have been different." *Hein v. Sullivan*, 601 F.3d 897, 915 (9th Cir. 2010), *cert. denied,* 563 U.S. 935 (2011). In some cases, although no single trial error is sufficiently prejudicial to warrant habeas relief, the cumulative effect of several errors may still prejudice a Petitioner so much that his conviction or sentence must be overturned. *See Alcala v. Woodford,* 334 F.3d 862, 893-95 (9th Cir. 2003). However, where no single constitutional error exists, nothing can accumulate to the level of a constitutional violation. *Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011); *cf. United States v. Martinez Martinez*, 369 F.3d 1076, 1090 (9th Cir.) ("[T]he 'cumulative error' analysis is inapposite [where] .... [the] Defendant has failed to demonstrate any [constitutional error]."), *cert. denied,* 543 U.S. 1013 (2004).

As discussed *supra,* this Court has found that the California Supreme Court may have reasonably determined that any prosecutorial misconduct here does not amount to a denial of due process nor suggest a reasonable probability of a different result absent the alleged misconduct. The court was not objectively unreasonable in concluding that any prosecutorial misconduct was harmless. Thus, this Court concludes that their can be no cumulative error. Claim 54 is DENIED.

## E.    **Trial Court Error**

A habeas corpus petitioner is not entitled to relief based on trial error, unless the error resulted in "actual prejudice." *Davis v. Ayala*, __ U.S. __, 135 S.Ct. 2187, 2197 (2015) (citing *Brecht*, 507 U.S. at 637); *Darden v. Wainwright*, 477 U.S. at 181; *Chapman v. California*, 386 U.S. 18, 24 (1967).  Under this standard, "relief is proper only if the federal court has 'grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict.' " *Davis v. Ayala*, 135 S.Ct. at 2197-98 (*quoting O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)); see also *O'Neal*, 513 U.S. at 437 (defining "grave doubt" as being in "virtual equipoise as to the harmlessness of the error"). "There  must be more than a 'reasonable possibility' that the error was harmful. . . . [T]he court must find that the defendant was actually prejudiced by the error." *Davis v. Ayala,* 135 S. Ct. at 2197–98 (internal quotes and citations omitted).

### 1.    *CLAIM 19: The Trial Court Erred in Allowing Excessive Courtroom Security*

In Claim 19, Petitioner argues that the trial court ordered excessive courtroom security at Petitioner's trial in violation of his constitutional rights to a fair trial, an impartial jury, a reliable special circumstance determination, a fair and reliable penalty phase determination, equal protection, and due process. (Dkt. No. 317 at 160-64.) Petitioner bases this claim on facts alleged in the May 18, 1996 declaration of Petitioner's wife, Francesca Mozqueda. (Dkt. No. 318, Ex. GG.)

Petitioner raised this claim for the first time in state court as Claim 12 of his March 1998 exhaustion petition. (Dkt. No. 336, Lodgment 4 at 157-60.) The California Supreme Court summarily rejected the claim on the merits and, alternatively, denied the claim as untimely, and *Dixon* barred. (Dkt No. 336, Lodgment 8.)

Respondent argues that Petitioner has failed to meet his burden of showing that the California Supreme Court's denial of Claim 11 on the merits amounted to

an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. §2254(d); *Pinholster*, 563 U.S. at 181-82.

In *Holbrook v. Flynn*, 475 U.S. 560 (1986), the Supreme Court established a framework for analyzing whether courtroom security measures violate a defendant's right to a fair trial. *Hayes v. Ayers*, 632 F.3d at 521. Reviewing courts must first "'look at the scene presented to jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial.'" *Id.* (quoting *Holbrook*, 475 U.S. at 572). In assessing inherent prejudice, the question is "whether an unacceptable risk is presented of impermissible factors coming into play" in the jury's evaluation of the defendant. *Hayes,* 632 F.3d at 521 (citing *Holbrook*, 475 U.S. at 570 (internal quotation marks omitted)). If security measures are not found to be inherently prejudicial, a court then considers whether the measures actually prejudiced members of the jury. *Hayes,* 632 F.3d at 521 (citing *Holbrook*, 475 U.S. at 572). "[I]f the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over." *Hayes*, 632 F.3d at 522 (quoting *Holbrook*, 475 U.S. at 572).

Petitioner complains of "a number of security measures" taken at his trial. (Dkt. 317 at 162.) According to Ms. Mozqueda's declaration: "[t]here were two bailiffs inside the courtroom and two outside the door"; "anyone entering the court room had to go through a metal detector and sign in"; Petitioner "was shackled during the entire trial and there were bailiffs at his side at all times"; and "[t]here was a helicopter circling the court building." (Dkt. No. 318-4 at 922.) The Court will address each of Petitioner's allegations in turn.

The "conspicuous" or "noticeable" deployment of security personnel in a courtroom during trial is not an "inherently prejudicial practice," like shackling or requiring the defendant to appear in court in prison garb, for example, which are

practices that need to be justified by "an essential state interest specific to each trial." *See Holbrook*, 475 U.S. at 568–69. "[T]he presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable. Jurors may just as easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence. Indeed, it is entirely possible that jurors will not infer anything at all from the presence of the guards." *Holbrook*, 475 U.S. at 569.

As the Ninth Circuit recognized in *Hayes*, the logic of *Holbrook* also permits entry-screening procedures such as those employed at Petitioner's trial.

> If uniformed guards sitting directly behind a defendant "need not be interpreted as a sign that he is particularly dangerous or culpable," then the mere screening of all who enter the courtroom certainly should not be. Indiscriminate screening at the courtroom door permits an even "wider range of inferences" than strategically placed guards, and it suggests even more strongly that the security is designed "to guard against disruptions emanating from outside the courtroom."

*Hayes*, 632 F.3d at 522 (quoting *Holbrook,* 475 U.S. at 569).

With respect to the shackling and circling helicopter, there is nothing beyond Ms. Mozqueda's declaration to support the allegations.  There is no indication in the trial record that Petitioner was shackled at trial.  In fact, in acknowledging the ongoing defense objection to the metal detector, the trial judge stated on the record that there was no additional "security than any other court has had in the court on capital cases." (RT 8334.)  There is no objection on the record to shackling or other security measures aside from the metal detector. Moreover, as Respondent correctly notes, it is highly unlikely that any helicopter flying above or circling the Orange County courthouse had anything to do with Petitioner's trial.  Beyond the declaration, Petitioner has provided no evidence to

122

support the existence of this helicopter, or its purpose. Petitioner's claims are conclusory.

In light of the foregoing authorities, the Court finds habeas relief is not warranted. Petitioner fails to demonstrate how he was "actually prejudiced" by any of the alleged security measures. *See Hayes*, 632 F.3d at 522–23 (where petitioner cannot show "actual prejudice" from courtroom security procedures, habeas relief not warranted). As Respondent notes, at the outset of the trial, the court instructed the jurors that they were not to consider the use of courtroom security measures, in particular the metal detector (RT 4376), and it is presumed that jurors follow the instructions they are given. *Penry v. Johnson*, 532 U.S. at 799; *Richardson v. Marsh,* 481 U.S. 200, 206-07 (1987*)*. While Petitioner cites the post-trial question of a single juror asking the trial court if it could "answer anything about the unusual security of the case?", this question is open to many interpretations and certainly does not demonstrate that Petitioner suffered actual prejudice. Assuming without finding that the juror was asking about the security measures employed at trial, the question alone reveals that the juror had not drawn negative inferences, but remained curious. Accordingly, the Court finds Petitioner has not carried his burden to show that the California Supreme Court's finding of no constitutional error was an unreasonable application of clearly established federal law under section 2254(d). Claim 19 is DENIED.

2.    *CLAIM 22: The Trial Court Erred When It Permitted the Prosecutor to Ask Questions During Voir Dire that Required Jurors to Prejudge the Evidence*

In Claim 22, Petitioner argues that the trial court erred in permitting the prosecutor to ask the voir dire questions to which he raises objection in Claim 21. In light of this Court's finding, *infra,* that the questions were not improper, the California Supreme Court's finding of no constitutional error was not an unreasonable application of clearly established federal law under section

123

2254(d)(1), nor an unreasonable determination of the facts under section 2254(d)(2). Claim 22 is DENIED.

**3.    *CLAIM 23: The Trial Court's Biased and Inappropriate Questions and Comments During Voir Dire Violated Petitioner's Rights***

In Claim 23, Petitioner argues that his constitutional rights were violated when, "[t]hroughout voir dire, the trial judge made flippant remarks that undermined the seriousness of the proceedings against Petitioner and indicated the court's lack of respect for the judicial system and the rules of law the court was bound to enforce." Petitioner also suggests that the court's comments "created an impermissible risk that the jurors, recognizing the trial court's bias against Petitioner, were also prejudiced against Petitioner and in favor of imposing the death penalty." (Dkt. No. 317 at 178.)

Petitioner raised this claim as Claim 13 in his March 1998 exhaustion petition. (Dkt. No. 336, Lodgment 4 at 160-63.) The California Supreme Court summarily denied the claim on the merits and, alternatively, found the claim to be untimely and *Dixon* barred. (Dkt. No. 336, Lodgment 8.)

Respondent argues that Petitioner has failed to meet his burden of showing that the California Supreme Court's resolution of the claim amounted to an unreasonable application of clearly established Federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding and, as such, Petitioner is barred from relitigating the claim in federal court. 28 U.S.C. §2254(d); *Pinholster*, 563 U.S. at 181-82. This Court agrees.

Petitioner takes issue with the following comment the trial court made while explaining sequestered voir dire:

> The Court will ask various questions concerning your feelings on capital punishment, your sexual prerogatives – never mind. [¶] As we get into this case, those of you that stay with us, you'll see that I have

124

a peculiar sense of humor – doesn't always work, as this last little
joke didn't.

(Dkt. No. 317 at 178, quoting RT 1460.)  Clearly an attempt at humor, nothing about the comment suggests bias that would entitle Petitioner to habeas corpus relief.  Similarly, the judge's comment made before beginning hardship voir dire, referencing "malingerers and whiners," did not reveal bias or undermine the seriousness of the proceedings. (Dkt. No. 317 at 178, quoting RT at 1465.) Rather, the court was making light of the process by which jurors seek to be removed from proceedings for hardship.

Petitioner also quotes a statement the trial judge made when preparing the jury for sequestered voir dire – "I didn't set up this kind of a coo-coo system, ladies and gentlemen. It's required under the State of California law and under the law of the United States." (Dkt. No. 317 at 178, quoting RT at 1461.)  As Respondent notes in its answer to the petition, Petitioner neglects to place the judge's quote in context.  Beyond the cited language, he continued, explaining that the reason for the sequestered voir dire was a good one, "though it is time consuming."  The court told the jury,

It may be that an individual is so anti capital punishment or so pro capital punishment, that they voice that with such a degree that it infects or impacts the other jurors and perhaps contaminates – perhaps not a good word – affects the jurors' minds to the degree that you don't have a full cross section of the community that is voting their own opinion in the case.

(Dkt. No. 330 at 73, quoting RT 1461.)  Examined in context, the judge's comments did not demonstrate bias or disrespect for the judicial process.

Petitioner similarly extracts out of context, remarks the trial court made while examining the venire en masse for hardship. During the voir dire, prospective juror Norman B stated "I'm against the death penalty." (RT 1470.)

125

Because the court was only considering hardship at the time, the judge replied, "I don't want to hear that now. After I talk to you, you may be for the death penalty. . . . [T]hose are the kinds of things that I want to talk to everybody privately about." (RT 1470.) In citing only the second sentence of the judge's reply, Petitioner removes the rationale behind the court's comment. The judge later elaborated upon his point when addressing the entire jury panel:

> For those of you that are for the death penalty, after I talk to you, you
> may switch over to being against the death penalty. My point is that
> no one is sure until you've thought about it in depth; and then there is
> a difference between how you think you feel and how you really feel
> when it becomes your responsibility to do something. We'll keep you
> for awhile.

(RT 1470.) Again, the judge's remarks do not demonstrate bias or disrespect for the judicial process.

Finally, Petitioner takes issue with three comments the trial judge made during sequestered voir dire of three prospective jurors who did not end up sitting on Petitioner's jury, and one remark he made after a prospective juror left the room and outside the presence of any other jurors. This Court finds nothing in any of the comments that rendered the proceedings unfair.

The California Supreme Court's finding of no constitutional error was not an unreasonable application of clearly established federal law under section 2254(d). Claim 23 is DENIED.

### 4. *CLAIM 27: The Trial Court Erred by Admitting Hearsay Statements Regarding the Victim's State of Mind*

In Claim 27, Petitioner argues that the trial court violated his Fifth, Sixth, Eighth and Fourteenth Amendment rights when it allowed the prosecution to introduce Jovita Navarro's hearsay statements through the testimony of Margaret Navarro and Mindy Jackson. (Dkt. No. 317 at 186-93.) Petitioner raised this claim

for the first time in state court as claim 1 of his direct appeal. (Dkt. No. 148, Lodgment 1 at 31-60.) The California Supreme Court rejected the claim on the merits, finding that although admission of the hearsay statements was improper, it was harmless error because "admission of the hearsay statements added little to a substantial case pointing to defendant's guilt." *People v. Noguera*, 4 Cal.4th at 622-23. Petitioner raised the claim again as claim 12 of his June 2003 exhaustion petition, adding additional arguments that he was denied the effective assistance of counsel, an impartial jury, and equal protection. (Dkt. No. 336, Lodgment 9 at 103-12.) The California Supreme Court denied the claim on the merits and, alternatively, found it untimely, *Dixon* barred as to those arguments not previously raised on appeal, and successive. (Dkt. No. 336, Lodgment 12.)

Respondent argues that Petitioner has failed to meet his burden of showing that the California Supreme Court's denial of Claim 27 on the merits amounted to an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. §2254(d); *Pinholster*, 563 U.S. at 181-82.

Petitioner argues that the California Supreme Court's harmless error finding was unreasonable because the statements "showed more than [Jovita's] fear" but also included evidence of "direct threats against the deceased" and Jovita's hatred for Petitioner. (Dkt. No. 317 at 191.) He also argues that the state court erred in finding that the information contained in the hearsay statements was introduced to the jury through other sources and failed to address the prosecution's use of the hearsay evidence during closing argument. (Dkt. No. 317 at 192.) While Petitioner may be correct about the individual details introduced via the improper testimony, this Court finds the California Supreme Court's harmless error finding to be reasonable given the weight of evidence of Petitioner's guilt. As the state court held, "the prosecution presented a strong case supporting the conclusion that Jovita Navarro was murdered by defendant." *People v. Noguera*, 4 Cal.4th at 622.

Although the specific details included in the hearsay statements could have been excluded, "both defendant and Dominique admitted that his relations with Jovita were not always good, that she wanted Dominique to date others and was concerned about the decline in Dominique's schoolwork." *People v. Noguera*, 4 Cal.4th at 622-23. With respect to the prosecutor's closing argument, as discussed in detail *infra,* the Court must "examine the likely effect of the statements in the context in which they were made," *Sandoval v. Calderon*, 241 F.3d at 778, to determine "whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden*, 477 U.S. at 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S. at 643). "Improper comment warrants reversal only if it appears that the comment may possibly have affected the verdict." *Lincoln v. Sunn*, 807 F.2d at 809 (citation omitted). The jury listened to Ricky Abram's testimony regarding the meeting at Bob's Big Boy, where Petitioner confided in Abram the details of his plan to kill Jovita Navarro, and sought his help. It heard John Arce's testimony that Petitioner said he wanted to kill Jovita. It heard Margaret Noone's testimony that Petitioner had threatened her into testifying on his behalf. No reasonable jurist could find that the prosecutor's remarks "had [a] substantial and injurious effect or influence in determining the jury's verdict." *Sandoval v. Calderon*, 241 F.3d at 778 (citation omitted) (alteration in original), *cert. denied*, 534 U.S. 847, and *cert denied*, 534 U.S. 943 (2001). Accordingly, the Court finds Petitioner has not carried his burden to show that the California Supreme Court's finding of no constitutional error was an unreasonable application of clearly established federal law under section 2254(d). Claim 27 is DENIED.

      **5.**     ***CLAIM 28: The Trial Court Erred in Admitting Evidence of Petitioner's Prior Bad Acts***

      In Claim 28, Petitioner argues that the trial court erroneously allowed the prosecution to introduce evidence, through the testimony of Steve Arce, of two

incidents in which Petitioner used martial arts to fight. Petitioner argues that the fights were introduced as prior bad acts to defame his character in violation of his constitutional rights. (Dkt. No. 317 at 195-97.) Petitioner raised this claim for the first time in state court as claim 2 of his direct appeal. (Dkt. No. 148, Lodgment 1 at 61-70.) The California Supreme Court rejected the claim on the merits, finding that the evidence was properly admitted. *People v. Noguera*, 4 Cal.4th at 623-24. Petitioner raised the claim again as Claim 13 of his June 2003 exhaustion petition, adding arguments regarding ineffective assistance of counsel, denial of an impartial jury, and denial of equal protection. (Dkt. No. 336, Lodgment 9 at 112-16.) The California Supreme Court summarily rejected the claim on the merits and, alternatively, found the claim to be untimely, *Dixon* barred as to those portions of the claim not raised on direct appeal, and successive. (Dkt. No. 336, Lodgment 12.)

Respondent argues that Petitioner has failed to meet his burden of showing that the California Supreme Court's denial of Claim 28 on the merits amounted to an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. §2254(d); *Pinholster*, 563 U.S. at 181-82.

This Court finds no error in the California Supreme Court's finding that introduction of the evidence was proper. Whereas other evidence of Petitioner's familiarity with martial arts was remote in time, Mr. Arce's testimony placed Petitioner's use of martial arts in closer proximity to the killing. Nevertheless, assuming without finding that the court improperly admitted the evidence, Petitioner has failed to demonstrate that he suffered prejudice therefrom. As discussed *supra*, the evidence of Petitioner's guilt was substantial. Accordingly, the Court finds Petitioner has not carried his burden to show that the California Supreme Court's finding of no constitutional error was an unreasonable application of clearly established federal law under section 2254(d). Claim 28 is

DENIED.

6.   ***CLAIM 29: The Trial Court Erred in Admitting Hearsay***
***Statements Regarding Dominique Navarro's Makeup***

In Claim 29, Petitioner argues that the trial court erroneously admitted hearsay statements of Dominique Navarro and Mindy Jackson regarding Dominique's makeup. (Dkt.No. 317 at 197-203.)  Petitioner raised this claim for the first time in state court as Claim 4 on direct appeal. (Dkt.No. 148, Lodgment 1 at 92-95.)  The California Supreme Court rejected the claim on the merits, finding that evidence that Dominique lied about the circumstances of the killing was relevant to proving the existence of the conspiracy. *People v. Noguera*, 4 Cal.4th at 626-28.  While the state court found that Dominique's prior statement about removing her makeup was inadmissible, it duplicated other properly admitted evidence, and Petitioner was not prejudiced as a result of its admission. *Id.* Petitioner raised the claim again as Claim 14 of his June 2003 exhaustion petition, adding additional arguments that admission of the evidence denied him effective assistance of counsel, an impartial jury, and equal protection.. (Dkt. No. 336, Lodgment 9 at 116-22.)  The California Supreme Court summarily denied the claim on the merits and, alternatively, found it to be untimely, *Dixon* barred as to those parts of the claim not previously brought on direct appeal, and successive. (Dkt. No. 336, Lodgment 12.)

Respondent argues that Petitioner has failed to meet his burden of showing that the California Supreme Court's denial of Claim 28 on the merits amounted to an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. §2254(d); *Pinholster*, 563 U.S. at 181-82.

Petitioner argues that he suffered prejudice as a result of the erroneously admitted hearsay testimony about Dominique's habit of removing her makeup.  He suggests that "[w]ithout the hearsay evidence. . . . the prosecutor would have been

unable to suggest that [Dominique] had not retired for the night. . . . or to argue that her account of having retired tended to show evidence of a well-planned scheme to kill her mother." (Dkt. No. 317 at 202.) Petitioner is mistaken. As the California Supreme Court noted in denying the claim, "[g]iven the early hour, and Dominique's testimony that she had been awakened from sleep by the sounds of a struggle, it is likely that a reasonable juror would be more impressed with the fact that Dominique was wearing makeup at all, rather than by the contested 'habit evidence that she always removed her cosmetics before going to bed.'" *People v. Noguera*, 4 Cal.4th at 628. Moreover, the jury heard Ricky Abram's testimony regarding the "well-planned scheme" to murder Jovita, including Dominique's involvement and role to run hysterically next door to report the break-in. (RT 4943-44.) In any event, Petitioner has failed to demonstrate that he suffered prejudice because the jury heard testimony about Dominique's habit of removing her make-up. As discussed *supra*, the evidence of Petitioner's guilt was substantial.

The Court finds Petitioner has not carried his burden to show that the California Supreme Court's finding of no constitutional error was an unreasonable application of clearly established federal law under section 2254(d). Claim 29 is DENIED.

### 7. *CLAIM 30: The Trial Court Erred in Admitting Ricky Abram's Prior Consistent Statements*

In Claim 30, Petitioner argues that the trial court violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights, including his rights to the effective assistance of counsel, a fair trial, an impartial jury, a reliable special circumstance finding, equal protection and due process, when it allowed the prosecution to introduce Ricky Abram's prior consistent statement. (Dkt. No. 317 at 203-206.) Petitioner raised this claim for the first time in state court as claim 5 of his direct appeal. (Dkt. No. 148, Lodgment 1 at 96-101.) The California Supreme Court

denied the claim on the merits, finding introduction of the prior statements to be proper, under state law, where they had been made before the alleged motive for Abram to lie arose. *People v. Noguera*, 4 Cal.4th at 628-30. Petitioner raised the arguments again in Claim 15 of his June 2003 exhaustion petition, adding arguments that admission of the evidence denied him effective assistance of counsel, an impartial jury, and equal protection. (Dkt. No. 336, Lodgment 9 at 123-24.) The California Supreme Court summarily denied the claim on the merits and, alternatively, found the claim to be untimely, *Dixon* barred as to the newly raised arguments, and successive. (Dkt. No. 336, Lodgment 12.)

Respondent argues that Petitioner has failed to meet his burden of showing that the California Supreme Court's denial of Claim 30 on the merits amounted to an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. §2254(d); *Pinholster*, 563 U.S. at 181-82.

Petitioner acknowledges that his trial attorney's cross-examination of Mr. Abram was, in large part, an effort to undermine his credibility. (Dkt. No. 317 at 205.) A review of the record reveals that Mr. Pereyda did not suggest that Abram "was under the threat of prosecution" in connection with the murder, as Petitioner implies,[22] but rather, had a motive to fabricate testimony in expectation of benefits connected to subsequent arrests. (RT 5026-58, 5113-19.) As such, it was reasonable for the California Supreme Court to find proper, under state law, the prosecution's introduction, on redirect, of Mr. Abram's prior consistent statement. "Although [Petitioner] argues that Abram had a motive to minimize his potential penal liability as soon as Keltner told him that he was liable criminally as a coconspirator, . . . the focus under Evidence Code Section 791 is the specific agreement or other inducement suggested by cross-examination as supporting the witness's improper motive." *People v. Noguera,* 4 Cal.4th at 630. "[A] prior

---

[22] Dkt. No. 317 at 205.

consistent statement is admissible as long as the statement [was] made before the existence of any one of the motives that the opposing party expressly or impliedly suggests may have influenced the witness's testimony." *Id.* at 629. "Here, the thrust of defense counsel's cross-examination of Ricky Abram sought to explore, in light of his cooperation in testifying against defendant, the existence and nature of any agreements with law enforcement authorities to obtain early parole or assistance in the favorable disposition of multiple criminal charges brought against him *after* the December 1983 interview with Keltner." *Id.* at 629-30. The admission of evidence is an issue of state law and errors of state law do not warrant federal habeas corpus relief. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

Petitioner cites no authority to carry his burden to show that the California Supreme Court's finding was an unreasonable application of clearly established federal law or an unreasonable determination of the factds under section 2254(d). Claim 30 is DENIED.

**8.** ***CLAIM 53 – The Trial Court Erred When It Permitted the Improper Prosecutorial Argument Regarding the Weighing of Aggravating and Mitigating Factors and Failed to Give Corrective Instructions to the Jury***

In Claim 53, Petitioner argues that the trial court erred in allowing alleged improper prosecutorial arguments regarding the weighing of aggravating and mitigating evidence and in failing to give corrective instructions to the jury. (Dkt. No. 317 at 300-01.)

Petitioner raised this claim for the first time as Claim 17 in his March 2, 1998, exhaustion petition. (Dkt. No. 336, Lodgment 4 at 172–73.) The California Supreme Court summarily denied the claim on the merits and, alternatively, found the claim to be untimely and barred for having been raised on direct appeal. (Dkt. No. 336, Lodgment 8.)

133

Respondent argues that Petitioner has failed to meet his burden of showing that the California Supreme Court's denials on the merits amounted to an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. §2254(d); *Pinholster*, 563 U.S. at 181-82.

As discussed above, any errors in the prosecutor's challenged statements were harmless. In light of the benign or non-existent errors Petitioner alleges, the Court cannot find trial court error that rendered the trial fundamentally unfair. Any trial court error in permitting the arguments did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 638. In fact, the trial court properly instructed the jury regarding the weighing of mitigating and aggravating evidence. The California Supreme Court's determination rejecting this claim was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts. Claim 53 is DENIED.

9. ***CLAIM 56 – The Trial Court Erred in Failing Properly to Answer the Jury's Question as to Whether They Could Return a Verdict of Life Without Possibility of Parole if the Aggravating Factors Outweighed Those in Mitigation***

In Claim 56, Petitioner argues that the trial court violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments when it failed to properly answer the jury's question regarding the weighing of aggravating and mitigating evidence. (Dkt. No. 317 at 304-09.)

The jury began penalty phase deliberations at 3:05 p.m. on May 21, 1987. (RT 8711; CT 1348.) The next day, May 22, 1987, the jury made a series of requests. In relevant part to the claim raised here, the jury asked the following question: "If the jury finds aggravating circumstances exceed the mitigating circumstances, is it still possible for the jury to find the appropriate sentence is life

134

without the possibility of parole?" (CT 1350; RT 8714.)  In a hearing held outside of the presence of the jury, the defense took the position that the trial court should simply respond to the question, "yes."  (RT 8712.)  The prosecution, on the other hand, asked the court to read the jury the relevant instruction regarding the weighing of mitigating and aggravating evidence.  (RT 8713.) At 2:35 p.m. on May 22, 1987, the Court reread Jury Instruction 8.84.2 to the jury, in accord with the district attorney's request.  The Court instructed the jury:

> It is now your duty to determine which of the two penalties, death or confinement in the state prison without possibility of parole, shall be imposed on the defendant.

> After having heard all of the evidence, and after having heard and considered the arguments of counsel, you shall consider, take into account, and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed.

> The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale.  You are free to assign whatever weight you deem appropriate to each and all of the various factors upon which you have been instructed.  By weighing the totality of the various circumstances you must determine which penalty is appropriate, death, or life without the possibility of parole.

> If, in your reasoned judgment, you conclude that the aggravating circumstances outweigh the mitigating circumstances and you personally believe death is the appropriate sentence under all the circumstances, then you shall impose death.  In the event that you cannot so find, you shall impose life without the possibility of parole.

(RT 8714-16.)  Twenty minutes after receiving the instruction, the jury returned a verdict of death.  (CT 1353; RT 8717.)

135

Petitioner contends that the trial court erred in answering the jury's inquiry, and the error violated his right to a fundamentally fair and reliable penalty phase proceeding. Petitioner suggests that the jury's question made clear that it was confused about the legal standard, and argues that rereading the same instruction that led to the confusion amounted to a failure to guide the juror's discretion and to prevent arbitrary action.

Petitioner raised this claim for the first time as Claim 39 of his June 9, 2003, exhaustion petition. (Dkt. No. 336, Lodgment 9 at 172–75.) The California Supreme Court summarily denied the claim on the merits and, alternatively, found the claim to be untimely, barred for having been raised on direct appeal, barred to the extent it was not raised on appeal, and barred as successive. (Dkt. No. 336, Lodgment 12.)

Respondent argues that Petitioner has failed to meet his burden of showing that the California Supreme Court's denials on the merits amounted to an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. §2254(d); *Pinholster*, 563 U.S. at 181-82.

The trial court's response to the jury's question, considered in the context of the instructions as a whole and the trial record, did not violate Petitioner's due process rights. *See Estelle v. McGuire*, 502 U.S. at 71–72. When a trial judge responds to a "jury's question by directing its attention to the precise paragraph of the constitutionally adequate instruction that answers its inquiry," the Constitution does not require anything more. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000). There is a strong presumption that juries understand and follow the trial court's instructions. *Id.*; *Richardson v. Marsh*, 481 U.S. at 211. Contrary to Petitioner's contention,[23] the trial court's instruction was a correct statement of state law.

---

[23] Petitioner contends that "[t]he court's original instruction was both legally wrong and confusing." (Dkt. No. 317 at 308.) The Supreme Court specifically considered CALJIC 8.84.2 in *Boyde,* and the mandatory language of penalty phase instructions more generally in *Blystone v.*

136

Petitioner has not demonstrated that the trial court's decision to re-read the agreed upon jury instruction was erroneous, or that it had a "substantial and injurious effect on the verdict." *Brecht*, 507 U.S. at 623. The California Supreme Court's decision denying Petitioner's claim was not contrary to or an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Claim 56 is DENIED.

> **10.** ***CLAIMS 58 & 59 – Aggravating Evidence Was Improperly Admitted at the Penalty Phase of Petitioner's Trial***

During the penalty phase of Petitioner's trial, the prosecution introduced aggravating evidence through the testimony of John Antenucci, the victim of an attempted robbery and car theft in August, 1983. Antenucci testified that Petitioner responded to an advertisement Antenucci placed in the newspaper listing his car for sale. After taking the car for a test drive, Petitioner pulled the car

---

*Pennsylvania*, 494 U.S. 299 (1990). In *Boyde*, the petitioner argued that CALJIC 8.84.2 did not adequately inform the jury as to its discretion in determining the appropriate sentence to be imposed. 494 U.S. at 376. The Court held that the mandatory language of the instruction did not unconstitutionally restrict jury sentencing discretion. Id. at 377 ("But there is no such constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consideration of mitigating evidence 'in an effort to achieve a more rational and equitable administration of the death penalty.' Petitioner's claim that the 'shall impose' language of CALJIC 8.84.2 unconstitutionally prevents 'individualized assessment' by the jury is thus without merit.") (quoting *Franklin v. Lynaugh*, 487 U.S. 164, 181 (1988) (plurality opinion)). The Supreme Court thus reasoned that there is no constitutional requirement of unfettered sentencing discretion that permits a jury to have the freedom to decline to impose the death penalty even if the jury decides that the aggravating circumstances outweigh the mitigating circumstances. *Id.*; see also *Kansas v. Marsh*, 548 U.S. 163, 171 (2006) ("So long as the sentencer is not precluded from considering relevant mitigating evidence, a capital sentencing statute cannot be said to impermissibly, much less automatically, impose death."); *Turner v.. Calderon*, 281 F.3d 851, 871 (9th Cir.2002); *Bonin v. Calderon*, 59 F.3d 815, 849 (9th Cir.1995) (finding this argument foreclosed by the decisions in *Boyde* and *Blystone* ), *cert. denied*, 516 U.S. 1051 (1996). Additionally, *Blystone* involved a Pennsylvania death penalty statute that in part mandated the death penalty if the jury unanimously found at least one aggravating circumstance and no mitigating circumstances. *Blystone*, 494 U.S. at 301. The petitioner in that case had argued that the mandatory nature of the instruction unconstitutionally restricted the discretion of the sentencing jury to weigh the aggravating and mitigating circumstances however it deemed appropriate. *Id.* at 302. In rejecting the petitioner's argument, the Supreme Court held that the requirement of individualized sentencing in capital cases is met by allowing the jury to consider all relevant mitigating factors and that the heightened standards of the Eighth Amendment are thereby satisfied. *Id.* at 307 08.

over to the side road, ostensibly to allow Antenucci to retake the driver's seat. When Antenucci got out of the car, Petitioner tried to drive away, but the car stalled. (RT 8368.) Once Antenucci was back in the car, Petitioner's cousin pulled a gun and Petitioner told Antenucci to get out, but Antenucci grabbed the keys from the ignition and ran away. (RT 8369-71.) Antenucci stopped a stranger on the street and told him that someone was trying to steal his car. The stranger said he had a gun and the two men returned to the car to find Petitioner and his cousin were trying to hot-wire the car. Petitioner and his cousin fled when they saw the gun. (RT 8372-73.)

In Claim 58, Petitioner contends that the trial court erroneously admitted this aggravating evidence because the statute of limitations on the attempted robbery and car theft had expired. Further, in Claim 59, Petitioner argues that his rights were violated because evidence of this unadjudicated crime was admitted in the penalty phase.

Petitioner raised these claims for the first time on direct appeal. The California Supreme Court rejected the claims in conjunction with other claims addressing "multiple flaws in the capital sentencing process [that] render the death penalty unconstituitonal." *People v. Noguera*, 1 Cal.4th at 649. He raised the claims again as Claims 18 and 19 of his March 2, 1998, exhaustion petition. (Dkt. No. 336, Lodgment 4 at 173-78.) The California Supreme Court summarily denied the claims on the merits and, alternatively, found the claims to be untimely, and barred for having been raised and rejected on direct appeal. (Dkt. No. 336, Lodgment 8.)

Respondent argues that Petitioner has failed to meet his burden of showing that the California Supreme Court's denials on the merits amounted to an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. §2254(d); *Pinholster*, 563 U.S. at 181-82.

Admission or exclusion of evidence in state court is ordinarily not a matter for federal habeas review unless the admission or exclusion violates a particular constitutional guarantee or is so prejudicial that it results in a denial of due process. *See Estelle v. McGuire*, 502 U.S. at 68; *Windham v. Merkle*, 163 F.3d 1092, 1103 (9th Cir.1998), *cert. denied,* 541 U.S. 950. In support of his claims, Petitioner cites *Godfrey v. Georgia*, 446 U.S. at 423 and Justice Marshall's dissent from the denial of certiorari in *Miranda v. California*, 486 U.S. 1038 (1988) (Marshall J, dissenting) ("I would grant the petition to resolve the question whether the Eighth and Fourteenth Amendments preclude the introduction of evidence of unadjudicated criminal conduct at the sentencing phase of a capital case."). Neither of these cites supports the suggestion the California Supreme Court's denial of habeas corpus relief amounted to an unreasonable application of *clearly established federal law*. Petitioner fails to cite any authority for his claim that the prosecution violated his due process rights in presenting aggravating evidence of offenses that might be barred from prosecution by a statute of limitations. Moreover and in fact, California's death penalty statute expressly provides that the prosecution in a capital case *may* introduce, in aggravation, evidence of prior felony convictions and evidence of "criminal activity. . . which involved . . . the express or implied threat to use force or violence." Cal. Penal Code §190.3 (b)-(c). The United States Supreme Court has upheld the constitutionality of this law. *California v. Brown*, 479 U.S. 538, 543 (1987); *see also Tuilaepa v. California*, 512 U.S. 967, 975-80 (1994); *see also Campbell v. Kincheloe*, 829 F.2d 1453, 1461 (9th Cir. 1987) (holding unadjudicated criminal conduct may be introduced to support the aggravating factor of probable future violence), *cert. denied*, 488 U.S. 948 (1988). Not only are Petitioner's claims inconsistent with the statutory scheme, they also contravene the fundamental principle consistently relied on by the United States Supreme Court that the jury should be provided "with all possible relevant information about the individual

defendant whose fate it must determine." *Jurek v. Texas*, 428 U.S. 262, 276 (1976). In *Williams v. New York*, the United States Supreme Court upheld the trial court's consideration of thirty-some burglaries allegedly committed by the defendant, despite the fact that he had not been convicted of these crimes. 337 U.S. 241 (1949). Petitioner does not identify any clearly established authority from the United States Supreme Court holding that a jury may not consider prior unadjudicated criminal activity as a factor in aggravation during the penalty phase of a capital case. Claims 58 and 59 are DENIED.

11. ***CLAIM 90 – The Trial Court Misunderstood Its Authority with Regard to the Automatic Motion for Modification of the Judgment***

In Claim 90, Petitioner argues that his trial judge indicated he "misunderstood" his authority when he "agreed" with the prosecutor's characterization of trial counsel's motion for new trial and modification of judgment as "similar to a 1385 motion to reduce the penalty." (Dkt. No. 317 at 355.) In actuality, the prosecutor did not characterize the motion, but rather asked a question, was it "similar to 1385 a motion to reduce the penalty of death down to life?" The judge answered, "Yes" and added, "The Court, of course, has authority, sitting as a 13th juror, to make those kinds of decisions." (RT at 8848.) Petitioner goes on to state, "the trial court only has the authority to determine the sufficiency of the evidence," and conclusorily argues "[t]he trial judge was biased in favor of the death penalty and was therefore unable to perform his duties in a fair and impartial manner" such that "Petitioner was prejudiced at sentencing." (Dkt. No. 317 at 355.)

Petitioner raised this claim for the first time in state court as Claim 30 of his March 1998 exhaustian petition. (Dkt. No. 336, Lodgment 4 at 197-98.) The California Supreme Court summarily denied the claim on the merits and, alternatively, found it to be untimely and *Dixon* barred. (Dkt. No. 336, Lodgment

8.

Respondent argues that Petitioner has failed to meet his burden of showing that the California Supreme Court's denial on the merits amounted to an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. §2254(d);  *Pinholster*, 563 U.S. at 181-82.  This Court agrees.

Petitioner ignores the fact that, in arguing the motion, Petitioner's trial attorney noted the trial court's use of the phrase "13th juror," and pointed out that "the Court is in a slightly different position in a capital case in this review than the Court is when it rules on sufficiency of evidence as a 13th juror typically after a straight homicide trial." (RT at 8850.) Mr. Pereyda argued that "the Court, like the jury, has the power and obligation to impose death in this case only if those aggravating factors, which in this case is basically the crime itself, so substantially outweigh any mitigating factors about this defendant that the Court can be sure that death is the final appropriate judgment." (RT at 8850-51.) Subsequently, in announcing its decision on the application to modify the verdict, the trial court clearly stated,

> In ruling on this application, the judge shall review the
> evidence, consider, take into account, and be guided by the
> aggravating and mitigating circumstances referred to in section 190.4
> of the penal code, and shall make a determination as to whether the
> jury's findings and verdicts that the aggravating circumstances
> outweigh the mitigating circumstances, are contrary to law or to the
> evidence presented.  The judge shall then state on the record the
> reasons for his findings.

> In this particular case, the Court specifically agrees with the
> jury's findings that the circumstances in aggravation outweigh the

circumstances in mitigation, and that they are supported by the weight of the evidence.

(RT at 8856-57.)

The California Supreme Court's decision denying Petitioner's claim was not contrary to or an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Claim 90 is DENIED.

## F. **Instructional Error**

### 1. *Legal Standard*

A claim of instructional error does not raise a cognizable federal claim unless the error "so infected the entire trial that the resulting conviction violates due process." *McGuire,* 502 U.S. at 71–72; *Henderson v. Kibbe,* 431 U.S. 145, 154 (1977); *Cupp v. Naughten,* 414 U.S. 141, 146–47 (1973). In determining whether a constitutional violation has occurred, the claimed instructional error must be viewed in the light of all the instructions given and the trial record, taken as a whole. *See McGuire,* 502 U.S. at 72; *Cupp,* 414 U.S. at 146–47.

"The fact that a jury instruction violates state law is not, by itself, a basis for federal habeas corpus relief." *Clark v. Brown,* 450 F.3d 898, 904 (9th Cir.), *cert. denied,* 549 U.S. 1027 (2006). "An appraisal of the significance of an error in the instructions to the jury requires a comparison of the instructions which were actually given with those that should have been given." *Kibbe*, 431 U.S. at 154. "Federal habeas courts therefore do not grant relief, as might a state appellate court, simply because the instruction may have been deficient in comparison to the CALJIC model." *Id.* (internal quotation omitted). "The question in a collateral proceeding is whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process, not merely whether the instruction is undesirable, erroneous, or even universally condemned." *Id.* (internal quotations omitted).

The record indicates that petitioner did not object to any of the challenged instructions at trial. Nevertheless, the California Supreme Court considered the challenges on the merits.

  **2. *CLAIMS 31-34: The Trial Court Erred When It Gave Contradictory, Misleading, and Ambiguous Instructions that Permitted the Jury to Find Guilt Based On the Uncorroborated Testimony of an Accomplice***

  In Claim 31, which Petitioner now pleads to include Claims 32 through 34, Petitioner argues that the trial court violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments when it simultaneously instructed the jury pursuant to CALJIC 3.11, that the testimony of an accomplice requires corroboration,[24] and pursuant to CALJIC 2.27, that the testimony of a single witness is enough to prove a fact.[25] Petitioner argues that these instructions confused the jury and, thus, his constitutional right to trial by jury was violated. (Dkt. No. 317 at 206-12.)

  Petitioner raised this claim for the first time in state court as claim 6 of his direct appeal. (Dkt. No. 148, Lodgment 1 at 102-08.) The California Supreme Court rejected the claim on the merits, finding "nothing in the combined instructions suggested to the jurors that corroboration of Abram's testimony was not required: 'A reasonable juror would have recognized [the single witness

---

[24] The CALJIC 3.11 instruction stated,

> A defendant cannot be found guilty based upon the testimony of an accomplice unless such testimony is corroborated by other evidence which tends to connect such defendant with the commission of the offense.

(CT 1722; RT 8268.)

[25] The CALJIC 2.27 instruction stated,

> Testimony which you believe given by one witness is sufficient for the proof of any fact. However, before finding any fact [required to be established by the prosecution] to be proved solely by the testimony of such a single witness, you should carefully review all the testimony upon which the proof of such fact depends.

(CT 1708; RT 8259-60.)

143

instruction] as setting forth the general rule and the charge on accomplice testimony as an exception to it. Nothing before us indicates that the jurors may have acted otherwise.'" *People v. Noguera*, 4 Cal.4th at 631 (internal citations omitted). Petitioner raised the claims again in his June 2003 exhaustion petition, adding constitutional arguments that the instructions denied him effective assistance of counsel, a reliable special circumstance determination, a reliable penalty phase determination, and equal protection. (Dkt. No. 336, Lodgment 9 at 125-30.) The California Supreme Court summarily denied the claims on the merits and, alternatively, found them to be untimely, *Dixon* barred with respect to those arguments not raised on direct appeal, and successive. (Dkt. No. 336, Lodgment 12.)

Respondent argues that Petitioner has failed to meet his burden of showing that the California Supreme Court's merits denials of the claims amounted to an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. §2254(d); *Pinholster*, 563 U.S. at 181-82.

The propriety of a jury instruction must be considered in light of the instructions as a whole. *Estelle v. McGuire*, 502 U.S. at 72. To obtain federal habeas corpus relief for an instructional error, a petitioner must demonstrate that the error "so infused the trial with unfairness as to deny due process of law." *Id.* at 75. In the present matter, the state court found no instructional error because "nothing in the combined instructions suggested to the jurors that corroboration of Abram's testimony was not required. . . . Moreover, because there was no error in giving the jury the combined single witness and accomplice corroboration charges, there is no basis upon which to conclude that the jurors relied solely on the uncorroborated testimony of Abram to convict defendant." *People v. Noguera*, 4 Cal.4th at 631. There is also no reason to believe that the jury relied solely on Abram's testimony to find the special circumstances to be true. This Court finds

144

no reason to reject the state court's determination and find that the jury was confused by the instructions. Nothing in the record suggests that the jury instructions were misleading or that the jury applied the instructions in a way that violated the Constitution. *Estelle v. McGuire*, 502 U.S. at 72.

The Court finds Petitioner has not carried his burden to show that the California Supreme Court's decision denying his claims was an unreasonable application of clearly established federal law under section 2254(d)(1), or an unreasonable determination of the facts under section 2254(d)(2). Claims 31, 32, 33 and 34 are DENIED.

3. ***CLAIMS 35-36: Petitioner's Death Sentence Must Be Vacated Because It Is Based Upon the Inherently Unreliable Accomplice Testimony of Prosecution Witness Ricky Abram***

In Claim 35, which Petitioner pleads to include Claim 36, Petitioner argues that Ricky Abram's testimony was inherently unreliable as that of an accomplice and, as such, his conviction and death sentence violate his Fifth, Sixth, Eighth and Fourteenth Amendment rights to effective assistance of counsel, a fair trial, an impartial jury, a reliable special and due process. (Dkt. No. 317 at 211-15.) Petitioner raised this claim for the first time in state court as claim 6 of his direct appeal. (Dkt. No. 148, Lodgment 1 at 102-108.) The California Supreme Court rejected the claim on the merits, finding that it rested on the erroneous presumption that the jury was confused by the trial court's instructions regarding witness testimony. *People v. Noguera*, 4 Cal.4th at 631-32. Petitioner raised the claim again in his June 2003 exhaustion petition, adding the constitutional claims that the testimony violated his rights to effective assistance of counsel, a fair trial, an impartial jury, and equal protection. (Dkt. No. 336, Lodgment 9 at 130.) The California Supreme Court summarily rejected the claim on the merits and, alternatively, found it to be untimely, *Dixon* barred as to the portions of the claim not raised on direct appeal, and successive. (Dkt. No. 336, Lodgment 12.)

145

Respondent argues that Petitioner has failed to meet his burden of showing that the California Supreme Court's merits denials of the claim amounted to an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. §2254(d); *Pinholster*, 563 U.S. at 181-82.

Petitioner's claim is based upon his contention, as discussed with respect to Claims 31-34, that "the trial court allowed the jury to believe that they could find the financial gain special circumstance to be true, based solely on the testimony of this particularly unreliable accomplice[, Ricky Abrams]." (Dkt. No. 317 at 214.) This Court has already rejected the premise of Petitioner's argument in denying Claims 31-34. Moreover, even if, as Petitioner contends, "Abram's testimony provided *the primary support for the financial gain special circumstance* that made Petitioner eligible for a death sentence," it was not the *sole* evidence introduced by the prosecution in support of the special circumstance. Petitioner has not demonstrated that the California Supreme Court's decision denying his claims was an unreasonable application of clearly established federal law under section 2254(d)(1), or an unreasonable determination of the facts under section 2254(d)(2). Claims 35 and 36 are DENIED.

> **4.** ***CLAIM 37: The Trial Court Erred in Giving California Jury Instructions that Impermissibly Discouraged the Jury from Viewing Accomplice Witness Ricky Abram's Testimony With Distrust or Requiring Corroboration***

In Claim 37, Petitioner argues that the trial court violated his constitutional rights when it instructed the jury pursuant to CALJIC 3.02, that an accomplice "can end his responsibility for the crime by notifying the other party or parties of whom he has knowledge of his intention to withdraw from the commission of the crime and by doing everything in his power to prevent its commission," and pursuant to CALJIC 6.20 that "any member of a conspiracy may withdraw from

146

and cease to be a party to a conspiracy, but his liability for the acts of his coconspirators continues until he effectively withdraws from the conspiracy." (Dkt. No. 317 at 215-22; CT 1625, 1642.) Petitioner suggests that these instructions permitted the jury to find that Abram was not an accomplice and, thus, that they were not required to view his testimony with distrust or require corroboration. (Dkt. No. 317 at 218.)

Petitioner raised this claim for the first time in state court as claim 7 on direct appeal. (Dkt. No. 148, Lodgment 1 at 109-114.) The California Supreme Court rejected the claim on the merits, finding that, in contradiction to Petitioner's contention, the instructions informed the jury "that withdrawal required something more than impossibility," and "favor[ed] a finding that Abram was an accomplice" because he had not communicated his withdrawal to his coconspirators. *People v. Noguera*, 4 Cal.4th at 633. As such, the instructions "require[d] . . . that his testimony be evaluated skeptically as well as corroborated." *Id.* Petitioner raised the claim again in his June 2003 exhaustion petition, adding arguments that the instructions denied him effective assistance of counsel, an impartial jury, and equal protection. (Dkt. No. 336, Lodgment 9 at 132-35.) The California Supreme Court summarily denied the claim on the merits and, alternatively, found the claim to be untimely, *Dixon* bared, and successive. (Dkt. No. 336, Lodgment 12.)

Respondent argues that Petitioner has failed to meet his burden of showing that the California Supreme Court's merits denials of the claim amounted to an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. §2254(d); *Pinholster*, 563 U.S. at 181-82.

The propriety of a jury instruction must be considered in light of the instructions as a whole. *Estelle v. McGuire*, 502 U.S. at 72. To obtain federal habeas corpus relief for an alleged instructional error, a petitioner must demonstrate that the error "so infused the trial with unfairness as to deny due

process of law." *Id.* at 75. In the present matter, the state court found no instructional error because "the contested instructions informed the jurors that withdrawal required something more than impossibility, that is, required Abram to communicate his withdrawal to his conspirators." *People v. Noguera*, 4 Cal.4th at 633. During the in-chambers conference in which the parties conferred regarding proposed jury instruction, the defense lodged a general objection to any instructions regarding conspiracy. (RT 7959, 7971.) As such, it is clear from the record that the district attorney advocated for 6.20 to protect the record. Mr. King argued that it was "important to give the instruction *for the defense view*" because it informed the jury that Abram's incarceration was insufficient for withdrawal, "that [it was] necessary for him to have communicated," and it was relevant to how the jury "view[ed] [Abram's] testimony [because it] gets back to the accomplice instructions." (RT 7971.) Mr. King stated for the record that he believed Abram was an accomplice. (RT 7963.) Without the instruction advising the jury that communication of withdrawal was necessary, the jury might "feel that [because of his incarceration] at the time of the murder he was not an accomplice" and they were "not required to view his testimony with distrust." (RT 7971.) This Court finds no reason to reject the state court's determination and find that the jury misunderstood or ignored the instructions. Nothing in the record suggests that the jury applied the instructions in a way that violated the Constitution. *Estelle v. McGuire*, 502 U.S. at 72.

Petitioner has not demonstrated that the California Supreme Court's decision denying his claims was an unreasonable application of clearly established federal law under section 2254(d)(1), or an unreasonable determination of the facts under section 2254(d)(2). Claim 37 is DENIED.

//
//

1

     **5.**     *CLAIM 38: The Trial Court Erred in Giving the Standard*

2

               *Reasonable Doubt Instruction in Combination with the*

3

               *Circumstantial Evidence Instruction*

4

     In Claim 38, Petitioner takes issue with the fact that the trial court gave both

5

the standard reasonable doubt instruction and instructions on the relationship

6

between reasonable doubt and circumstantial evidence. Citing *Cage v. Louisiana*,

7

498 U.S. 39 (1990), he argues that, in combination, the instructions redefined

8

reasonable doubt, "render[ing] the process prejudicially unreliable" in violation of

9

his Fifth, Sixth, Eighth and Fourteenth Amendment rights. (Dkt. No. 317 at 222-

10

27.) Petitioner contends that "[t]he instructions as a whole. . . led the jury to find

11

guilt based on reasonable interpretations of events, rather than facts found beyond

12

any reasonabl[e] doubt." (Dkt. No. 317 at 224.)

13

     Petitioner raised this claim for the first time in state court as Claim 8 of his

14

direct appeal. (Dkt. No. 148, Lodgment 1 at 115-18.) The California Supreme

15

Court rejected the claim on the merits, finding that the trial court gave the standard

16

CALJIC 2.90 reasonable doubt instruction defining reasonable doubt "as one that

17

leaves 'the minds of the jurors in that condition that they cannot say that they feel

18

an abiding conviction to a moral certainty of the truth of the charge.'" *People v.*

19

*Noguera*, 4 Cal.4th at 634. "[T]here was no *Cage*-like dilution of the standard

20

required to convict" and no "transformation of true reasonable doubt . . . into a

21

higher degree of doubt [required to acquit]." *Id.* With respect to the circumstantial

22

evidence instruction, the court rejected Petitioner's "claim that the standard

23

reasonable doubt instructions regarding circumstantial evidence are in effect

24

irrebuttable presumptions of guilt."*Id.* Rather, "'[r]ead in context, the instructions

25

merely require the jury to reject unreasonable interpretations of the evidence, and

26

to accept the reasonable version of the events which fits the evidence.'" *Id.*

27

     Petitioner raised the claim again in his June 2003 exhaustion petition,

28

adding claims that the error denied him effective assistance of counsel, an

impartial jury, and equal protection. (Dkt. No. 336, Lodgment 9 at 135-36.) The California Supreme Court summarily denied the claim on the merits and, alternatively, found it untimely, *Dixon* barred as to the arguments not raised on appeal, and successive. (Dkt. No. 336, Lodgment 12.)

Respondent argues that Petitioner has failed to meet his burden of showing that the California Supreme Court's merits denials of the claim amounted to an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. §2254(d); *Pinholster*, 563 U.S. at 181-82.

To obtain federal habeas corpus relief for an instructional error, a petitioner must demonstrate that the error "so infused the trial with unfairness as to deny due process of law." *Estelle v. McGuire*, 502 U.S. at 75. The propriety of a jury instruction must be considered in light of the instructions as a whole, and the proper inquiry is not whether the instruction "could have" been applied unconstitutionally but whether there is a reasonable likelihood that the jury did so apply it. *Id.* at 72; *Victor v. Nebraska*, 511 U.S. 1, 6 (1994). In the present matter, the state court found no instructional error and there is also no reason to believe that the jury applied the instructions in a way that violated the Constitution. *Estelle v. McGuire*, 502 U.S. at 72.

Petitioner has not demonstrated that the California Supreme Court's decision denying his claims was an unreasonable application of clearly established federal law under section 2254(d)(1), or an unreasonable determination of the facts under section 2254(d)(2). Claim 38 is DENIED.

**6.    CLAIM 39 – *The Trial Court Erred In Giving a Penalty Instruction that was Inconsistent with* <u>*People v. Brown*</u>**

In Claim 39, Petitioner contends that the trial court's penalty phase instructions improperly required the jury to determine penalty by mechanically weighing aggravating evidence against mitigating evidence, in direct

150

contravention of the California Supreme Court's decisions in *People v. Brown*, 40 Cal.3d 512 (1985) and *People v. Burgener*, 41 Cal.3d 505 (1986). (Dkt. No. 317 at 228-29.)

Petitioner raised this claim for the first time on direct appeal as Claim 15 of his appellate opening brief. (Dkt. No. 148, Lodgment 1 at 165-172.) The California Supreme Court rejected the claim, noting that the trial court had tailored its instruction to comply with *Brown*. *People v. Noguera*, 4 Cal.4th at 640. It disagreed with Petitioner's contention that he "suffered substantial prejudice when the trial [court] failed to fully modify the [Penal Code section 190.3] instruction." (Dkt. No. 148, Lodgment 1 at 168.) Rather, the Court held that

> [g]iven the modifications in the instruction made in light of the concerns expressed in *Brown,...*we do not think there is a reasonable likelihood that a juror would have misunderstood the nature of his or her role in the capital sentencing process – either as one involving mechanical quantification of relevant factors or *requiring* the imposition of the death penalty.

*People v. Noguera*, 4 Cal.4th at 641 (citing *People v. Clair,* 2 Cal.4th 629, 662-63 (1992)). Petitioner again presented this claim to the California Supreme Court as Claim 24 in his June 9, 2003 exhaustion petition. (Dkt. No. 336, Lodgment 9 at 136-38.) The California Supreme Court summarily denied the claim on the merits and, alternatively, found the claim to be untimely, barred to the extent it was raised on direct appeal, barred to the extent it was not raised on direct appeal, and barred as successive. (Dkt. No. 336, Lodgment 12.)

Respondent argues that Petitioner has failed to meet his burden of showing that the California Supreme Court's denials on the merits amounted to an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. §2254(d); *Pinholster*, 563 U.S. at 181-82.

At the close of the penalty phase, the trial court instructed Petitioner's jury concerning the scope of its sentencing function as follows:

> After having heard all of the evidence and having heard and considered the argument of counsel, you shall consider and take into account and be guided by the applicable factors of aggravating and mitigating circumstance upon which you have been instructed.
>
> The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale. You are free to assign whatever weight you deem appropriate to each and all of the various factors upon which you have been instructed. By weighing the totality of various circumstances, you must determine which penalty is appropriate, death, or life without the possibility of parole.
>
> If, in your reasoned judgment, you conclude that the aggravating circumstances outweigh the mitigating circumstances and you personally believe death is the appropriate sentence under all the circumstances, then you shall impose death. In the event that you cannot so find, you shall impose life without the possibility of parole.

(RT 8702-703; CT 1254.) Petitioner contends that this instruction was improper under *People v. Brown*, 40 Cal.3d 512, in which the California Supreme Court considered an appellant's claim that the unadorned language of section 190.3 of the 1978 death penalty statute could mislead penalty phase juries as to their role in the capital sentencing process, thereby leading to unconstitutional capital sentences. Looking at the language of *the statute*, the state court agreed that it "would be invalid if . . . it required jurors to render a death verdict on the basis of some arithmetic formula, or if it forced them to impose death on any basis other than their own judgment that such a verdict was appropriate under all the facts and circumstances of the individual case." *People v. Brown*, 40 Cal.3d at 540.

However, the Court agreed with the People, that the statute "need not, and should not, be so interpreted." *Id*. at 531. The Court did acknowledge that, under some circumstances, the statute's language could confuse a penalty jury regarding its role in the capital sentencing process, and it instructed "trial courts in future death penalty trials . . . [to] instruct the jury as to the scope of its discretion and responsibility in accordance with the principles set forth in this opinion." *Id.* at 544 n. 17.

As the California Supreme Court noted in denying Petitioner's claim on direct appeal, "[t]he penalty determination instruction given in this case was not the instruction challenged in *People v. Brown* . . .'"[26] *People v. Noguera*, 4 Cal.4th at 640. Rather, "the transcript of the chambers conference at which counsel and the trial judge discussed proposed penalty instructions indicates that the instruction challenged by [Petitioner] as erroneous under *Brown* was drawn with full knowledge of [the] opinion in that case . . . [and] passes muster in light of the the twin concerns . . . expressed in *Brown*." *Id.* First, the instruction clearly informed the jury that its sentencing decision should not be the result of a "mechanical counting of factors on each side of an imaginary scale," and the jurors were "free to assign whatever weight [they] deem[ed] appropriate to each and all of the various factors." (RT at 8715.) Second, the inclusion of the word "shall" was not fatal to the instruction's validity where, in light of the whole instruction, there was virtually no risk that a juror misunderstood his or her sentencing discretion or the penalty determination process. Each juror was instructed to abide by their own "reasoned judgment," in coming to a penalty decision – "if , in your reasoned judgment, you conclude that the aggravating circumstances outweigh the mitigating circumstances *and you personally believe death is the appropriate*

---

[26] CALJIC 8.84.2 told the jury to consider all applicable aggravating and mitigating circumstances and followed with this direction: "If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death. However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in the state prison for life without the possibility of parole."

*sentence under all the circumstances*, then you shall impose death. In the event that you cannot so find, you shall impose life without the possibility of parole." (RT at 8715-16 (emphasis added).)

The California Supreme Court's determination rejecting this claim was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts.  Claim 39 is DENIED.

## 7. *CLAIM 57 – The Trial Court Erred in Refusing Pinpoint Instructions Requested by Petitioner*

In Claim 57, Petitioner argues that the trial court violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments when it refused to give a special pinpoint instruction, offered by the defense, that listed the mitigating evidence presented in Petitioner's case and directed the jurors to "consider, take into account, and be guided" by each of mitigating factors "if [they] deem[ed] them applicable."  (CT 1266.)  Petitioner suggests that, in denying this claim, the California Supreme Court erroneously and unreasonably decided the state legal issues and failed to decide the federal substantive issues.  (Dkt. No. 317 at 312.)

Petitioner raised this claim for the first time on direct appeal, and the California Supreme Court rejected it finding that a defendant is not entitled to have the trial court direct the jury to favorable evidence, but rather has a "'right to an instruction that "pinpoint[s] the *theory* of the defnse." ' "  *People v. Noguera*, 1 Cal.4th at 647-48 (internal citations omitted) (emphasis in original).  Petitioner raised the claim again as Claim 40 of his June 9, 2003, exhaustion petition.  (Dkt. No. 336, Lodgment 9 at 175-77.)  The California Supreme Court summarily denied the claim on the merits and, alternatively, found the claim to be untimely, barred for having been raised on direct appeal, barred to the extent it was not raised on appeal, and barred as successive. (Dkt. No. 336, Lodgment 12.)

Respondent argues that Petitioner has failed to meet his burden of showing that the California Supreme Court's denials on the merits amounted to an

unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. §2254(d); *Pinholster*, 563 U.S. at 181-82.

Beyond generally referring to constitutional provisions, Petitioner cites no authority in support of his claim, and there is no clearly established federal law requiring courts to give the kind of instruction requested here. Broad, conclusory allegations of unconstitutionality are insufficient to state a cognizable claim. *Jones v. Gomez*, 66 F.3d at 205; *Greyson v. Kellam*, 937 F.2d 1409, 1412 (9th Cir.1991) (bald assertions of ineffective assistance of counsel did not entitle the petitioner to an evidentiary hearing); *see also Hiivala v. Wood*, 195 F.3d 1098, 1106 (9th Cir.1999) (*citing Gray v. Netherland*, 518 U.S. 152, 162-63 (1996) for the proposition that "general appeals to broad constitutional principles, such as due process, equal protection, and the right to a fair trial, are insufficient to establish exhaustion"), *cert. denied*, 529 U.S. 1009 (2000). A petitioner in federal court cannot merely characterize some state act as unconstitutional and expect the court to explore all possible grounds under each article and amendment of the Constitution. Petitioner's claim is insufficiently pled to raise a federal question in these habeas proceedings. Claim 57 is DENIED.

        **8.**    ***CLAIM 60 – The Trial Court Improperly Instructed the Jury That It Must Consider All the Evidence Which Has Been Received During Any Part of This Trial***

In Claim 60, Petitioner argues that the trial court improperly instructed the jury pursuant to CALJIC 8.84.1 that, "in determining which penalty is to be imposed," it must "consider *all of the evidence which as been received during any part of this trial*." (CALJIC 8.84.1 (1986 Revision); CT 1245; RT 8696-97). Petitioner contends that this instruction invited the jury "to consider any evidence from the penalty phase, without any guidelines." (Dkt. No. 317 at 319-20.)

Petitioner raised this claim for the first time as Claim 20 in his March 2,

1998, exhaustion petition.  (Dkt. No. 336, Lodgment 4 at 179-80.)  The California

Supreme Court summarily denied the claim on the merits and, alternatively, found

the claim to be untimely, and barred because it could have been but was not raised

and direct appeal. (Dkt. No. 336, Lodgment 8.)

Respondent argues that Petitioner has failed to meet his burden of showing

that the California Supreme Court's denial on the merits amounted to an

unreasonable application of clearly established federal law, or an unreasonable

determination of the facts in light of the evidence presented in the state court

proceeding.  28 U.S.C. §2254(d);  *Pinholster*, 563 U.S. at 181-82.

For decades capital habeas petitioners have been calling into question the

validity of CALJIC 8.84.1, with particular attention to the validity of the "factor

(k)" instruction, which they argue prevents jurors from considering mitigating

evidence of background and character.  Addressing such a claim in 1990, the

United States Supreme Court held in *Boyde v. California* that, through CALJIC

8.84.1,

> the jury was instructed that it "*shall consider all of the evidence*
> which has been received during any part of the trial of this case," and
> in our view reasonable jurors surely would not have felt constrained
> by the factor (k) instruction to *ignore all* of the evidence presented by
> petitioner during the sentencing phase.

494 U.S. at 383-84 (emphasis in original).  In the present matter, Petitioner turns

the factor (k) argument on its head, suggesting that, by permitting the jury to

consider evidence received at any pont during the trial, CALJIC 8.84.1 abandons

the jury to the wind, encouraging jurors to use "unfettered discretion to decide

whether Petitioner should live or die." (Dkt. No. 317 at 320.)  In so arguing,

Petitioner ignores the entirety of the penalty phase instructions, and the history of

judicial approval of CALJIC 8.84.1.  Petitioner's claim is entirely without merit

and the California Supreme Court's decision denying the claim was in no way an

unreasonable application of clearly established federal law.  Claim 60 is DENIED.

9.    ***CLAIM 67 – The Trial Court Failed to Make Clear that Petitioner's Age Could Only Be Used as a Mitigating Factor***

In Claim 67, Petitioner argues that the trial court erred in failing to "make clear that Petitioner's age could only be considered as a mitigating factor" and that this error violated his "constitutional right to a reliable, individualized sentencing decision based on the jury's exercise fo properly guided discretion..." (Dkt. No. 317 at 334-35.)

Petitioner raised this claim for the first time as Claim 47 in his June 9, 2003, exhaustion petition.  (Dkt. No. 336, Lodgment 9 at 184.)  The California Supreme Court summarily denied the claim on the merits. (Dkt. No. 336, Lodgment 12.)

Respondent argues that Petitioner has failed to meet his burden of showing that the California Supreme Court's denials on the merits amounted to an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. §2254(d);  *Pinholster*, 563 U.S. at 181-82.

Petitioner was eighteen years old at the time of the murder.  His trial attorney argued in penalty phase closing argument that Petitioner's age was a mitigating factor.  In countering the prosecutor's contention that Petitioner "had all the blessings of life and, therefore, maybe [the jury] should not take into account his young age", Mr. Pereyda noted:

> . . . [I]t is important to realize that at age 18, he probably – had he been a few months younger, he would not have had to face the death penalty and be spared this ordeal just by a mere factor of months.
>
>     And I think that when you consider age, you have to consider age and the experiences of life up to that young age of 18 and it's a factor of mitigation, something that you have to consider, I think.

(RT 8664.)  Subsequently, the trial court instructed the jury that, in making its

sentencing recommendation, among the things it must consider was "... (i) the age of the defendant at the time of the crime." (CT 1245-46; RT 8697-98.) While Petitioner now suggests that the trial court should have included another instruction that made "clear that Petitioner's age could only be considered as a mitigating factor," he provides no clearly established federal law to support this claim. In *Tuilaepa v. California*, 512 U.S. at 976, the Supreme Court rejected petitioner's challenge to the "equivocal" nature of the jury's consideration of the defendant's age at the time of the crime, holding that "[i]t is neither surprising nor remarkable that the relevance of the defendant's age can pose a dilemma for the sentencer." *Id.* at 977 (observing that "difficulty in application is not equivalent to vagueness."). Moreover, in *Ayers v. Belmontes*, 549 U.S. 7 (2006), the Court observed that "California's overall balancing process" provided by the 1978 death penalty statute "requires juries to consider and balance... factors ... that are labeled neither as mitigating nor as aggravating ... [T]he jury itself must determine the side of the balance on which each listed factor falls." 549 U.S. at 23 (rejecting challenge to factor (k) instruction); *see also Pulley v. Harris*, 465 U.S. 37, 51, 52 n. 14 (1984) (holding that, notwithstanding the fact that "[th]e statute does not separate aggravating and mitigating circumstances," the 1977 California statute was not unconstitutionally arbitrary); *Babbitt v. Calderon*, 151 F.3d at 117-79 (rejecting argument the 1978 statute "was erroneous because the jury was not specifically told which factors it could consider as extenuating"); *Williams*, 52 F.3d at 1484 (holding that the 1977 statute's "failure to label aggravating and mitigating factors is constitutional").

In *Lockett v. Ohio*, 438 U.S. 586 (1978) the United States Supreme Court made clear that the Constitution guarantees a capital defendant not only the right to introduce evidence mitigating against the death penalty, but also the right to consideration of that evidence by the sentencing authority. Two years prior, in *Jurek v. Texas*, 428 U.S. 262, the Supreme Court held that the state of Texas's

158

sentencing procedures satisfied the Eighth Amendment that the sentencer be allowed to consider circumstances mitigating against capital punishment where the special verdict question regarding a defendant's future dangerousness permitted the jury to consider mitigating evidence of the defendant's prior criminal record, age, mental state, and the circumstances of the crime. *Id.* at 271-73. Here, Petitioner's trial counsel argued that the jury should weigh his age as a mitigating factor, and CALJIC 8.84.1 adequately instructed the jury that Petitioner's age was a factor for its consideration in coming to its penalty phase determination. The California Supreme Court's decision denying the claim was neither an unreasonable application of clearly established federal law nor an unreasonable determination of the facts under §2254(d). Claim 67 is DENIED.

> **10.** ***CLAIM 69 – The Trial Court Failed to Instruct the Jury Not to Draw an Adverse Inference from Petitioner's Failure to Testify at the Penalty Phase***

In Claim 69, Petitioner contends that the trial court committed prejudicial error in failing to instruct the jury not to draw an adverse inference from Petitioner's failure to testify at the penalty phase.

Petitioner raised this claim for the first time as Claim 49 in his June 9, 2003, exhaustion petition. (Dkt. No. 336, Lodgment 9 at 185-86.) The California Supreme Court summarily denied the claim on the merits. (Dkt. No. 336, Lodgment 12.)

Respondent argues that Petitioner has failed to meet his burden of showing that the California Supreme Court's denials on the merits amounted to an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. §2254(d); *Pinholster*, 563 U.S. at 181-82.

In 2014, the United States Supreme Court held in *White v. Woodall*, that the Kentucky Supreme Court's conclusion, that the Fifth Amendment did not require a

no-adverse-inference instruction to protect a nontestifying defendant at the penalty phase of a capital trial, did not constitute a decision "contrary to" clearly established federal law. __ U.S. __, 134 S.Ct. 1697, 1702 (2014). The Court noted that it has "'never directly held that *Carter* applies at a sentencing phase where the Fifth Amendment interests of the defendant are different.'" *Woodall*, 134 S.Ct. at 1703 (internal citation omitted). Moreover, "if *Mitchell [v. United States*, 526 U.S. 314] suggests that *some* actual inferences might be permissible at the penalty phase, it certainly cannot be read to require a blanket no-adverse-inference instruction at every penalty-phase trial." *Woodall*, 134 U.S. at 1704. Here, as in *Woodall*, this Court cannot find that the state court was unreasonable in its decision refusing to extend *Carter* to the penalty phase context. *Id.* at 1705-06. Claim 69 is DENIED.

### G. Cumulative Error Claims

#### 1. *CLAIM 40: The Cumulative Effect of the Guilt-Phase Errors Denied Petitioner a Fair Trial and Constitutionally Reliable Penalty Phase Verdicts*

In Claim 40, Petitioner argues that the cumulative effect of numerous guilt-phase errors denied him a fair trial and a constitutionally reliable penalty phase verdict. (Dkt. 317 at 231-35.) Petitioner raised this claim for the first time in state court as claim 10 of his direct appeal. (Dkt. No. 148, Lodgment 1 at 133-35.) The California Supreme Court rejected the claim, finding that none of the alleged guilt phase errors were prejudicial in light of the other evidence of Petitioner's guilt, and the trial court's limiting instructions. *People v. Noguera*, 4 Cal.4th at 637. Because the prosecution's case for guilt was strong, and the problems with Ricky Abram's testimony were made evident to the jury through cross-examination, Petitioner could not demonstrate a reasonable probability of a different result without the alleged errors; any error was harmless beyond a reasonable doubt. *Id.* Petitioner raised the claim again as claim 25 in his June 2003 exhaustion petition,

adding claims that the cumulative error denied him effective assistance of counsel, an impartial jury, equal protection and due process. (Dkt. No. 336, Lodgment 9 at 138-41.) The California Supreme Court summarily denied the claim on the merits and, alternatively, found it untimely, *Dixon* barred as to the arguments not previously raised on direct appeal, and successive. (Dkt. No. 336, Lodgment 12.)

Respondent argues that Petitioner has failed to meet his burden of showing that the California Supreme Court's merits denials of the claim amounted to an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. §2254(d); *Pinholster*, 563 U.S. at 181-82.

The Ninth Circuit has recognized that "[a]lthough individual errors might not rise to the level of a constitutional violation, a collection of errors might violate a defendant's constitutional rights." *Woods v. Sinclair*, 764 F.3d 1109, 1139 (9th Cir. 2014), *cert. denied*, 135 S.Ct. 2311 (2015); *Davis v. Woodford*, 384 F.3d 628, 654 (9th Cir. 2004), ; *see also Killian v. Poole*, 282 F.3d 1204 (9th Cir. 2002) ("[E]ven if no single error were prejudicial, where there are several substantial errors, 'their cumulative effect may nevertheless be so prejudicial as to require reversal.'"), *cert. denied,* 537 U.S. 1179 (2003). In light of this Court's finding, granting relief on Claims 1, 4, 6, 7, 10 and 14, the Court grants relief on Claim 40.

> **2.      *CLAIM 61 – The Cumulative Effect of the Penalty Phase Errors and the Prosecutorial Misconduct Requires That Petitioner's Death Judgment Be Vacated***

In Claim 61, Petitioner asserts that he is entitled to relief based upon "the cumulative effect of the penalty-phase error[s] and the prosecutor's misconduct." (Dkt. 317 at 321.) Petitioner raised this claim for the first time in state court as Claim 21 of this direct appeal. (Dkt. No. 148, Lodgment 1 at 211-13.) The California Supreme Court denied the claim on the merits, finding there were "no

errors to cumulate." *Noguera*, 4 Cal.4th at 649. He raised the argument again as claim 41 of his June 2003 exhaustion petition. (Dkt. No. 336, Lodgment 9 at 178.) The California Supreme Court summarily denied the claim on the merits and, alternatively, found the claim to be untimely, *Dixon* barred and successive. (Dkt. No. 336, Lodgment 12.)

Respondent argues that Petitioner has failed to meet his burden of showing that the California Supreme Court's merits denials of the claim amounted to an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. §2254(d); *Pinholster*, 563 U.S. at 181-82.

As discussed, *infra*, with respect to Petitioner's claim of cumulative guilt-phase error, the Ninth Circuit has recognized that "[a]lthough individual errors might not rise to the level of a constitutional violation, a collection of errors might violate a defendant's constitutional rights." *See e.g., Woods v. Sinclair*, 764 F.3d at 1139. In light of this Court's finding, granting relief on Claims 1, 4, 6, 7, 10, and 14, the Court grants relief on Claim 61.

**H.** **Systemic Error**

**1.** ***CLAIM 25: The Death-Qualification of Petitioner's Jury Violated His Constitutional Rights***'

In Claim 25, Petitioner argues that the death qualification procedure, whereby jurors who opposed the death penalty were removed for cause, violated his right to trial by a fair and impartial jury. (Dkt. No. 317 at 182-84.) Petitioner raised this claim for the first time in state court as claim 11 of his June 2003 exhaustion petition. (Dkt. No. 336, Lodgment 9 at 101-02.) The California Supreme Court summarily denied the claim on the merits and, alternatively, found the claim to be untimely, *Dixon* barred, and successive. (Dkt. No. 336, Lodgment 12.)

Respondent argues that Petitioner has failed to meet his burden of showing

that the California Supreme Court's resolution of the claim amounted to an unreasonable application of clearly established Federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding and, as such, Petitioner is barred from relitigating the claim in federal court. 28 U.S.C. §2254(d); *Pinholster*, 563 U.S. at 181-82. This Court agrees.

It is well established that death qualification does not violate a defendant's right to a fair and impartial jury. *Lockhart v. McCree*, 476 U.S. at 178; *Wainwright v. Witt*, 469 U.S. at 424; *Adams v. Texas*, 448 U.S. at 45. The California Supreme Court's finding of no constitutional error was not an unreasonable application of clearly established federal law under section 2254(d). Claim 25 is DENIED.

**2.** ***CLAIM 26: Petitioner's Jury Was Not Representative of the Community, Because Hispanics and Other People of Color Were Underrepresented and Systematically Excluded***

In Claim 26, Petitioner claims that his Fifth, Sixth, Eighth and Fourteenth Amendment rights were violated because "[t]he process of selecting prospective jurors in Orange County is constitutionally defective." (Dkt. No. 317 at 184-86.) Petitioner raised this claim for the first time in state court as Claim 15 of his March 1998 exhaustion petition. (Dkt. No. 336, Lodgment 4 at 164-65.) The California Supreme Court summarily denied the claim on the merits and, alternatively, found the claim to be untimely. (Dkt. No. 336, Lodgment 8.)

Respondent argues that Petitioner has failed to meet his burden of showing that the California Supreme Court's resolution of the claim amounted to an unreasonable application of clearly established Federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding and, as such, Petitioner is barred from relitigating the claim in federal court. 28 U.S.C. §2254(d); *Pinholster*, 563 U.S. at 181-82. This Court agrees.

Petitioner's claim is entirely conclusory. He fails to cite any factual support for his allegations. The California Supreme Court's finding of no constitutional

error was not an unreasonable application of clearly established federal law under section 2254(d). Claim 26 is DENIED.

### 3. *CLAIM 41 – The Special Circumstance, on Its Face and as Applied, Is Unconstitutional*

In Claim 41, Petitioner argues that the his convictions and sentence are unconstitutional because the financial gain special circumstance is vague and overbroad, generally, and was vague and overbroad as applied in his case. Petitioner claims that the jury was improperly instructed because it was not required to find that financial gain was the motivating force behind the murder; he argues that the "the financial gain motive contemplated by the statute must be more than merely incidental to the killing." Finally, Petitioner claims that, by instructing the jury under CALJIC 2.51, the trial court confused the jury and eliminated motive from the jury's consideration. (Dkt. No. 317 at 235-45.)

Petitioner raised the allegations included in this claim for the first time in Claim 9(B) of his direct appeal. The California Supreme Court denied the claim on the merits. *People v. Noguera*, 4 Cal.4th at 634-37. Petitioner raised the claim again in Claims 26 and 27 of his June 9, 2003, exhaustion petition. (Dkt. No. 336, Lodgment 9 at 142-47.) The California Supreme Court summarily denied the claim on the merits and alternatively denied the claim as untimely, barred to the extent it was raised and rejected on appeal, barred to the extent it was not raised on appeal, and barred as successive. (Dkt. No. 336, Lodgment 12.)

Respondent argues that Petitioner has failed to meet his burden of showing that the California Supreme Court's denials on the merits amounted to an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. §2254(d); *Pinholster*, 563 U.S. at 181-82.

a. *Vague and Overbroad*

In support of his contention that the financial gain special circumstance is

unconstitutionally vague and overbroad, Petitioner cites *Godfrey v. Georgia*, 446 U.S. 420, in which the Supreme Court held that the Constitution requires that a state statutory scheme provide a "meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not." *Id.* at 427–28. Petitioner argues that the special circumstance fails to provide "clear, specific and detailed guidelines for determining death eligibility." (Dkt. No. 317 at 238.)

In *Tuilaepa v. California*, the United States Supreme Court discussed the "two different aspects of the capital decisionmaking process: the eligibility decision and the selection decision." 512 U.S. at 971-72. With regard to the eligibility decision, the Court provided that the qualifying circumstance must meet two requirements: it must not apply to every defendant convicted of a murder, and it must not be "unconstitutionally vague." *Id.* at 972 (citing *Godfrey v. Georgia*, 446 U.S. at 428). "The eligibility decision fits the crime within a defined classification. Eligibility factors almost of necessity require an answer to a question with a factual nexus to the crime or the defendant so as to 'make rationally reviewable the process for imposing a sentence of death." *Tuilaepa*, 512 U.S. at 973 (quoting *Arave v. Creech,* 507 U.S. 463, 471 (1993)). The Supreme Court noted that "[b]ecause 'the proper degree of definition' of eligibility. . . factors often 'is not susceptible of mathematical precision,' [the Court's] vagueness review is quite deferential." *Tuilaepa*, 512 at 973 (quoting *Walton v. Arizona,* 497 U.S. 639, 655 (1990)). The Court held, "a factor is not unconstitutional if it has some 'common-sense core of meaning. . . . that criminal juries should be capable of understanding.'" *Tuilaepa*, 512 U.S. at 973-74 (quoting *Jurek*, 428 U.S. at 279) (White, J., concurring in judgment)).

Under California's death penalty statute, a defendant is eligible for the death penalty when the jury finds him guilty of first-degree murder and finds one of the §190.2 special circumstances true. *See California v. Ramos*, 463 U.S. 992, 1008

(1983). Petitioner argues that the financial gain special circumstance is unconstitutionally vague, but he fails carry his burden of demonstrating that it does not have a "common-sense core of meaning" that a criminal jury "should be capable of understanding." *Tuilaepa*, 512 U.S. at 973-74. The California Supreme Court's resolution of this claim did not "result[] in a decision that was contrary to, or involve[] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" nor did it "result[] in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d). The financial gain special circumstance is not vague and overbroad generally, or as applied in this case. Accordingly, this issue presents no basis for habeas corpus relief.

> b. *Instruction Did Not Require Financial Gain to be the Motivating Force Behind the Murder*

Citing *People v. Edelbacher*, 47 Cal.3d 983, 1027 (1989), Petitioner argues that, in order for a jury to find the financial gain special circumstance true, it must believe that the financial gain was the "motivating force" behind the murder, not simply "incidental motive for the killing." (Dkt. No. 317 at 240-43). As the California Supreme Court noted in rejecting this claim on direct appeal, "the drafters [of the death penalty statute] intended no such limitation." *People v. Noguera*, 4 Cal.4th at 635. In fact, the Court noted that it held in *Edelbacher* that "Proof of actual pecuniary benefit to the defendant from the victim's death is neither necessary nor sufficient to establish the financial-gain special circumstance. . . . 'the relevant inquiry is whether the defendant *committed the murder in the expectation that he would thereby obtain the desired financial gain.*'" *Id.* at 636 (emphasis added) (quoting *Edelbacher*, 47 Cal.3d at 1025). Here, the evidence demonstrated that Petitioner did, in fact, commit the murder with an expectation that he would obtain proceeds from Jovita's life insurance.

As with all of Petitioner's state law claims, his claims regarding the correct interpretation of the financial gain special circumstance provide no basis for habeas corpus relief.  Petitioner fails carry his burden of demonstrating how the California Supreme Court's resolution of this claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d).

   c.   *CALJIC 2.51 Eliminated Motive from the Jury's Consideration*

On direct appeal, the California Supreme Court addressed this argument as follows:

> [D]efendant's claim that giving the jury CALJIC No. 2.51 (motive is not an element of the crime charged and need not be proven) permitted it to dispense with proof of financial gain also fails. We rejected the identical claim in *People v. Edelbacher*, supra, 47 Cal.3d at page 1027, 254 Cal.Rptr. 586, 766 P.2d 1, on the commonsense ground that here, as there, the " 'crime charged' was murder and any reasonable juror would have understood the instruction as referring to this substantive offense only and not to any special circumstance allegation."

*People v. Noguera*, 4 Cal.4th at 637.

The state court's rejection of this claim was not objectively unreasonable. Based upon its express language, CALJIC No. 2.51 was applicable only to the substantive charge and not to the special circumstance allegations. (*See* RT 8261 ("motive is not an element of the *crime charged* and need not be shown." (emphasis added)).  There is no likelihood that a reasonable juror understood the terms "motive" and "intent" to be interchangeable."  Motive was not listed as an

element of any of the charged crimes, or special circumstance allegations.

Petitioner has not shown any reasonable probability that the jurors understood the

motive instruction to mean that they did not have to find that petitioner had the

required *intent* for the financial gain special circumstance allegation. *Cf. People v.

Guerra*, 37 Cal.4th 1067, 1135 (2006). Thus, he cannot demonstrate that the

giving of CALJIC No. 2.51 rendered his trial fundamentally unfair. The California

Supreme Court's resolution of this claim was not contrary to, or an unreasonable

application of, Supreme Court precedent. 28 U.S.C. § 2254(d).

Claim 41 is DENIED.

### 4. *CLAIM 62 – The California Death Penalty Statute Unconstitutionally Fails to Designate Which Factors Are Aggravating and Which Are Mitigating*

In Claim 62, Petitioner alleges that the California death penalty statute is

unconstitutional because it fails to specify which factors are mitigating and which

factors are aggravating. (Dkt. No. 317 at 322.)

Petitioner raised this claim for the first time as Claim 42 in his June 9, 2003,

exhaustion petition. (Dkt. No. 336, Lodgment 9 at 178.) The California Supreme

Court summarily denied the claim on the merits. (Dkt. No. 336, Lodgment 12.)

As discussed *supra* with respect to Claim 67, in rejecting a challenge to the

factor (k) instruction, the United States Supreme Court noted in *Belmontes*, that the

balancing process provided by California's 1978 death penalty statute "requires

juries to consider and balance . . . factors . . . that are labeled neither as mitigating

nor as aggravating. . . . [Rather,] the jury itself must determine the side of the

balance on which each listed factors falls." 549 U.S. at 23; *see also Pulley v.

Harris*, 465 U.S. at 51, 52 n. 14 (holding that, notwithstanding the fact that "[th]e

statute does not separate aggravating and mitigating circumstances," the 1977

California statute was not unconstitutionally arbitrary); *Babbitt v. Calderon*, 151

F.3d at 1178-79 (rejecting argument the 1978 statute "was erroneous because the

jury was not specifically told which factors it could consider as extenuating"); *Williams*, 52 F.3d at 1484 (holding the 1977 statute's "failure to label aggravating and mitigating factors is constitutional").

Petitioner's claim lacks support in clearly established federal law. Thus, the state court's rejection of the claim was not contrary to or an unreasonable application of clearly established federal law. Claim 62 is DENIED.

5. ***CLAIM 63 – The California Death Penalty Statute Unconstitutionally Fails to Require that Aggravation Outweigh Mitigation Beyond a Reasonable Doubt***

In Claim 63, Petitioner alleges that the California death penalty statute unconstitutionally fails to require that aggravation outweigh mitigation beyond a reasonable doubt. (Dkt. No. 317 at 324.)

Petitioner raised this claim for the first time as Claim 43 in his June 9, 2003, exhaustion petition. (Dkt. No. 336, Lodgment 9 at 179.) The California Supreme Court summarily denied the claim on the merits. (Dkt. No. 336, Lodgment 12.)

In *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Supreme Court held that "[i]f a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact – no matter how the State labels it – must be found by a jury beyond a reasonable doubt." *Ring v. Arizona*, 536 U.S. 584, 602 (2002) (discussing *Apprendi*). The Court applied *Apprendi* in *Ring* to hold that a state cannot "allow[] a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty. Because Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense,' the Sixth Amendment requires that they be found by a jury." *Ring*, 536 U.S. at 609 (quoting *Apprendi*, 530 U.S. at 494 n. 19; internal citation omitted). The Court distinguished California's death penalty statute from Arizona's, observing that California commits sentencing decisions to juries, while Arizona was one of only four states to "commit both

capital sentencing factfinding and the ultimate sentencing decision entirely to judges." *Id.* at 608 n.6.

In California, "[s]pecial circumstances. . . make a criminal defendant eligible for the death penalty [and] operate as 'the functional equivalent of an element of a greater offense.'" *Webster v. Woodford*, 369 F.3d 1062, 1068 (9th Cir. 2004) (quoting *Ring*, 536 U.S. at 609). Once the jury has found a special circumstance to be true, unanimously and beyond a reasonable doubt, death is an authorized punishment. The jury need not make any additional findings beyond a reasonable doubt.

In *United States v. Mitchell*, 502 F.3d 931 (9th Cir. 2007), *cert. denied*, 553 U.S. 1094 (2008), the Ninth Circuit denied a federal capital defendant's claim that the jury was required to find "that aggravating factors sufficiently outweigh mitigating factors beyond a reasonable doubt." *Id.* at 993. The Court of Appeals distinguished the finding of a death eligibility factor, made by the jury beyond a reasonable doubt, from the weighing of aggravating and mitigating factors. The Court explained that, during the weighing stage,

> the jury's task is no longer to find whether factors exist; rather, each juror is to consider the [eligibility] factors already found and to make an individualized judgment whether a death sentence is justified. Thus, the weighing step is an 'equation' that 'merely channels a jury's discretion by providing it with criteria by which it may determine whther a sentence of life or death is appropriate.' *See Kansas v. Marsh*, 548 U.S. at 177. [Defendant] does not suggest how a beyond-reasonable-doubt standard could sensibly be superimposed upon this process, or why it must be in order to comport with due process, or to make his death sentence reliable, or to comply with the Sixth Amendment.

*Id.* (internal quotation omitted; internal citation edited).

The California Supreme Court may have reasonably determined that Petitioner did not have a constitutional right to unanimous findings beyond a reasonable doubt that aggravating factors existed and outweighed mitigating factors. Claim 63 is DENIED.

### 6. *CLAIM 64 – The 1978 Death Penalty Statute is Unconstitutional on Its Face and As Applied*

In Claim 64, Petitioner alleges that the 1978 California Death Penalty Statute is unconstitutional on its face and as applied in his case. (Dkt. No. 317 at 326.) The claim includes six specific constitutional challenges to California's death penalty statute. (Dkt No. 317 at 328.)

Petitioner raised aspects of this claim for the first time in Claim 22 of his direct appeal. (Dkt. No. 148, Lodgment 1 at 214-17.) The California Supreme Court denied the claim, citing its multiple prior decisions rejecting similar attacks on the 1978 death penalty law. *People v. Noguera*, 4 Cal.4th at 649. Petitioner raised the Claim again as Claim 44 in his June 9, 2003, exhaustion petition. (Dkt. No. 336, Lodgment 9 at 180.) The California Supreme Court summarily denied the claim on the merits. (Dkt. No. 336, Lodgment 12.)

#### a. *Failure to Require Written Findings as to the Aggravating Factors*

First, Petitioner faults California's death penalty statute for failing to require written findings as to the aggravating factors found by the jury. As discussed with reference to Claim 63, the jury need not make any additional findings at the penalty phase, unanimously or otherwise, as the special circumstance finding at the guilt phase makes death an authorized punishment. Further, the California Supreme Court may have reasonably concluded, as the Ninth Circuit did in reviewing the 1977 California death penalty statute, that its "statute ensures meaningful appellate review, and need not require written jury findings in order to be constitutional." *Williams*, 52 F.3d at 1484-85 (internal citation omitted).

1

b.    *Failure to Require Proof Beyond a Reasonable Doubt*

2      Second, Petitioner argues that California's statute is unconstitutional

3  because it fails to require "proof beyond a reasonable doubt of any aggravating

4  factors," "a finding that aggravating factors outweigh mitigating factors beyond a

5  reasonable doubt," or "a finding that death s the appropriate punishment beyond a

6  reasonable doubt." (Dkt. No. 317 at 328.)  The California Supreme Court

7  reasonably rejected Petitioner's arguments.  The court may have reasonably

8  determined that Petitioner has no such constitutional rights.

9      As discussed above with reference to Claim 63, the Supreme Court held in

10 *Apprendi* that "[i]f a State makes an increase in a defendant's authorized

11 punishment contingent on the finding of a fact, that fact – no matter how the State

12 labels it – must be found by a jury beyond a reasonable doubt." *Ring*, 536 U.S. at

13 602 (discussing *Apprendi*).  The Court distinguished California's death penalty

14 statute from Arizona's, observing that California commits sentencing decisions to

15 juries, while Arizona was one of only four states to "commit both capital

16 sentencing factfinding and the ultimate sentencing decision entirely to judges." *Id.*

17 at 608 n.6.

18     In California, once the jury has found a special circumstances to be true,

19 unanimously and beyond a reasonable doubt, death is an authorized punishment.

20 *See Belmontes*, 529 F.3d at 876 ("[T]he maximum sentence authorized by the

21 jury's guilt phase verdict was death"). The jury need not make any additional

22 findings beyond a reasonable doubt. *See e.g., Williams v. Calderon*, 52 F.3d 1465,

23 1484–85 (9th Cir. 1995) ("[T]he failure of the [California death penalty] statute to

24 require a specific finding that death is beyond a reasonable doubt the appropriate

25 penalty does not render it unconstitutional."), *cert. denied*, 516 U.S. 1124 (1996).

26     The California Supreme Court's decision, that Petitioner's constitutional

27 rights were not violated by the lack of requirements that the jury find that

28 aggravating circumstances be proven beyond a reasonable doubt, that aggravating

172

factors outweigh mitigating factors beyond a reasonable doubt, or that death be the appropriate sentence beyond a reasonable doubt, was not objectively unreasonable.

c. *Failure to Require Jury Unanimity on Aggravating Factors*

Petitioner argues that the California death penalty statute is unconstitutional because it does not require the jury to find aggravating factors with unanimity. As this Court noted in *Bonin v. Vasquez*, 79 F.Supp. 957 (C.D. Cal. 1992), *aff'd*, 59 F.3d 815 (9th Cir. 1995), *cert. denied*, 516 U.S. 1051 (1996), "the United States Supreme Court has never embraced such a requirement." *Id.* at 989. While jurors must agree on the ultimate decision, that aggravating factors outweigh mitigating factors, "the Constitution does not require jury unanimity on aggravating factors." *Id.*

d. *Failure to Require a Procedure to Enable a Reviewing Court to Evaluate Meaningfully the Sentencer's Decision*

Petitioner argues that the 1978 death penalty statute is unconstitutional because it does not provide for a procedure that would enable a "reviewing court to evaluate meaningfully the sentencer's decision." (Dkt. No. 317 at 328.) As Respondent properly noted in its informal response to Petitioner's 2003 exhaustion petition, California's appellate and collateral review processes provide adequate means for reviewing the sentencer's decision. There is no need for the statute to provide an alternative procedure.

Claim 64 is, therefore, DENIED.

7. **CLAIM 65 – The California Death Penalty Statute Unconstitutionally Fails to Require that Inapplicable Sentencing Factors Be Deleted from Jury Instructions**

In Claim 65, Petitioner alleges that the California death penalty statute is unconstitutional in failing to require inapplicable sentencing factors be deleted from penalty phase jury instructions. (Dkt. No. 317 at 329.) In particular,

173

1    Petitioner claims that his rights to effective assistance of counsel, a fair trial, an
2    impartial jury, a reliable special circumstance determination, equal protection, and
3    due process were violated because the failure to delete inapplicable sentencing
4    factors confused the jury.  (Dkt. No. 317 at 330.)

5         Petitioner raised this claim for the first time as Claim 45 in his June 9, 2003,
6    exhaustion petition. (Dkt. No. 336, Lodgment 9 at 182.)  The California Supreme
7    Court summarily denied the claim on the merits.  (Dkt. No. 336, Lodgment 12.)

8         The Ninth Circuit has found no constitutional violation in the inclusion of
9    inapplicable factors in the jury's penalty phase instructions.  *See Bonin v.*
10   *Calderon*, 59 F.3d at 848 (rejecting a petitioners argument that the inclusion of
11   inapplicable factors allowed the jury "to consider the absence of numerous
12   possible mitigating circumstances to be aggravating circumstances"); *Williams v.*
13   *Calderon*, 52 F.3d at 1481 (finding no constitutional error in the trial court's
14   instructions on "the entire list of factors the state considered relevant to the
15   sentencing decision, even when some did not apply").  The Circuit has held that
16   where the jury was instructed "to consider the listed factors only 'if applicable,'" it
17   was "warned . . . that not all of the factors would be relevant and the absence of a
18   factor made it inapplicable rather than an aggravating factor."  *Bonin*, 59 F.3d at
19   848.  Petitioner's jury was instructed that it should "consider, take into account and
20   be guided by the following [factors provided to the jury], *if applicable.* (RT 8697
21   (emphasis added).)

22        The decision of the California Supreme Court rejecting this claim was
23   neither contrary to nor an unreasonable application of clearly established federal
24   law, nor was it based on an unreasonable interpretation of the facts.  Claim 65 is
25   DENIED.

26   //
27   //
28

**8.** ***CLAIM 66 – The California Death Penalty Statute***
***Unconstitutionally Fails to Require Jury Unanimity on Prior***
***Criminal Activity***

In Claim 66, Petitioner alleges that the California death penalty statute is unconstitutional in failing to require a unanimous jury determination of prior criminal activity.  (Dkt. No. 317 at 331.)

Petitioner raised this claim for the first time as Claim 22(H) on direct appeal. (Dkt. No. 148, Lodgment 1 at 216.)  The California Supreme Court denied the claim on the merits.  *People v. Noguera*, 4 Cal.4th at 649.  Noguera raised the claim again as Claim 46 in his June 9, 2003, exhaustion petition.  (Dkt. No. 336, Lodgment 9 at 183.)  The California Supreme Court summarily denied the claim on the merits.  (Dkt. No. 336, Lodgment 12.)

Respondent argues that Petitioner has failed to meet his burden of showing that the California Supreme Court's denials on the merits amounted to an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. §2254(d);  *Pinholster*, 563 U.S. at 181-82.

Petitioner does not cite any clearly established authority from the United States Supreme Court holding that a jury must unanimously find Petitioner's prior criminal activity to be true in order to consider it as a factor in aggravation during the penalty phase.  *See Cummings v. Polk*, 475 F.3d 230, 238 (4th Cir.) (recognizing that the United States Supreme Court has not resolved this issue and thus, under AEDPA, the claim must be denied), *cert. denied,* 552 U.S. 961 (2007).  Moreover, an issue solely of state law is not a basis for habeas relief.  *Estelle v. McGuire*, 502 U.S. at 67-68.

Petitioner's citation to *Apprendi v. New Jersey*, 530 U.S. 466, does not support this claim. As discussed *supra*, *Apprendi* requires that any fact that increases the penalty for a crime beyond the prescribed statutory maximum, must

be submitted to a jury and proved beyond a reasonable doubt. It is not contravened by California's death penalty scheme. Once a California jury convicts of first degree murder with a special circumstance, "the defendant stands convicted of an offense whose maximum penalty is death." *People v. Ochoa*, 26 Cal.4th 398, 454 (2001), *abrogated on other grounds as stated in People v. Prieto*, 30 Cal. 4th 226, 263 n.14 (2003). The jury need not make any additional findings beyond a reasonable doubt. *Ramos*, 463 U.S. at 1008 n.22, (*quoting Zant v. Stephens*, 462 U.S. at 875) ("the constitutional prohibition on arbitrary and capricious capital sentencing determinations is not violated by a capital sentencing 'scheme that permits the jury to exercise unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty by statute.' ") Aggravating circumstances are not separate penalties but are standards to guide the making of the choice between death and life imprisonment. *People v. Raley*, 2 Cal. 4th 870, 910 (1992). A factor set forth in Penal Code § 190.3 does not require a "yes" or "no" answer to a specific question, but points the sentencer to the subject matter which guides the choice between the two punishments. *Tuilaepa*, 512 U.S. at 975.

In *Williams v. Calderon*, 52 F.3d 1465, the Ninth Circuit rejected the argument that, to satisfy constitutional requirements, a jury must unanimously find other criminal acts to be proven before they may be considered in aggravation. The Court of Appeals held that any failure to instruct the jury that "it could consider any [other] criminal activity only if proved beyond a reasonable doubt. . . . is state law error, not cognizable on federal habeas." *Id.* at 1480. Petitioner has failed to establish that the California Supreme Court unreasonably applied controlling United States Supreme Court authority in rejecting Petitioner's claim that the California death penalty statute unconstitutionally fails to require jury unanimity on prior criminal activity. Claim 66 is DENIED.

### 9. *CLAIM 70 – The Death Penalty is Arbitrary, Capricious, Fundamentally Unfair and Disproportionate*

In Claim 70, Petitioner alleges that the death penalty "is arbitrary, capricious, fundamentally unfair and disproportionate in light of the circumstances of the crime, Petitioner's age and other mitigating evidence and the sentence of co-defendant Dominique Navarro who was sentenced as a minor to the Youth Authority in violation of the Eighth Amendment and the Due Process Clause of the U.S. Constitution." (Dkt. No. 317 at 339.)

Petitioner raised this claim for the first time as Claim 22(K) on direct appeal, alleging violations of California law. (Dkt. No. 148, Lodgment 1 at 217.) The California Supreme Court denied the claim on the merits. *People v. Noguera*, 4 Cal.4th at 649. Noguera raised the claim again as Claim 50 in his June 9, 2003, exhaustion petition, adding federal claims that he was denied effective assistance of counsel, equal protection, and due process. (Dkt. No. 336, Lodgment 9 at 186.) The California Supreme Court summarily denied the claim on the merits. (Dkt. No. 336, Lodgment 12.)

Respondent argues that Petitioner has failed to meet his burden of showing that the California Supreme Court's denials on the merits amounted to an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. §2254(d); *Pinholster*, 563 U.S. at 181-82.

In *Pulley v. Harris*, the United States Supreme Court considered the argument that the Constitution mandates a comparative proportionality review that "purports to inquire ... whether the penalty is ... unacceptable in a particular case because [it is] disproportionate to the punishment imposed on others convicted of the same crime." 465 U.S. at 44. The Court rejected this argument as contrary to its holdings in *Jurek v. Texas*, 428 U.S. 262, *Gregg v. Georgia*, 428 U.S. 153 (1976), and *Proffitt v. Florida*, 428 U.S. 242 (1976). *Pulley v. Harris*, 465 U.S. at 50–51.

The Court reaffirmed *Pulley* in *McCleskey v. Kemp*, 481 U.S. 279 (1987), expressly holding that a defendant could not "prove a constitutional violation by demonstrating that other defendants who may be similarly situated did not receive the death penalty." *McCleskey*, 481 U.S. at 306–07. The Ninth Circuit has recognized this principle. *See Beardslee v. Woodford*, 358 F.3d 560, 579–81 (9th Cir.) (rejecting argument that "different sentences for equally culpable co-defendants violate the prohibition against arbitrary imposition of the death penalty"), *cert. denied*, 543 U.S. 842 (2004). The decision of the California Supreme Court rejecting this claim was neither contrary to nor an unreasonable application of clearly established federal law, nor was it based on an unreasonable interpretation of the facts.  Claim 70 is DENIED.

> **10.** ***CLAIM 89 – The Prosecutor Committed Misconduct, Petitioner's Trial Counsel was Ineffective, and the Trial Court Erred in Failing to Address Discriminatory Charging by the District Attorney's Office***

In Claim 89, Petitioner alleges that the Orange County District Attorney's Office engaged in "discriminatory charging" in violation of his constitutional rights.  (Dkt. No. 317 at 353.)

Petitioner raised this claim for the first time as Claim 29 in his March 2, 1998, exhaustion petition.  (Dkt. No. 336, Lodgment 4 at 196.)  The California Supreme Court summarily denied the claim on the merits and, alternatively, found the claim to be untimely, and barred because it could have been but was not raised and direct appeal. (Dkt. No. 336, Lodgment 8.)

Respondent argues that Petitioner has failed to meet his burden of showing that the California Supreme Court's denials on the merits amounted to an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. §2254(d);  *Pinholster*, 563 U.S. at 181-82.

178

A selective prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution. *See United States v. Armstrong*, 517 U.S. 456, 463 (1996). Although the decision whether to prosecute and what charges to bring generally rests entirely in the prosecutor's discretion, this discretion is subject to constitutional constraints. *Id.* at 464. One of these constraints is that the prosecutorial decision may not violate equal protection by resting on "an unjustifiable standards such as race, religion, or other arbitrary classification." *Id.*

Courts presume that prosecutors have properly discharged their official duties. *See id.* In order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present "clear evidence to the contrary." *Id.* at 465 (citation omitted). Unsupported allegations of selective prosecution are not enough. *See United States v. Davis*, 36 F.3d 1424, 1433 (9th Cir. 1994), *cert. denied*, 513 U.S. 1171 (1995); *see also United States v. Buffington*, 815 F.2d 1292, 1305 (9th Cir. 1987) (finding that speculation of selective prosecution, without additional proof, insufficient to establish selective prosecution).

A prosecutor's charging decision cannot be judicially reviewed absent a prima facie showing that it rested on an impermissible basis, such as gender, race or denial of a constitutional right. *See United State v. Diaz*, 961 F.2d 1417, 1420 (9th Cir. 1992). To establish a prima facie case of selective prosecution, the claimant must show that the prosecutorial policy: (1) had a discriminatory effect; and (2) was motivated by a discriminatory purpose. *See Armstrong*, 517 U.S. at 465.

Petitioner's claim falls far short of stating a prima facie case of selective prosecution. He offers no statistical evidence and no evidence specific to his case that discriminatory considerations played a part in his charging. Rather, Petitioner

179

makes conclusory allegations without factual support. It is within the purview of a
reviewing court to "not accept conclusory allegations." *Pinholster*, 563 U.S. at 188
n. 12. The California Supreme Court's summary decision denying this claim was
not objectively unreasonable under clearly established federal law. Claim 89 is
DENIED.

11. ***CLAIM 91 – Execution by Any Means, Including Lethal
Injection, Is Constitutionally Prohibited***

In Claim 91, Petitioner alleges that execution by any means, including lethal
injection, violates the constitutional prohibition against cruel and unusual
punishment. (Dkt. No. 317 at 357.)

Petitioner raised this claim for the first time as Claim 32 in his March 2,
1998, exhaustion petition. (Dkt. No. 336, Lodgment 4 at 201.) The California
Supreme Court summarily denied the claim on the merits. (Dkt. No. 336,
Lodgment 8.)

Respondent argues that Petitioner has failed to meet his burden of showing
that the California Supreme Court's denials on the merits amounted to an
unreasonable application of clearly established federal law, or an unreasonable
determination of the facts in light of the evidence presented in the state court
proceeding. 28 U.S.C. §2254(d); *Pinholster*, 563 U.S. at 181-82.

In 2015, addressing a §1983 action challenging the constitutionality of
Oklahoma's lethal injection protocol, the United States Supreme Court
categorically stated, "we have time and again reaffirmed that capital punishment is
not *per se* unconstitutional." *Glossip v. Gross*, __ U.S. __, 135 S. Ct. 2726, 2739,
*reh'g denied*, 136 S. Ct. 20 (2015) (citing *Baze v. Rees*, 553 U.S. 35, 47 (2008);
*Gregg*, 428 U.S. at 187; *Francis v. Resweber*, 329 U.S. 459, 464 (1947); *In re
Kemmler*, 136 U.S. 436, 447 (1890); *Wilkerson v. Utah*, 99 U.S. 130, 134-135
(1879)). The California Supreme Court's decision denying this claim was not
objectively unreasonable under clearly established federal law, nor was it an

unreasonable determination of the facts under §2254(d). Claim 91 is DENIED.

12. ***CLAIM 93 – The Enforcement of the Death Penalty on Petitioner, A Person Who, Because of His Mental Age, Lacks Moral Culpability, Violates the Eighth Amendment's Prohibition Against the Imposition of Cruel and Unusual Punishment***

In Claim 93 Petitioner argues that although he was 18 years old at the time of the crime, imposition of the death sentence violated his Eighth and Fourteenth Amendment right to be free from cruel and unusual punishment because he is "developmentally similar to 17-year-olds, who are categorically ineligible for the death penalty." (Dkt. 317 at 364.)

Petitioner raised this claim for the first time as Claim 3 in his August 29, 2005, exhaustion petition. (Dkt. No. 336, Lodgment 13 at 13-34.) The California Supreme Court summarily denied the claim on the merits. (Dkt. No. 336, Lodgment 15.)

Respondent argues that Petitioner has failed to meet his burden of showing that the California Supreme Court's denials on the merits amounted to an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. §2254(d); *Pinholster*, 563 U.S. at 181-82.

At the time of Petitioner's trial, Supreme Court precedent permitted the imposition of the death penalty on intellectually disabled defendants. *See Penry v. Lynaugh*, 492 U.S. 302, 340 (1989). Subsequently, in *Atkins v. Virginia*, 536 U.S. 304 (2002), the Court held that "in light of . . . 'evolving standards of decency,'" the Eighth Amendment " 'places a substantive restriction on the State's power to take the life' of a mentally retarded offender." 536 U.S. at 321 (quoting *Ford v. Wainwright*, 477 U.S. 399, 405 (1986). Acknowledging the "disagreement" regarding how to "determin[e] which offenders are in fact" intellectually disabled,

the Court left "to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." *Atkins,* 536 U.S. at 317 (internal quotation marks omitted).

In 2003 the California Legislature enacted Penal Code section 1376, which sets forth standards and procedures for determining whether a defendant against whom the prosecution seeks the death penalty is mentally retarded within the meaning of *Atkins*. In 2005, the California Supreme Court in *In re Hawthorne*, 35 Cal.4th 40 (2005), that postconviction claims of mental retardation should be raised by petition for writ of habeas corpus and adjudicated in substantial conformance with the section 1376 statutory model. *Id.* at 44. To state a prima facie claim for relief, the petition must contain "a declaration by a qualified expert stating his or her opinion that the [petitioner] is mentally retarded." Cal. Pen. Code §1376(b)(1).

Similar to the American Psychiatric Association's definition, section 1376 defines "mentally retarded" as "the condition of significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested before the age of 18." Cal. Pen. Code §1376(a). Thus, in post-conviction, "[u]pon the submission of a declaration by a qualified expert stating his or her opinion that he defendant is mentally retarded, the court shall order a [show cause] hearing to determine whether the defendant is mentally retarded." Cal. Pen. Code §1376(b)(1); *Hawthorne*, 35 Cal.4th at 49. Mental retardation is a question of fact and the petitioner bears the burden of proof by a preponderance of the evidence.... Cal. Pen. Code §1376(b)(3). Mental retardation "is not measured according to a fixed intelligence test score or a specific adaptive behavior deficiency, but rather constitutes an assessment of the individual's overall capacity based on a consideration of all the relevant evidence." *Hawthorne*, 35 Cal.4th at 49.

Petitioner has not submitted evidence from a qualified expert opining that he is mentally *retarded*. Rather, he contends that "[a]t the time of the crime, he lacked the cognitive capacity of an adult" as a result of "neurological, physiological and psychological deficits." (Dkt. No. 317 at 364.) He argues that his history of mental illness and abuse impaired his cognitive functions such that, although chronologically eighteen years old at the time of the crime, he was developmentally delayed, had the mental age of a seventeen year old, and lacked adult moral culpability. Specifically, Petitioner cites the declarations of experts who opine that his mental age at the time of the crime was "well below that of an 18-year-old" due to "long-standing metal illness" and "organic brain damage." (Dkt. No. 317 at 365; Exhibits B, Y, Z and BB.) In so arguing, Petitioner relies not on *Atkins*, but on *Roper v. Simmons*, 543 U.S. 551 (2005), in which the United States Supreme Court held that, with a majority of states rejecting the imposition of the death penalty on juvenile offenders, a national consensus against the death penalty for juveniles had arisen. As such, the Court held that Eighth and Fourteenth Amendments prohibit the imposition of the death penalty on persons who were less than 18 years old at the time of the crimes for which they were convicted. *Id.* at 567-68.

As the Supreme Court discussed in *Simmons*, clearly there will be those, like Petitioner, who disagree with drawing the line at 18 years old because "[t]he qualities that distinguish juveniles do not disappear when an individual turns 18." *Id.* at 574. "[H]owever, the line must be drawn. . . The age of 18 is the point where society draws the line for many purposes between childhood and adulthood. It is, [the Court] conclude[d], the age at which the line for death eligibility ought to rest." *Id.* at 574.

While Petitioner cites his neurological, physiological, and psychological deficits, as well as is history of mental illness and traumatic/abusive childhood, as factors contributing to his lower developmental age, there is simply no clearly established federal law to support his contention that his death sentence violates

the Eighth and Fourteenth Amendments.  He was neither intellectually disabled nor a juvenile a the time of the murder. Rather, each of the deficiencies and circumstances he cites could properly have been presented in mitigation, for the jury's consideration in determining the appropriate penalty. The California Supreme Court's rejection of Petitioner's argument that he should have been *exempted* from the death penalty under *Simmons* and *Atkins*, was not unreasonable. Claim 93 is DENIED.

## I.  Post-Conviction Process

### 1.  *CLAIM 84 – Petitioner's Appointed Counsel Incompetently and Inadequately Represented Him During State Post-Conviction and Appellate Proceedings*

In Claim 84, Petitioner contends that his state postconviction counsel provided inadequate representation on direct appeal and in state habeas proceedings.  (Dkt.  No 317 at 344.)

Petitioner raised this claim for the first time as Claim 25 in his March 2, 1998, exhaustion petition.  (Dkt. No. 336, Lodgment 4 at 187.)  The California Supreme Court summarily denied the claim on the merits and, alternatively, found the claim to be untimely. (Dkt. No. 336, Lodgment 8.)

Respondent argues that Petitioner has failed to meet his burden of showing that the California Supreme Court's denials on the merits amounted to an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. §2254(d);  *Pinholster*, 563 U.S. at 181-82.

Petitioner claims that his direct appeal counsel provided ineffective representation in failing to raise a claim regarding trial counsel's failure to participate in a pre-charging conference with the district attorney and in failing to raise the issues raised by trial counsel in the motion for new trial.  In order to satisfy *Strickland*, Petitioner must show that appellate counsel's performance was objectively unreasonable and demonstrate a reasonable probability that, but for

184

appellate counsel's failure to raise the claim(s), he would have prevailed on appeal. *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Moorman v. Ryan*, 628 F.3d 1102, 1106 (9th Cir. 2010), *cert. denied*, 565 U.S. 921 (2011). Petitioner fails to elaborate regarding the "issues" he alleges appellate counsel failed to raise from the motion for new trial. A quick review of the motion and the appellate opening brief reveals that counsel did, in fact, raise two of the three claims from the motion on direct appeal.[27] Moreover, because this Court has considered the third claim, and found it to be without merit,[28] Petitioner cannot demonstrate that he suffered any prejudice from appellate counsel's alleged deficient representation in failing to raise the claim on direct appeal.

With respect to Petitioner's claim that appellate counsel provided deficient representation in failing to raise trial counsel's failure to participate in a pre-charging conference with the district attorney, because this subclaim is integrally related to Claim 14, the Court grants relief on this aspect of Claim 84.

To the extent that Petitioner raises ineffective assistance of state habeas counsel, his claim is not cognizable because there is no federal constitutional right to the effective assistance of counsel in state post-conviction proceedings. *Pennsylvania v. Finley*, 481 U.S. 551, 554 (1987); *Bonin v. Vasquez*, 999 F.2d 425, 430 (9th Cir. 1993). While the Supreme Court recognized an equitable exception to the procedural default doctrine based on ineffective assistance of post-conviction counsel in *Martinez v. Ryan*, 566 U.S. 1 (2012), the Court's ruling in *Finley,* that

---

[27] In Claim II of the Motion for New Trial, Petitioner argued that the court erred in failing to instruct the jury in accordance with *People v. Bigelow*, 37 Cal.3d 731 (1984), as to the special circumstance alleged. (CT at 693.) In Claim 9 of the Appellate Opening Brief, Petitioner argued that the financial gain special circumstance must be vacated for multiple reasons, including those raised in the motion for new trial. (Dkt. No. 148, Lodgment No. 1 at 119.) In Claim III of the Motion for New Trial, Petitioner argued that the court erred in instructing the jury that if "the aggravating circumstances outweigh the mitigating circumstances and you personally believe death is the appropriate sentence under all the circumstances, the you *shall* impose death." (CT at 697.) In Claim 15 of the Appellate Opening Brief, Petitioner argued that the trial court failed to give a proper *People v. Brown* instruction. (Dkt. No. 148, Lodgment No. 1 at 165.)

[28] *See* this Court's discussion with respect to Claim 51 (alleging prosecutorial misconduct with respect to the admission of evidence that Dominique Navarro had refused to testify).

there is no freestanding constitutional right to effective assistance of counsel in post-conviction proceedings, remains the law. The California Supreme Court's decision denying this claim was not objectively unreasonable under clearly established federal law, nor was it an unreasonable determination of the facts under §2254(d). Claim 84 is DENIED in all respects save Petitioner's claim regarding appellate counsel's failure to raise trial counsel's failure to participate in a pre-charging conference with the district attorney.

> **2.** ***CLAIM 88 – Petitioner's Convictions and Death Judgment Must Be Vacated Because State Appellate Counsel Has Uncovered New Evidence that the Prosecution's Key Witness Is a Perjurer***

In Claim 88, Petitioner argues that his conviction and death sentence must be vacated because "newly discovered evidence conclusively demonstrates that the prosecution's key witness is unreliable." (Dkt. No. 317 at 350-52.) Petitioner raised this claim for the first time in state court as claim 5 of his initial state habeas petition. (Dkt. No. 148, Lodgment 4 at 77-78.) The California summarily denied the claim on the merits. (Dkt. No. 1336, Lodgment 3.) He subsequently raised the argument again in claim 60 of his June 2003 exhaustion petition, addition additional arguments that he was denied effective assistance of counsel, an impartial jury, and equal protection. (Dkt. No. 336, Lodgment 9 at 198-99.) The California Supreme Court summarily denied the claim on the merits and, alternatively, found it to be untimely and successive. (Dkt. No. 336, Lodgment 12.)

Respondent argues that Petitioner has failed to meet his burden of showing that the California Supreme Court's denials on the merits amounted to an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. §2254(d); *Pinholster*, 563 U.S. at 181-82.

The "newly discovered evidence" Petitioner cites includes an Information and minute order from Abram's 1989 prosecution for perjury in connection with a

personal injury case in Louisiana. (Dkt. No. 318-2, Exhibits T & U.) Petitioner argues that "[t]his evidence casts fundamental doubt both on the accuracy of Abram's testimony, . . . and on the reliability of the guilt and penalty phase verdicts." (Dkt. No. 317 at 351.) The fact that Abram committed perjury two years after Petitioner's trial in a different case does not amount to a violation of Petitioner's constitutional rights in this matter. The California Supreme Court's decision denying this claim was not objectively unreasonable under clearly established federal law, nor was it an unreasonable determination of the facts under §2254(d). Claim 88 is DENIED.

**J.** **Actual Innocence – CLAIMS 87 & 92– Petitioner is Innocent of First Degree Murder and the Special Circumstance and Facts that Resulted in the Death Verdict**

In Claims 87 and 92, Petitioner argues that he is actually innocent of first degree murder and the special circumstance finding because (1) no reasonable fact-finder would have found he had the mens rea for first degree murder or for the financial gain special circumstance as defined under California law; and (2) the bitemark testimony admitted at trial was unreliable. (Dkt. No. 317 at 347, 357.)

Respondent argues that Petitioner has failed to meet his burden of showing that the California Supreme Court's denials on the merits amounted to an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. §2254(d); *Pinholster*, 563 U.S. at 181-82.

The Supreme Court has assumed that a freestanding innocence claim is cognizable on federal habeas review, but it has noted that "the threshold showing for such an assumed right would necessarily be extraordinarily high." *Herrera v. Collins*, 506 U.S. 390, 417 (1993). Petitioner does not meet this high threshold of proof as the evidence before the state court did not support his contentions that he (1) lacked the mens rea for first degree murder or for the financial gain special circumstance as defined under California law; or (2) the bitemark testimony

187

admitted at trial was unreliable. Petitioner's evidence in support of his claim is much less compelling than that submitted by the petitioner in *Herrera*. *See id.* at 396–98 (denying Herrera's actual innocence claim even though several individuals, including one eyewitness, submitted affidavits claiming that Herrera's brother committed the murders for which Herrera had been convicted). The Supreme Court's denial of Herrera's freestanding innocence claim urges the same result here. The California Supreme Court's dismissal of these claims was therefore not unreasonable under §2254(d). Claims 87 and 92 are DENIED.

## V.     ORDER

For the reasons set forth above, Claims 3, 5, 8, 9, 11-13, 15, 17-39, 41, 43-54, 56-60, 62-67, 69, 70, 84 (in all respects save Petitioner's claim regarding appellate counsel's failure to raise trial counsel's failure to participate in the pretrial penalty evaluation process), and 87-93 are DENIED.

Petitioner omitted Claims 2, 42, 55, 68, 71-83 and 85-86 from the Fourth Amended Petition. They are deemed abandoned.

Claims 1, 4, 6, 7, 10, 14, 16, 40, 61 and the aspect of Claim 84 raising appellate counsel's failure to raise trial counsel's failure to participate in the pretrial penalty evaluation process, are GRANTED. The Court concludes that conflicted counsel provided constitutionally deficient representation during pretrial, guilt and penalty-phase proceedings, denying Petitioner a fair trial, and that the appropriate remedy is a new trial free from the taint which plagued all phases of the original trial.

*//*
*//*
*//*
*//*
*//*
*//*

The judgment of conviction in the matter of *People v. William Noguera*, Case No. C-53691 of the California Superior Court of Orange County, shall be VACATED. The State of California shall, within 120 days, either release petitioner or grant petitioner a new trial.

IT IS SO ORDERED.

Dated: November 17, 2017

*Christine A. Snyder*

CHRISTINA A. SNYDER
United States District Judge